**ORAL ARGUMENT NOT YET SCHEDULED**

## No. 17-7059

_____

### In the

# United States Court of Appeals
# for the District of Columbia Circuit

_____

AMERICAN FREEDOM DEFENSE INITIATIVE;
PAMELA GELLER; and ROBERT SPENCER,
*Plaintiffs-Appellants*,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
("WMATA") and PAUL J. WIEDEFELD, in his official capacity as
General Manager for WMATA,
*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
HONORABLE GLADYS KESSLER
CASE NO. Case No. 1:15-cv-01038-GK

_____

## APPELLANTS' BRIEF

_____

ROBERT JOSEPH MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MICHIGAN 48113
(734) 635-3756

*Counsel for Appellants*

DAVID YERUSHALMI, ESQ.
AMERICAN FREEDOM LAW CENTER
2020 PENNSYLVANIA AVENUE NW
SUITE 189
WASHINGTON, D.C. 20006
(646) 262-0500

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiffs-Appellants American Freedom Defense Initiative, Pamela Geller, and Robert Spencer hereby submit the following certificate pursuant to Circuit Rules 12 and 28(a)(1):

1.     **Parties and Amici.**

The following list includes all parties, intervenors, and amici who have appeared before the district court, and all persons who are parties, intervenors, or amici in this court.

**Plaintiffs-Appellants:**

American Freedom Defense Initiative; Pamela Geller; and Robert Spencer.

**Defendant-Appellee:**

Washington Metropolitan Transit Authority (WMATA); Jack Requa, who was the Interim General Manager and Chief Executive Officer of WMATA at the time this action was filed; he was subsequently replaced by Paul J. Wiedefeld, who is now the permanent General Manager and Chief Executive Officer for WMATA.

2.     **Rulings Under Review.**

Plaintiffs-Appellants are appealing from the Order and associated Memorandum Opinion of U.S. District Court Judge Gladys Kessler entered on March 28, 2017, granting Defendants' Motion for Summary Judgment and denying

i

Plaintiffs' Motion for Summary Judgment.  The Order and Memorandum Opinion appear on the district court's docket at entries 30 and 31, respectively.

**3.     Related Cases.**

The instant case was never previously before this court or any other court, other than the district court from which this case has been appealed.  Plaintiffs-Appellants are not aware of any related cases pending in this or any other court.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

*/s/ David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)

*Counsel for Appellants*

ii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Cir. Rule 26.1, Plaintiff-Appellant American Freedom Defense Initiative, through undersigned counsel, state as follows: the American Freedom Defense Initiative is a nonprofit corporation managed by its board of directors, all of whom are individuals. The American Freedom Defense Initiative has no parent, subsidiary, or affiliated corporation, and no public entity has any ownership interest in the American Freedom Defense Initiative.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq.

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)

*Counsel for Appellants*

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF AUTHORITIES ....................................................................................vi

GLOSSARY OF TERMS ...................................................................................... xiii

INTRODUCTION ....................................................................................................1

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATEMENT OF PERTINENT AUTHORITIES ...................................................3

STATEMENT OF THE CASE..................................................................................3

    A.   Procedural History .................................................................................3

    B.   Statement of Facts .................................................................................4

SUMMARY OF THE ARGUMENT .....................................................................15

STANDARD OF REVIEW ...................................................................................16

DISTRICT COURT'S DECISION.........................................................................16

ARGUMENT .........................................................................................................18

I.    PLAINTIFFS' SPEECH IS ENTITLED TO
    "SPECIAL PROTECTION".......................................................................18

II.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF
    LAW ON THEIR FREE SPEECH CLAIM ...................................................21

    A.   WMATA's Prior Restraint on Protected Speech .................................21

B.     Forum Analysis .................................................................23

C.     Application of the Appropriate Standard .............................31

     1.     WMATA's Speech Restriction Is Content Based ...................31

     2.     WMATA's Speech Restriction Is Viewpoint Based ...............34

     3.     WMATA's Speech Restriction Is Unreasonable .....................41

III.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR EQUAL PROTECTION CLAIM ...................................45

IV.    PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF ...............................................................................46

V.    DEFENDANTS ARE LIABLE FOR VIOLATING PLAINTIFFS' CONSTITUTIONAL RIGHTS .....................................................50

CONCLUSION ...................................................................................54

CERTIFICATE OF COMPLIANCE ....................................................56

CERTIFICATE OF SERVICE ............................................................57

# TABLE OF AUTHORITIES

## CASES

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016)....................................................................48

*Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*,
No. 2:14-5335, 2014 U.S. Dist. LEXIS 164575, (E.D. Pa. Nov. 25, 2014)............22

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
898 F. Supp. 2d 73 (D.D.C. 2012) ........................................10, 18, 21, 22

*Boos v. Barry*,
485 U.S. 312 (1988)............................................................................33

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)............................................................................16

*Brown v. Cal. Dep't of Transp.*,
321 F.3d 1217 (9th Cir. 2003) ............................................................41

*Carey v. Brown*,
447 U.S. 455 (1980)........................................................................21, 46

*Carey v. Piphus*,
435 U.S. 247 (1978)............................................................................53

*Chabad-Lubavitch of Ga. v. Miller*,
5 F.3d 1383 (11th Cir. 1993) ..............................................................28

*Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*,
148 F.3d 242 (3d Cir. 1998)................................................................42

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)............................................................................47

*Cohen v. Cal.*,
403 U.S. 15 (1971)..............................................................................34

*Coleman v. Ann Arbor Transp. Auth.,
947 F. Supp. 2d 777 (E.D. Mich. 2013)....................................................30

Connick v. Myers,
461 U.S. 138 (1983)..................................................................................21

Consolidated Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.,
447 U.S. 530 (1980)..................................................................................32

*Cornelius v. NAACP Legal Def. & Educ. Fund,
473 U.S. 788 (1985) ........................................... 23, 24, 25, 28, 32, 35, 41

DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,
196 F.3d 958 (9th Cir. 1999) ....................................................................28

Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.,
239 F.R.D. 9 (D.D.C. 2006)......................................................................51

*Elrod v. Burns,
427 U.S. 347 (1976)..................................................................................46

Erznoznik v. City of Jacksonville,
422 U.S. 205 (1975)..................................................................................34

Ex Parte Young,
209 U.S. 123 (1908)..................................................................................54

*Forsyth Cnty. v. Nationalist Movement,
505 U.S. 123 (1992)..............................................................................33, 40

Good News Club v. Milford Cent. Sch.,
533 U.S. 98 (2001)....................................................................................38

Gregoire v. Centennial Sch. Dist.,
907 F.2d 1366 (3d Cir. 1990).....................................................................26

Hague v. CIO,
307 U.S. 496 (1939)..................................................................................24

vii

*Hamilton v. Geithner*,
666 F.3d 1344 (D.C. Cir. 2012) ............................................................16

*Headen v. Wash. Metro. Area Transit Auth.*,
741 F. Supp. 2d 289 (D.D.C. 2010) .......................................................51

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Bos.*,
515 U.S. 557 (1995) ..............................................................................16

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
685 F.3d 1066 (D.C. Cir. 2012) ........................................................24, 49

*James v. Wash. Metro. Area Transit Auth.*,
649 F. Supp. 2d 424 (D. Md. 2009) .......................................................51

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ..........................................................................34, 35

*\*Lebron v. Wash. Metro. Transit. Auth.*,
749 F.2d 893 (D.C. Cir. 1984) ..........................................................18, 22

*\*Lebron v. Wash. Metro. Area Transit Auth.*,
665 F. Supp. 923 (D.D.C. 1987) ......................................................6, 50, 51

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974) ..............................................................................27

*Lewis v. Wilson*,
253 F.3d 1077 (8th Cir. 2001) ...............................................................33

*Lucero-Nelson v. Wash. Metro. Area Transit Auth.*,
1 F. Supp. 2d 1 (D.D.C. 1998) ...............................................................51

*\*Matal v. Tam*,
No. 15-1293, 2017 U.S. LEXIS 3872, (U.S. June 19, 2017) ...............18, 19, 20, 33

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) ..............................................................................37

*Mo. v. Jenkins*,
491 U.S. 274 (1989)........................................................................53

*\*Monell v. N.Y. Dep't of Social Servs.*,
436 U.S. 658 (1978)...................................................................51, 52

*NAACP v. Button*,
371 U.S. 415 (1963)........................................................................39

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)...................................................................18, 21

*\*NAACP v. City of Phila.*,
39 F. Supp. 3d. 611 (E.D. Pa. 2014)...............................................43

*\*NAACP v. City of Phila.*,
834 F.3d 435 (3d Cir. 2016)...........................................................43

*\*N.Y. Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998)...............................................22, 31, 46

*Nieto v. Flatau*,
715 F. Supp. 2d 650 (E.D.N.C. 2010) .............................................26

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993)........................................................................47

*People Against Police Violence v. City of Pitt.*,
520 F.3d 226 (3d Cir. 2008)...........................................................48

*\*Perry Educ. Ass'n v. Perry Local Educators*,
460 U.S. 37 (1983) ............................................... 25, 28, 31, 32, 35, 41

*Pitt. League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
653 F.3d 290 (3d Cir. 2011)............................................................35

*Plater v. Dist. of Columbia Dep't of Transp.*,
530 F. Supp. 2d 101 (D.D.C. 2008).................................................51

ix

*Police Dep't of the City of Chi. v. Mosley,*
408 U.S. 92 (1972) ............................................................................45, 46

*R.A.V. v. St. Paul,*
505 U.S. 377 (1992) ................................................................................32

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ....................................................................29

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995)..................................................32, 34, 35, 36, 39

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002) .................................................................41

Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,
502 U.S. 105 (1991).................................................................................34

Se. Promotions, Ltd. v. Conrad,
420 U.S. 546 (1975).................................................................................26

S.O.C., Inc. v. Cnty. of Clark,
152 F.3d 1136 (9th Cir. 1998) ...............................................................32

Stromberg v. Cal.,
283 U.S. 359 (1931)................................................................................18

Tapp v. Wash. Metro. Area Transit Auth.,
No. 15-cv-0768 (KBJ), 2016 U.S. Dist. LEXIS 135747,
(D.D.C. Sept. 30, 2016) .........................................................................51

*United Food & Commercial Workers Union Local 1099 v. Sw. Ohio Reg'l Transit
Auth.,*
163 F.3d 341 (6th Cir. 1998) ..............................................22, 26, 40

*United States v. Griefen*,
200 F.3d 1256 (9th Cir. 2000) ..............................................................30

x

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953)...........................................................................46

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989)...................................................................51, 52, 54

**Statutes**

15 U.S.C. § 1502(a) ...........................................................................19

28 U.S.C. § 1291 .................................................................................2

28 U.S.C. § 1331 .................................................................................1

42 U.S.C. § 1983 .............................................3, 50, 51, 52, 53, 54

42 U.S.C. § 1988...................................................................10, 53

*D.C. Code § 9-1107.01 .................................................4, 6, 50, 53, 54

**Other**

https://www.wmata.com/about/business/advertising.cfm ..........................................5

http://www.wmata.com/Images/Mrel/MF_Uploads/GMCEO-PD.pdf ....................7

_____

\* Authorities on which we chiefly rely are marked with asterisks.

xi

# GLOSSARY OF TERMS

| AFDI | American Freedom Defense Initiative |
|------|-----------------------------------|
| WMATA | Washington Metropolitan Area Transit Authority |
| | |
| | |
| | |

## INTRODUCTION

This case challenges Defendants-Appellees' (collectively referred to as "WMATA") prior restraint on Plaintiffs-Appellants' ("Plaintiffs") speech. The principle issue presented is whether WMATA may target Plaintiffs' speech for censorship by issuing a temporary "moratorium" on the display of certain advertisements on its property *following the submission of Plaintiffs' ads* so as to prevent the display of these ads and then formalizing the censorship by way of a resolution that purportedly changed the regulations on advertising. As a result of the "moratorium" and resolution,[1] which are content- and viewpoint-based restrictions on speech, WMATA has refused to display Plaintiffs' ads, and this refusal continues today.

## JURISDICTIONAL STATEMENT

On July 1, 2015, Plaintiffs filed their Complaint challenging WMATA's speech restrictions under the First and Fourteenth Amendments. (R-1; JA-10-19[Compl.]). The District Court had jurisdiction under 28 U.S.C. § 1331.

Pursuant to the District Court's scheduling order (R-28), on August 5, 2016, WMATA filed a motion for summary judgment, (R-19), and on September 5,

---

[1] The November 19, 2015 resolution is at issue in this litigation. Not only is it the continuation of the constitutional harm caused initially by the temporary "moratorium," WMATA itself introduced the resolution into this litigation, making it part of its motion for summary judgment and arguing that it is the basis for denying Plaintiffs relief in this case. (R-19-1[Defs.' Mem. at 8-11]).

2016, Plaintiffs' filed their response and cross-motion for summary judgment (R-20; R-21).   On October 23, 2015, WMATA filed its opposition to Plaintiffs' motion.  (R-25).  The parties subsequently filed their corresponding replies.  (R-27; R-29).

On March 28, 2017, the District Court entered its Order (R-30; JA-142-43) and Memorandum Opinion (R-31; JA-144-60) granting WMATA's motion for summary judgment and denying Plaintiffs' cross-motion for summary judgment.

On April 7, 2017, Plaintiffs timely filed their Notice of Appeal.   (R-32). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether WMATA may target Plaintiffs' speech for censorship by issuing a temporary "moratorium" on the display of certain advertisements on its property following the submission of Plaintiffs' ads so as to prevent the display of these ads and then formalizing the censorship by way of a resolution that purportedly changed the regulations on advertising.

II.     Whether Plaintiffs' challenge to WMATA's rejection of their ads under the advertising regulations existing at the time Plaintiffs submitted the ads—regulations that permitted the display of issue-oriented advertising—is moot as a result of the "moratorium" and subsequent resolution that purportedly changed the regulations.

III.     Whether Plaintiffs were entitled to summary judgment on their constitutional claims arising under the First and Fourteenth Amendments.

IV.     Whether WMATA is immune from suit under 42 U.S.C. § 1983 such that Plaintiffs are not entitled to nominal damages should they prevail on their constitutional claims.

## STATEMENT OF PERTINENT AUTHORITIES

All relevant portions of any pertinent statute or regulation cited by Plaintiffs are set forth in the body of this brief.

## STATEMENT OF THE CASE

### A.     Procedural History.

On July 1, 2015, Plaintiffs filed their Complaint challenging WMATA's speech restrictions under the First and Fourteenth Amendments.  Plaintiffs alleged that WMATA's restrictions are content- and viewpoint-based and that its true purpose for adopting the restrictions at issue was to silence the viewpoint expressed by Plaintiffs' ads in violation of the First Amendment.  Additionally, Plaintiffs alleged that WMATA deprived them of the equal protection of the law by preventing Plaintiffs from expressing a message based on its content and viewpoint, thereby denying the use of a forum to those whose views WMATA finds unacceptable in violation of the Fourteenth Amendment.  (R-1; JA-

17[Compl. ¶¶ 33-34, 37]).  Plaintiffs sought declaratory and injunctive relief and nominal damages.  (R-1; JA-18[Compl., Prayer for Relief]).

On March 28, 2017, the District Court granted WMATA's motion for summary judgment and denied Plaintiffs' cross-motion for summary judgment.  (R-30; JA-142-43[Order]; R-31; JA-144-60[Mem. Op.]).  This appeal follows.

### B.    Statement of Facts.

Plaintiff AFDI is a nonprofit organization incorporated under the laws of New Hampshire.  Plaintiff Geller is the President, and Plaintiff Spencer is the Vice President.  AFDI is dedicated to promoting and protecting the right to freedom of speech under the First Amendment.  Plaintiffs frequently purchase advertising space on transit authority property in major cities throughout the United States, including Washington, D.C., to promote their message on current events and public issues, including issues involving the suppression of free speech.  (R-31; JA-145[Mem. Op. at 2]).

WMATA is a government agency that was established through a congressionally approved interstate compact to provide public transportation in the Washington D.C. metropolitan area.   D.C. Code § 9-1107.01 ("WMATA Compact").  WMATA leases space on its property, including its Metrobuses and free-standing dioramas inside its subway stations, for use as advertising space.  (R-31; JA-146[Mem. Op. at 3]).  According to WMATA's website:

> Metro provides a unique opportunity to reach the out-of-home market in the Washington metropolitan area. The Metrobus and Metrorail system covers all of the District of Columbia and the suburbs of Maryland and Northern Virginia. Exterior bus advertising penetrates 90% of the daily population and makes multiple impressions all over the region, throughout business districts, residential areas, and tourist attractions. Advertising in the Metrorail system provides an opportunity to target business executives, federal employees, students, and tourists. Advertising displays are available on the sides, backs, and interiors of Metrobuses. In the Metrorail system, backlighted advertising displays and two-sheet poster displays are available in Metro stations. Advertising space is also available inside rail cars.

(R-20-2; JA-41, 46[Geller Decl. ¶ 8, Ex. A (WMATA advertising webpage)]; *see also* https://www.wmata.com/about/business/advertising.cfm (last visited July 17, 2017)).

Since the 1970's, WMATA has permitted a wide array of commercial and non-commercial advertising on its advertising space. (R-20-3; JA-67, 81[Muise Decl. ¶ 2, Ex. A (Bowersox Dep. at 38:21-25 to 39:1)] (hereinafter "Bowersox Dep.")). Indeed, "as the seat of the federal government, the D.C. market is distinct in the amount of issue oriented advertising." (R-20-3; JA-79[Bowersox Dep. at 30:3-11]).

"[O]n an annual basis [WMATA's] issue oriented advertising sales have been as high as 40 percent in the years 2008-2009, but average approximately 10 to 12 percent of sales, 16 million in revenue." (R-20-3; JA-79[Bowersox Dep. at 30:12-17]). WMATA's operating budget is approximately $1.8 billion annually, of which roughly $700 to $800 million comes back through fare revenue; the

shortfall is made up through tax revenues.  (R-20-3; JA-80-81[Bowersox Dep. at 36:10-12, 24-25 to 37:1-10]).  On an annual basis, WMATA is <u>not</u> profitable.  (R-20-3; JA-80[Bowersox Dep. at 36:3-4]).

Since September 2012, AFDI has contracted for advertising space in the Metro system eight (8) distinct times, running six (6) distinct sets of copy.  The total value of these eight contracts was $65,200.  (R-20-3; JA-68, 109[Muise Decl. ¶ 7, Ex. F ("History with AFDI Advertising")]).  "The value of this new contract [*i.e.*, the contract for Plaintiffs' ads at issue here] is $20,500 for 4 weeks." (R-20-3; JA-68, 109[Muise Decl. ¶ 7, Ex. F ("History with AFDI Advertising")]).

Section 80 of the WMATA Compact provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function."  D.C. Code § 9-1107.01(80).  WMATA's leasing of its advertising space is a proprietary function.  D.C. Code § 9-1107.01(80); *Lebron v. Wash. Metro. Transit Auth.*, 665 F. Supp. 923, 935 (D.D.C. 1987).

Jack Requa was the Interim General Manager and Chief Executive Officer of WMATA at the time this action was filed; he was subsequently replaced by Paul J. Wiedefeld, who is now the permanent General Manager and Chief Executive Officer for WMATA.  (R-20-3; JA-78[Bowersox Dep. at 26:25 to 27:1-14]).  The General Manager and Chief Executive Officer for WMATA is responsible for

"[a]dminister[ing] and interpret[ing]" WMATA's policies, including WMATA's advertising policies used to censor Plaintiffs' speech in this case. (R-20-3; JA-68, 103[Muise Decl. ¶ 6, Ex. E (posted job description found at http://www.wmata.com/Images/Mrel/MF_Uploads/GMCEO-PD.pdf)]).

On <u>May 20, 2015</u>, Plaintiffs submitted to WMATA's advertising agent the ads at issue here. As part of this submission, Plaintiffs stated that they "wish to submit the following ad to run on 20 Washington DC buses and 5 DC Dioramas including Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station (if available)." (R-20-2; JA-42-43, 52-54[Geller Decl. ¶¶ 13, 17, Ex. D (email with WMATA ad agent)]).

The proposed ad for display on WMATA's buses appears as follows:



(R-20-2; JA-42, 48[Geller Decl. ¶ 14, Ex. B (bus ad)]).

The proposed ad for display on WMATA's dioramas appears as follows:



(R-20-2; JA-43, 50[Geller Decl. ¶ 15, Ex. C (diorama ad)]).

On May 22, 2015, WMATA's advertising agent responded to Plaintiffs' submission request, stating, in relevant part, "The copy has been submitted to the transit authority.  We are also looking into available inventory.  I will let you know about both as soon as I hear back."  (R-20-2; JA-43, 52-54[Geller Decl. ¶ 17, Ex. D (email with WMATA ad agent)]).  Plaintiffs' ads were received by WMATA on May 22, 2015.  (R-20-3; JA-77[Bowersox Dep. at 21:1-3; R-20-2; JA-43, 52-54[Geller Decl. ¶ 17, Ex. D (email with WMATA ad agent)]).

At the time Plaintiffs submitted the ads, WMATA leased its space for a wide array of political, religious, public-issue, public-service, and commercial advertisements, including advertisements expressing controversial views and addressing controversial issues.  (R-20-2; JA-41-42[Geller Decl. ¶¶ 9-11]; R-20-3; JA-81[Bowersox Dep. at 38:21-25 to 39:1]).  Consequently, at the time Plaintiffs submitted the ads, WMATA's advertising space was a public forum for Plaintiffs'

- 8 -

speech.  (R-31; JA-152[Mem. Op. at 9] ["WMATA does not dispute this assertion."]).  Moreover, at the time Plaintiffs submitted the ads, the ads complied with WMATA's policy—in other words, there was no reason to reject Plaintiffs' ads.  (R-20-3; JA-75-76[Bowersox Dep. at 16:23-25 to 17:1-8 (conceding that Plaintiffs' ads were compliant with WMATA policy and that there was "no reason to reject" the ads at the time)]).  And at the time Plaintiffs submitted the ads, there was known availability for their placement.  (R-20-3; JA-68, 109-10[Muise Decl. ¶ 7, Ex. F ("History with AFDI Advertising")]).

The submission of Plaintiffs' ads was the moving force ("the straw that broke the camel's back") that prompted WMATA to draft a motion for the executive session of the May 28, 2015 Board meeting that would impose a temporary "moratorium" on "issue-oriented" ads so that Plaintiffs' ads would not run.  (R-20-3; JA-82[Bowersox Dep. at 49:10-21 (conceding that Plaintiffs' ads were "the straw that broke the camel's back")]).

Contemporaneous with the submission of Plaintiffs' ads, WMATA prepared a memorandum which suggested a change in policy that would restrict Plaintiffs' ads.  (R-20-3; JA-76-77[Bowersox Dep. at 19:3-23, 21:9-22] R-20-3; JA-68, 109-10[Muise Decl. ¶ 7, Ex. F ("History with AFDI Advertising") (referencing policy change of "MTA/NY" that would "ban[] both religious and political ads," and stating, "[t]he question then becomes if AFDI's ads can always be defined as

religious ads?")]).  Prior to suggesting a policy change, the then-WMATA Board Chairman, Mr. Mort Downey, sent an email to Ms. Lynn M. Bowersox, the assistant general manager for customer service, communications, and marketing, regarding Plaintiffs' ads, in which Mr. Downey is reacting to a news article about the ads and directs Ms. Bowersox to be prepared to discuss the matter with the Board on May 28, to which Ms. Bowersox responded, "we are."  (R-20-3; JA-77[Bowersox Dep. at 23:1-25 to 24:1-10]; R-20-3; JA-68, 112-16[Muise Decl. ¶ 7, Ex. G (email between Downey and Bowersox)]).

On May 28, 2015, which was the first opportunity following the submission of Plaintiffs' ads, the WMATA Board held an executive session to put in place a "moratorium" on "issue-oriented" ads—a "moratorium" that would be used to halt the display of Plaintiffs' ads.[2]  (R-20-3; JA-78[Bowersox Dep. at 26:3-21]; *see also* R-20-2; JA-43-44, 56-57, 59-60[Geller Decl. ¶¶ 18-21, Exs. E (meeting transcript), F (agenda)]; R-20-3; JA-68-69, 109-10[Muise Decl. ¶¶ 7-9, Exs. F ("History with AFDI Advertising"), G (email between Downey and Bowersox), H (meeting schedule)]).  Following the submission of Plaintiffs' ads, the recommendation that

---

[2] The parties have a contentious history.  In 2012, WMATA tried to delay the display of Plaintiffs' ad, but the court held that the delay violated the First Amendment and enjoined WMATA's speech restriction.  *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73 (D.D.C. 2012) (granting injunction for violating the First Amendment) ("*AFDI v. WMATA I*").  As a result of this decision, WMATA agreed to settle Plaintiffs' claim for attorneys' under 42 U.S.C. § 1988 by paying Plaintiffs' counsel $35,000.  (R-20-3; JA-69, 120-21[Muise Decl. ¶ 11, Ex. I (email confirming agreement)]).

Ms. Bowersox was preparing for the WMATA Board of Directors was to change its policy on a temporary basis so as to suspend the acceptance of "issue-oriented" advertising.  (R-20-3; JA-80[Bowersox Dep. at 33:3-7]; *see also* R-20-3; JA-68, 100, 112-16[Muise Decl. ¶¶ 5, 7 Exs. D (motion), G (email between Downey and Bowersox)]).

Despite the unprecedented nature of this "moratorium" and its negative impact on revenue, the proposal was made verbally at the executive session with little discussion.  (R-20-3; JA-84-85[Bowersox Dep. at 60:25 to 61:1-23]).  While no formal vote is taken at an executive session, there appeared to be a consensus among the members at the time that the motion would pass during the open meeting.  (R-20-3; JA-86[Bowersox Dep. at 67:2-13]).

During the May 28, 2015 Board meeting, the motion was raised as the last item.  (R-20-3; JA-86[Bowersox Dep. at 67:14-17]; R-20-3; JA-67, 94-95[Muise Decl. ¶ 3, Ex. B (meeting transcript)]).  The "moratorium" proposal was not on the Board's agenda for the meeting that evening.  (R-20-3; JA-86[Bowersox Dep. at 65:17-25 to 66:1-10]; R-20-2; JA-43-44, 59-60[Geller Decl. ¶ 19, Ex. F (agenda)]).  The Board voted unanimously to approve the motion, thereby imposing a temporary "moratorium" on "issue-oriented" ads.  (R-20-3; JA-85[Bowersox Dep. at 61:24-25 to 62:1-3]; *see also* R-20-2; JA-43[Geller Decl. ¶ 18]; R-19-3; JA-32, 34[Bowersox Aff. ¶ 3, Ex. A (motion)]).

Prior to approving the motion, WMATA had no specific information that the display of Plaintiffs' ads would result in disruption or violence directed at WMATA, its property, or its passengers. (R-20-3; JA-89, 92[Bowersox Dep. at 102:1-24 (citing "generic" concerns, but nothing "specific"); 120:2-7 (referencing 6 or 7 complaints, none of which threatened violence)]).

During the May 28, 2015 public meeting, the Board appeared confused in terms of how to present and approve the proposed "moratorium" motion, questioning its procedural propriety. (R-20-3; JA-87-88[Bowersox Dep. at 71:14-25 to 74:1-13 (transcription of recording of Board meeting)]; R-20-3; JA-67, 94-95[Muise Decl. ¶ 3, Ex. B (meeting transcript)]). There was very little discussion of the motion prior to the Board approving it unanimously, despite the unprecedented nature of the "moratorium." (R-20-3; JA-87-88[Bowersox Dep. 71:25 to 75:1-15]; *see also* R-20-3; JA-67, 94-95[Muise Decl. ¶ 3, Ex. B (meeting transcript)]). Thus, because WMATA was determined to not display Plaintiffs' ads, the Board took the unprecedented step of approving a motion that "directs management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious, and advocacy advertising until the end of the calendar year." (R-19-3; JA-32, 34[Bowersox Aff. ¶ 3, Ex. A (motion)]; R-20-3; JA-68, 100, 109-10, 112-16[Muise Decl. ¶¶ 5, 7 Ex. D (motion), Ex. F ("History with AFDI Advertising), Ex. G (email between

Downey and Bowersox)]).  The proposed motion (marked Bates # 10 and produced by WMATA) *had printed on it "Approved Unanimously May 22, 2015"; yet, the meeting to consider it was not scheduled to take place until <u>May 28, 2015</u>, and, as noted, this motion was not on the Board's published agenda.*  (R-20-3; JA-68, 100[Muise Decl. ¶ 5, Ex. D (motion)]).  It wasn't until the executive session held just prior to the Board meeting that the "moratorium" motion was presented to the members of the Board.  In other words, this was the first time the Board received the suggestion.  (R-20-3; JA-84-85[Bowersox Dep. at 60:15-25 to 62:1-3]; *see also* R-20-3; JA-68, 112-16[Muise Decl. ¶ 7, Ex. G (email between Downey and Bowersox)]).

The approval of this unprecedented "moratorium" fundamentally altered (temporarily) the way WMATA had been doing business for many decades.  (R-20-3; JA-81[Bowersox Dep. at 38:1-4, 17-25 to 39:1 (testifying that since the "70's" WMATA has leased advertising space on its property for public issue ads)]).  Based on this "moratorium," WMATA rejected Plaintiffs' ads.  (R-20-2; JA-44[Geller Decl. ¶ 21]).

On November 19, 2015, WMATA passed a resolution, stating, *inter alia*, "9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."; "11.  Advertisements that support or oppose any political party or candidate are prohibited."; "12.

Advertisements that support or oppose any religion, religious practice or belief are prohibited."; and "13. Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertisers are prohibited." (R-19-3; JA-32-33, 35-38[Bowersox Aff. ¶ 5, Ex. B (resolution)]).

Plaintiffs' ads were the moving force behind the approval of the "moratorium" and subsequent adoption of the resolution. (R-20-3; JA-82[Bowersox Dep. at 49:10-21 (conceding that Plaintiffs' ads were "the straw that broke the camel's back")]).

"There was no reason" for WMATA to reject Plaintiffs' ads when they were submitted on May 20, 2016. (R-20-3; JA-90[Bowersox Dep. at 107:4-16]). WMATA refused to display Plaintiffs' ads then, and it continues to refuse to do so today. (R-20-3; JA-44[Geller Decl. ¶ 23] R-20-3; JA-90[Bowersox Dep. at 107:17-25 to 108:1-17]).

WMATA rejected Plaintiffs' ads because it claims that the ads "advocate[] free speech." (R-20-3; JA-90[Bowersox Dep. at 107:17-25 to 108:1-17]).

There are no objective criteria under the new policy for determining whether an ad should be permitted. (R-20-3; JA-91[Bowersox Dep. at 113:23-25 to 115:1-9] ("I try to view it on a case-by-case basis."); *see also* R-19-3; JA-32-33, 35-38[Bowersox Aff. ¶ 5, Ex. B (resolution)]).

Plaintiffs want to display their ads on WMATA property, and they wanted to do so when the ads were originally submitted, but WMATA refuses, causing Plaintiffs irreparable harm.  (R-20-3; JA-44[Geller Decl. ¶ 23]).

## SUMMARY OF THE ARGUMENT

Because WMATA's speech restriction operates as a prior restraint, WMATA carries a heavy burden of showing justification for the imposition of such a restraint—a burden which it cannot carry.

Additionally, changes to a forum motivated by discrimination against a speaker or her message are impermissible under the First Amendment.  Because WMATA's "moratorium" and subsequent resolution were designed to prevent Plaintiffs' disfavored speech, the federal courts are capable of taking prompt and measurably appropriate action to remedy this First Amendment violation.  Indeed, the "moratorium" and resolution, facially and as applied, are content- and viewpoint-based restrictions that violate the First Amendment.

Pursuant to clearly established law, the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury sufficient to warrant injunctive relief.  And the voluntary cessation of illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways.  Thus, along with its power to hear the case, the Court's power to grant injunctive relief survives discontinuance of the challenged conduct.

Additionally, Plaintiffs are entitled to nominal damages for the past loss of their constitutional rights as a matter of law.

In sum, WMATA seeks to escape all liability for violating Plaintiffs' right to free speech.  This Court should reject such a proposition, which would leave the government free to violate the First Amendment with impunity by issuing hasty "moratoriums" to prevent disfavored speech.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012).  And because this case implicates First Amendment rights, the Court must closely scrutinize the record without *any* deference to the District Court.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Bos.*, 515 U.S. 557, 567 (1995) (requiring courts to "conduct an independent examination of the record as a whole, without deference to the trial court" in cases involving the First Amendment); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (same).

## DISTRICT COURT'S DECISION

The District Court granted WMATA's motion for summary judgment.  In its decision, the court noted that "[t]he Parties do not dispute that Plaintiffs' ads are protected speech."  (R-31; JA-150[Mem. Op. at 7]).  However, the court concluded that for purposes of its analysis, the forum at issue was a nonpublic forum.  (R-31;

JA-150-52[Mem. Op. at 7-9]).  The court was dismissive of the fact that when Plaintiffs submitted their ads, the forum was a public forum.  (R-31; JA-152[Mem. Op. at 9] ["Plaintiffs contend that WMATA's advertising space was a designated public forum at the time they submitted their ads. . . .  WMATA does not dispute this assertion."]).  Similarly, the court found that WMATA's unprecedented policy change that coincided precisely with the submission of Plaintiffs' ads presented no constitutional concerns.  (R-31; JA-152-56[Mem. Op. at 9-13]).

Having found that the applicable forum was nonpublic, the court proceeded to hold that WMATA's restriction on Plaintiffs' speech was viewpoint neutral (R-31; JA-152-56[Mem. Op. at 9-13]) and reasonable (R-31; JA-156-58[Mem. Op. at 13-15]).  The court also concluded that WMATA's restriction was not unconstitutionally vague.  (R-31; JA-158-59[Mem. Op. at 15-16]).  The court further stated in a footnote that "[t]o the extent that Plaintiff (sic) brings their claims under WMATA's pre-May 28, 2015 policy which permitted the publication of issue-oriented ads on WMATA's property, WMATA's May 28 Moratorium mooted any such claim."  (R-31; JA-153[Mem. Op. at 10 n.1]).  Finally, the court concluded in a footnote that because it found that WMATA was not liable, "Plaintiffs are not entitled to nominal damages and the Court need not reach the issue of whether WMATA posseses (sic) sovereign immunity."  (R-31; JA-159[Mem. Op. at 16 n.3]).

- 17 -

## ARGUMENT

## I. PLAINTIFFS' SPEECH IS ENTITLED TO "SPECIAL PROTECTION."

It is indisputable that the First Amendment protects Plaintiffs' right to freedom of speech from infringement by government actors such as WMATA and its officials. *AFDI v. WMATA I*, 898 F. Supp. 2d at 76 ("WMATA . . . . does not deny that it is a government actor to which the First Amendment applies."); *Lebron v. Wash. Metro. Area Transit Auth.,* 749 F.2d 893, 896 (D.C. Cir. 1984).

As the Supreme Court noted, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citations omitted); *Stromberg v. Cal.,* 283 U.S. 359, 369 (1931) (observing that "free political discussion" is "essential to the security of the Republic" and "a fundamental principle of our constitutional system"). And this is particularly true when the speaker is wishing to express a political viewpoint in Washington, D.C.—"the seat of the federal government." (R-20-3; JA-79[Bowersox Dep. at 30:3-11]).

The breadth of protection provided by the First Amendment was on full display in *Matal v. Tam*, No. 15-1293, 2017 U.S. LEXIS 3872 (U.S. June 19, 2017). In *Matal*, Simon Tam, the lead singer of the rock group, "The Slants," sought federal registration of the mark "THE SLANTS." The Patent and Trademark Office denied the application under a Lanham Act provision that

prohibited the registration of trademarks that may "disparage . . . or bring . . . into contemp[t] or disrepute" any "person, living or dead." 15 U.S.C. § 1502(a). Tam appealed the denial of the registration through the administrative appeal process, to no avail. He then filed an action in federal court, where the *en banc* Federal Circuit ultimately held that the disparagement clause was facially unconstitutional that the provision engages in viewpoint-based discrimination. *See Matal*, 2017 U.S. LEXIS 3872, at *16-17. The Supreme Court affirmed unanimously, stating: "We now hold that this provision violates the Free Speech Clause of the First Amendment. It offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend."[3] *Id.* at *9.

Justice Kennedy's concurrence (joined by Justices Ginsburg, Sotomayor, and Kagan) is particularly relevant. He begins by affirming the Court's decision and explaining his further treatment of the First Amendment issue. *See id*. at *41-42 (Kennedy, J., concurring): ("This separate writing explains in greater detail why the First Amendment's protections against viewpoint discrimination apply to the trademark here. It submits further that the viewpoint discrimination rationale renders unnecessary any extended treatment of other questions raised by the

---

[3] The case at bar does not involve government speech, government subsidies, nor a government program. Consequently, those portions of the Supreme Court's decision addressing these issues are not relevant here. *See, e.g., Matal*, 2017 U.S. LEXIS 3872, at *22-23.

parties.").[4]   In his concurrence, Justice Kennedy lays bare the Government's argument that the speech restriction is viewpoint neutral:

> The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side.  *It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses*. . . .  The Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience.  The Court has suggested that viewpoint discrimination occurs when the government intends to suppress a speaker's beliefs, . . . but viewpoint discrimination need not take that form in every instance.  The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. . . .  *The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message*.

*Id*. at *43-46 (Kennedy, J., concurring) (emphasis added).

Plaintiffs' ads make the point that our First Amendment freedoms will not yield to those who want to enforce so-called blasphemy laws (*i.e.*, prohibitions on speech mandated by religious law), whether through threats of violence or through the actions of complicit government officials who willingly yield to political correctness.  WMATA's actions confirm the critical importance of this message and demonstrate the bitter irony of this case: The "issue" WMATA wants to censor here is "free speech."  (*See* R-20-13; JA-90[Bowersox Dep. at 108:12-15 ("But I

---

[4] As discussed further in the text above, the "viewpoint discrimination rationale" here "renders" largely "unnecessary any extended treatment of other questions" raised by the parties.

believe that this ad would come under advocacy because it advocates free speech and it does not try to sell you a commercial product.")]).

As stated by the Supreme Court, "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Claiborne Hardware Co.*, 458 U.S. at 913 (1982) & *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Because WMATA unlawfully censored Plaintiffs' speech—speech which is entitled to "*special protection*"—Plaintiffs are entitled to judgment in their favor.

## II.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR FREE SPEECH CLAIM.

A free speech claim is typically examined in three steps.  First, the Court must determine whether the speech in question is protected speech.  Second, the Court must conduct an analysis as to the forum in question to determine the proper constitutional standard to apply.  And third, the Court must then determine whether the speech restriction comports with the applicable standard.  *AFDI v. WMATA I*, 898 F. Supp. 2d at 78-79 (applying three-step analysis).

### A.    WMATA's Prior Restraint on Protected Speech.

The first question is easily answered.  Conveying a "free speech" message with signs posted on the advertising space of government transit authorities constitutes speech protected by the First Amendment.  *See AFDI v. WMATA I,* 898

F. Supp. 2d at 79 (concluding that the proposed advertisement was protected speech); *Lebron,* 749 F.2d at 896 (same); *N.Y. Magazine v. Metro. Transp. Auth.,* 136 F.3d 123, 130 (2d Cir. 1998) (same); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (same) (hereinafter "*United Food*"); *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.* ("SEPTA"), No. 2:14-5335, 2014 U.S. Dist. LEXIS 164575, at *8 (E.D. Pa. Nov. 25, 2014) ("[T]he advertisement at issue here is exactly the sort of political expression that lies at the heart of the First Amendment."). WMATA concedes this point. (R-31; JA-150[Mem. Op. at 7 ("The Parties do not dispute that Plaintiffs' ads are protected speech.")]).

Moreover, WMATA's restriction on Plaintiffs' speech operates as a prior restraint. *Lebron,* 749 F.2d at 896 (holding that the refusal to display the poster "because of its content is a clearcut prior restraint"). Consequently, "WMATA carries a heavy burden of showing justification for the imposition of such a restraint." *Id*. (internal quotations and citation omitted); *AFDI v. WMATA I*, 898 F. Supp. 2d at 79 ("WMATA imposed a prior restraint because it prevented Plaintiffs from displaying their ad in WMATA stations; a prior restraint 'bear[s] a heavy presumption against its constitutional validity.'") (citation omitted). The District Court failed to address the prior restraint aspect of this case.

Here, WMATA cannot carry the "heavy burden of showing justification for the imposition of such a restraint."

**B.     Forum Analysis.**

"The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985). Forum analysis has traditionally divided government property into three general categories: traditional public forums, designated public forums, and nonpublic forums.[5] *Cornelius,* 473 U.S. at 800. Once the forum is identified,

---

[5] The courts have also referred to a "limited public forum." However, as WMATA noted in its memorandum, nonpublic and limited public forums are often used interchangeably since the same standard is typically applied to both. (*See* R-19-1 [Defs.' Mem. at 10, n.1]). Unfortunately, this blurred and confused distinction, which results in the blending of the two forums, is a mistake, and it operates in a way that favors the government and disfavors the First Amendment. For example, a federal courtroom is clearly a nonpublic forum—its characteristics are significantly different and thus distinguishable from a government transit authority's advertising space in which the government allows some private speakers but prohibits others based on the message they are conveying (here, for example, WMATA is trying to exclude speech which is entitled to "special protection" ["issue-oriented" speech] in favor of speech that has less political importance ["commercial" speech]). To argue that the two forums should be treated the same under the law is to treat the First Amendment as a simple inconvenience for the government rather than a fundamental liberty interest that is the foundation of our constitutional Republic. A limited public forum (a forum in which the government allows some speech), such as a transit authority's advertising space, should be treated as a subcategory of a designated public forum, applying the heightened standard for that forum, rather than as a nonpublic forum

---

the court must then determine whether the speech restriction is justified by the requisite standard. *Id.*

On one end of the spectrum lies the traditional public forum. Traditional public forums, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). This forum is not implicated here.

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity. As the Supreme Court stated, "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."[6] *Cornelius*, 473 U.S. at 802.

---

in which free speech takes a back seat (on the metro bus, to complete the metaphor). Consider further the situation involving interior postal sidewalks at issue in *Initiative and Referendum Institute v. United States Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012). There, this Court held that the sidewalks were a nonpublic forum. However, it is implausible to argue that the government could permit someone to use those sidewalks to solicit a sale of goods (commercial speech) but not solicit signatures for a referendum (political speech), demonstrating further why WMATA's advertising space should be treated as a public forum.

[6] Note that under this definition, a government transit authority's advertising space, which is open to *certain speakers* (those who are willing to pay for

A designated public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To discern the government's intent, courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id*. In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny. *Id.* at 800 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . .").

At the opposite end of the spectrum is the nonpublic forum. The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 46 (1983). In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id*. Thus, even in a nonpublic forum,

---

advertisements), is a designated public forum. *See also supra* n.5. Thus, to distinguish based on content (permitting commercial messages but prohibiting "issue-oriented" messages), requires the government to satisfy strict scrutiny. The government could convert the designated public forum into a nonpublic forum by shutting down *all* speech, but that is not what WMATA is trying to do here.

a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id*.; *see e.g., Nieto v. Flatau*, 715 F. Supp. 2d 650 (E.D.N.C. 2010) (holding that a speech restriction on a military base, a nonpublic forum, was viewpoint based in violation of the First Amendment).

Moreover, as the Supreme Court warned, "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Consequently, "the definition of the standards for inclusion and exclusion must be unambiguous and definite." *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1375 (3d Cir. 1990). And the reason for this is evident: "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food*, 163 F.3d at 359. Thus, a speech restriction "offends the First Amendment when it grants a public official unbridled discretion such that the official's decision to limit speech is not constrained by objective criteria, but may rest on ambiguous and subjective reasons." *Id.* at 359 (internal quotations and citation omitted).

Here, WMATA's "moratorium" and subsequent guidelines are hopelessly vague, particularly as applied to Plaintiffs' ads. What precisely is an "issue-

oriented" ad?  The "issue" presented by Plaintiffs' ads is "*Free Speech*."  But all advertising is free speech at some level.  And would WMATA permit an ad from Plaintiffs that just included the cartoon, which was the winning entry of an art contest sponsored by Plaintiffs?  If not, why not?[7]

Moreover, the restriction is not a speaker restriction or a subject matter restriction, such as a restriction on all political campaign ads.  *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304 (1974) (upholding the City's consistently enforced ban on political campaign advertising).  Rather, it is a viewpoint-based restriction: WMATA restricts ads that convey a "political, religious, [or] advocacy" point of view.

WMATA's unbridled control over the use of the forum at issue here does not meet the standard required by the First Amendment.  On their face, the "moratorium" and the guidelines do not satisfy First Amendment safeguards.[8]  As WMATA concedes, there are no objective criteria for determining whether an ad is acceptable.  Rather, WMATA applies a "case-by-case" approach.  (R-20-3; JA-91[Bowersox Dep. at 113:23-25 to 115:1-9]).

---

[7] The revised guidelines permit ads "promoting contests."  (R-19-3; JA-32-33, 35-38[Bowersox Aff. ¶ 5, Ex. B ("2. Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations.")]).

[8] For example, pursuant to the guidelines, "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."  (R-19-3; JA-32-33, 35-38[Bowersox Aff. ¶ 5, Ex. B]).  This restriction is not constrained in *any way* by objective criteria.

- 27 -

At the time Plaintiffs' ads were submitted for display, WMATA's advertising space was a public forum. WMATA concedes this point. (R-31; JA-152[Mem. Op. at 152]). Therefore, WMATA's restriction on Plaintiffs' speech should have to survive strict scrutiny, which it cannot, and WMATA doesn't argue that it could.

It is generally true that the government has an inherent right to control its property, which, depending upon the facts and circumstances, *may* include the right to *close* a previously open forum. *Cornelius*, 473 U.S. at 802 (observing that "the government is not required to indefinitely retain the open character of the facility") (internal quotations and citation omitted); *see also Perry*, 460 U.S. at 46 ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."). For example, closing the forum has been held to be a permissible solution to the problem caused by concerns about providing equal access while avoiding the appearance of government endorsement of religion, which could raise potential Establishment Clause issues. *See Chabad-Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1394 (11th Cir. 1993) (en banc); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 970 (9th Cir. 1999). Suffice to say, there are no Establishment Clause concerns at issue here, nor has WMATA closed

the forum to *all* speech—the forum remains open for some advertising based upon its content and/or viewpoint.

Thus, it is incorrect to conclude that the government's discretion to close a forum for protected speech (particularly when it remains open for commercial speech) is without constitutional limits.   In *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65, 77 (1st Cir. 2004), for example, the court noted that "[t]he government is free to change the nature of any nontraditional forum as it wishes. . . .   Thus, even if MBTA's previous intent was to maintain a designated public forum, it would be free to decide in good faith to close the forum at any time."   *Id.*   The court proceeded to find that "[t]here is no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements," concluding as follows: "To the contrary, the MBTA acted in response to expressed constitutional concerns about its prior guidelines, and cannot be faulted for trying to adhere more closely to the constitutional line.   And if the MBTA revised a guideline merely as a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created."   *Id.*

Here, WMATA didn't issue its "moratorium" or adopt new guidelines in response to any expressed constitutional concerns.   Rather, WMATA acted in response to the submission of Plaintiffs' ads, as evidenced by the timing of the

"moratorium," the circumstances surrounding the "moratorium," and the haste with which the "moratorium" was passed by WMATA's Board of Directors.[9]

The court in *Coleman v. Ann Arbor Transportation Authority*, 947 F. Supp. 2d 777 (E.D. Mich. 2013), echoed the point Plaintiffs are making here: "It is true that changes to a forum motivated by actual viewpoint discrimination may well limit the government's freedom of action." *Id*. at 788. And as the Ninth Circuit observed in *United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000), "Should it appear that the true purpose of . . . an order [closing a forum] was to silence disfavored speech or speakers, or that the order was not narrowly tailored to the realities of the situation, or that it did not leave open alternative avenues for communication, the federal courts are capable of taking prompt and measurably appropriate action."

In other words, even assuming, *arguendo*, that WMATA lawfully closed the forum to Plaintiffs' speech via its "moratorium" and then reaffirmed the closure by way of its resolution (and leaving aside the vagueness and viewpoint concerns), the evidence supports the conclusion that WMATA's actions were motivated by an animus toward Plaintiffs' speech such that a "prompt and measurably appropriate action" for this Court would be to grant judgment in Plaintiffs' favor and issue the

---

[9] Contrary to the District Court's assertion, Plaintiffs do not rely solely on WMATA's statement that Plaintiffs' ads were the "straw that broke the camel's back." (R-31; JA-155[Mem. Op. at 12]). There is far more evidence, as noted above. This statement just confirms WMATA's animus toward Plaintiffs.

requested injunction. *Perry Educ. Ass'n,* 460 U.S. at 46 (observing that the government "may reserve the forum for its . . . purposes . . . as long as the regulation on speech is . . . *not an effort to suppress expression merely because public officials oppose the speaker's view*") (emphasis added). Indeed, it would hardly be equitable to permit the government to avoid an injunction protecting a party's right to freedom of speech based on actions taken by the government designed to suppress the very speech at issue, which is precisely what has happened in this case. Thus, "it cannot be true that if the government excludes any category of speech from a forum through a rule or standard, that forum becomes *ipso facto* a non-public forum, such that we would examine the exclusion of the category only for reasonableness. This reasoning would allow every designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content." *N.Y. Magazine*, 136 F.3d 129-30.

## C.    Application of the Appropriate Standard.

### 1.    WMATA's Speech Restriction Is Content Based.

In a designated public forum (which is the proper characterization of the forum at issue), similar to a traditional public forum, the government's ability to restrict speech is sharply limited. The government may enforce reasonable, content-neutral time, place, and manner regulations of speech if the regulations are

narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Perry Educ. Ass'n,* 460 U.S. at 45. However, content-based restrictions are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800. That is, content restrictions are only permissible when they are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that interest." *Id.* For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992) (stating that the government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed"). Consequently, content-based restrictions "are presumptively unconstitutional." *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998).

To determine whether a restriction is content based, the courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consolidated Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980). Here, the restriction is content based because WMATA restricted Plaintiffs' speech based on the belief that the speech conveyed an "issue-oriented" message. In reality, WMATA was concerned that others might

be offended by Plaintiffs' message.[10]  However, such concerns are not a legitimate

basis for prohibiting speech.  *Matal*, 2017 U.S. LEXIS 3872, at *9.  The Supreme

Court has long held that a listener's (or, in this case, a viewer's) reaction to speech

is not a content-neutral basis for regulation.  *Forsyth Cnty. v. Nationalist

Movement*, 505 U.S. 123, 134 (1992).  "The First Amendment knows no heckler's

veto."  *Lewis v. Wilson,* 253 F.3d 1077, 1082 (8th Cir. 2001).  While restrictions on

speech because of the "secondary effects" that the speech creates are sometimes

permissible, an effect from speech is not secondary if it arises from the content of

the speech or the viewpoint of the speaker.  "The emotive impact of speech on its

audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988)

(opinion of O'Connor, J.).  The fact that Plaintiffs' speech may actually offend

some people does not lessen its constitutionally protected status; it enhances it.

"The fact that society may find speech offensive is not a sufficient reason for

suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that

---

[10] WMATA demonstrates this point in its memorandum by conceding that it relied on adverse public comments as the basis for rejecting "issue-oriented" advertising. (R-19-1[Defs.' Mem. at 10 (citing results of "review" conducted by WMATA and relying upon the opinions of those who oppose "issue-oriented" ads); *see also id*. at 10 (citing the "controversy frequently generated by issue-oriented advertisements" and "the fact that transit patrons are in close contact in confined spaces with ads aboard buses and subway trains")]).  Nonetheless, it's a strange notion to suggest that persons who work and live in our nation's capital would be so offended by political controversy.  Moreover, on its face, WMATA's ban on "issue-oriented" advertising wouldn't ban ads selling condoms, for example, regardless of how controversial or offensive that ad might be to its ridership.  In short, under the circumstances, the restriction is content and viewpoint based and unreasonable.

consequence is a reason for according it constitutional protection." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted). Thus, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975). Rather than censoring the speaker, the burden rests with the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Cohen v. Cal.*, 403 U.S. 15, 21 (1971).

WMATA cannot, consistent with the Constitution, restrict Plaintiffs' message *via* its "moratorium" and subsequent resolution because it or other viewers might find the message offensive. Otherwise, the government "would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Id.* at 21.

In sum, WMATA's restriction on Plaintiffs' ads is content based and cannot survive strict scrutiny.

### 2.    WMATA's Speech Restriction Is Viewpoint Based.

WMATA restricted Plaintiffs' ads not only on the basis of their content, which is impermissible, but on the basis of the viewpoint expressed, which is fatal. Viewpoint discrimination is an egregious form of content discrimination that is prohibited in <u>all</u> forums. *See Rosenberger*, 515 U.S. at 829; *Lamb's Chapel v. Ctr.*

*Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (internal quotations and citation omitted); *Pitt. League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 296 (3d Cir. 2011) ("Regardless of whether the advertising space is a public or nonpublic forum, the coalition is entitled to relief because it has established viewpoint discrimination.").

Viewpoint discrimination occurs when, as here, the government regulates speech "because public officials oppose the speaker's view." *Perry Educ. Ass'n,* 460 U.S. at 46. Thus, the government acts unconstitutionally *even when it adopts an apparently evenhanded rule excluding expression on its property* if it acts with a motive to discourage or suppress a particular viewpoint. *See Rosenberger,* 515 U.S. at 829 (stating that when the "rationale for the restriction" is "the specific motivating ideology or the opinion or perspective of the speaker," the government engages in forbidden viewpoint discrimination). Moreover, "[t]he existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius,* 473 U.S. at 811.

WMATA's restriction is facially viewpoint based. "When the government targets *not subject matter*, but particular views taken by speakers on a subject, the

violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829 (emphasis added).   Silencing multiple viewpoints, whether religious or political or otherwise, doesn't make the restriction less viewpoint based; it makes it more so.  *Id.* at 831-32 ("The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. . . .  The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.").  Here, an advertisement on an acceptable subject matter (the sale of condoms, for example) will be accepted so long as it doesn't express a religious, or political, or some other vague "issue-oriented" viewpoint.  Consequently, an advertiser can strongly promote the sale (and thus use) of condoms, but an ad that opposes the sale (and use) of condoms on religious grounds will be rejected.  There is no escaping the conclusion that WMATA's speech restriction is viewpoint based.

Indeed, the "moratorium" on its face favors commercial viewpoints over non-commercial viewpoints.  For example, under this policy, an advertiser could express the view that his commercial product is the "best value," the "most efficient," or the "best tasting," but an advertiser could not express the view that his religion was the "best," "truthful," or the "most charitable."   Under the

moratorium, a commercial advertiser could encourage the public to purchase his product because it's the "highest quality," but a non-commercial advertiser could not encourage the public to join his religion because it's the "truth."  Speech restrictions that favor commercial *viewpoints* over non-commercial *viewpoints* are viewpoint based and thus impermissible in any forum.[11]   *See generally Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 514 (1981) ("Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.").[12]

The policy that formalized the "moratorium" is worse (indeed, it provides further understanding as to what WMATA meant by "issue-oriented" advertising, thereby further demonstrating WMATA's viewpoint discrimination).   The

---

[11] On its face, the "moratorium" would not prevent a church, for example, from advertising its Mass schedule or street address.  Consequently, "religion" as a subject is not prohibited by the policy.

[12] In its decision, the District Court states, "Plaintiffs' argument that the government may not 'discriminate' against non-commercial ads in favor of commercial ads . . . is unsupported by the case it cites, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 514 (1981), and runs counter to the holdings of many of the other cases cited above upholding guidelines that prohibit political or issue-oriented advertising."  (R-31; JA-156[Mem. Op. at 13 n.2]).  The District Court mischaracterizes Plaintiffs' argument.    Plaintiffs are not arguing here discrimination based on content (commercial versus non-commercial).  Plaintiffs are arguing discrimination based on *viewpoint*.   The distinction is subtle, but exceedingly important.

November 19, 2015 resolution (which did not adopt the term "issue-oriented" advertising), prohibits, in relevant part, certain advertising as follows: "9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."; "11. Advertisements that support or oppose any political party or candidate are prohibited."; "12. Advertisements that support or oppose any religion, religious practice or belief are prohibited."; and "13. Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertisers are prohibited." (R-19-3; JA-32-33, 35-38[Bowersox Aff. ¶ 5, Ex. B]).

Per the resolution, viewpoints that support or oppose an industry position or industry goal, for example, that *have direct commercial benefit* to the advertiser are permitted (while those without such a commercial benefit are banned). Per the resolution, an advertiser can express a viewpoint that is neutral towards religion or a political candidate (*n.b.*, religion and politics are not excluded *subjects*), but not a viewpoint that supports or opposes a religion or political candidate. And per the resolution, a commercial advertiser could run an ad promoting a certain product, but not if the very same product is promoted because it is Kosher (the ad would then be promoting a religious practice or belief). This is viewpoint discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("[S]peech

- 38 -

discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint.").

And contrary to WMATA's view, "consistently appl[ying]" a policy that is inherently viewpoint based does not make the policy viewpoint neutral. (*See* R-25[Defs.' Opp'n at 8 ("Because WMATA has consistently applied the ban on issue-oriented ads since enacting it in 2015, its policy is viewpoint neutral.")]). A viewpoint-based policy that is evenhandedly applied is nonetheless unlawful. *See Rosenberger,* 515 U.S. at 831-32.

Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. Here, the resolution on its face does not restrict subject matter, *just viewpoints*, in violation of the First and Fourteenth Amendments.

Additionally, and closely related, how does this restriction pass constitutional muster under any First Amendment standard: "9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited"? This restriction hardly meets the "precision" required when the government seeks to regulate speech. *See NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.") (internal citations omitted). As

noted by the Sixth Circuit, "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors," *United Food*, 163 F.3d at 359, such as the speaker's viewpoint, *Forsyth Cnty.*, 505 U.S. at 130 ("A government regulation that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view.").

In fact, on what basis did WMATA reject Plaintiffs' advertisements? The ads on their face contain a cartoon of an artist drawing a man with a sword saying, "You can't draw me!," and the artist responding, "That's why I draw you." The caption on the ad says, "Support Free Speech." WMATA's Rule 30(b)(6) witness testified that the ads were impermissible because they "advocate[] free speech and [do] not try to sell you a commercial product." Where does it say that ads "advocating free speech" are not permitted? Are there "varying opinions" on whether we should support free speech? On its face, the ad does not mention a political party, a political candidate, a religion, a religious belief, or a religious practice. So what precisely was the basis for rejecting Plaintiffs' ads? Does the policy permit WMATA's censors to go outside the four corners of an advertisement to try and discern the hidden meaning of an ad (or its proponent)?

Because WMATA's regulations are viewpoint based and are so vague and thus allow for viewpoint discrimination, they violate the First Amendment.

### 3.     WMATA's Speech Restriction Is Unreasonable.

Finally, not only is WMATA's restriction on Plaintiffs' speech content and viewpoint based, it is unreasonable, and thus impermissible even in a nonpublic forum. *Perry Educ. Ass'n,* 460 U.S. at 46 (requiring speech restrictions in a nonpublic forum to be reasonable and viewpoint neutral). Reasonableness is evaluated "in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809; *see also Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222-23 (9th Cir. 2003) (granting a preliminarily injunction and finding that the "proffered justification" for the speech restriction was "patently unreasonable"). And the "reasonableness" requirement for speech restrictions "requires more of a showing than does the traditional rational basis test; *i.e.*, it is not the same as establishing that the regulation is rationally related to a legitimate government objective, as might be the case for the typical exercise of the government's police power. There must be evidence in the record to support a determination that the restriction is reasonable. That is, there must be evidence that the restriction reasonably fulfils a legitimate need." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966-67 (9th Cir. 2002) (internal quotations and citations omitted). As the Third Circuit observed: "Consideration of a forum's

special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 255 (3d Cir. 1998) (block quotation and citation omitted). Thus, "the reasonableness of the government's restriction on speech depends on the nature and purpose of the property for which it is barred." *Id*. For example, rules limiting disruptive behavior in a library are reasonable given the nature and purpose of a library. *See id*. In light of the overall circumstances here, including WMATA's long history of accepting controversial ads, the nature and characteristics of the forum at issue, and the fact that the ads will appear in our nation's capital, WMATA's "moratorium" and subsequent resolution are patently unreasonable.

In *Christ's Bride*, for example, the Third Circuit concluded "that SEPTA's removal of the [anti-abortion] posters violated the First Amendment because the removal was not 'reasonable.'" *Id*. Despite the controversial nature of the abortion issue, the court concluded that "[t]he subject of the speech, and the manner in which it was presented, were compatible with the purposes of the forum," noting that "the government has offered no basis on which to conclude that the speech in question would interfere with the accepted purposes of the advertising space." *Id*. at 256.

In *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611 (E.D. Pa. 2014), the court held that the prohibition on non-commercial ads at the Philadelphia International Airport—a nonpublic forum—was "unreasonable" in that displaying such ads was "perfectly compatible" with the forum, would not "diminish advertising revenue" or the airport's "efficacy," nor make the airport "a meaningfully less positive, family oriented place." *Id.* at 630. The adoption of a subsequent *written* policy prohibiting non-commercial ads at the airport was more recently before the Third Circuit, and the court struck it down.[13]  *NAACP v. City of Phila.*, 834 F.3d 435 (3d Cir. 2016).

Thus, contrary to WMATA's position and the District Court's decision, the government does _not_ have plenary authority to simply shut down a forum to non-commercial speech, even when the forum is a nonpublic forum to begin with, as in *NAACP*.  Indeed, in the current case, the situation is far worse for WMATA because the forum was unquestionably a public forum at the time Plaintiffs' ads were submitted (R-31; JA-152[Mem. OP. at 9]), and there is no dispute that

---

[13] In *NAACP v. City of Philadelphia,* the City adopted the challenged written policy during the pendency of the litigation.  The NAACP filed an amended complaint to challenge the written policy.  However, that was done after the City agreed to display the NAACP's ad for three months and to pay the organization $8,800 in attorneys' fees.  *See NAACP*, 834 F.3d at 438.  Here, Plaintiffs are not opposed to amending their Complaint in light of the resolution that was approved while this case was pending.  However, as noted previously, Plaintiffs do not believe this is necessary because the resolution is part of the ongoing harm, and WMATA itself has put the resolution at issue.

Plaintiffs' ads are compatible with this forum (R-20-3; JA-75-76[Bowersox Dep. at 16:23-25 to 17:1-8 [conceding that at the time Plaintiffs' ads were submitted, there was "no reason to reject" them]).    In fact, WMATA has previously displayed Plaintiffs' ads on their property, and these ads generated $65,200 in much needed revenue for the transit authority.    (R-20-3; JA-68, 109[Muise Decl. ¶ 7, Ex. F ("History with AFDI Advertising")]).

Thus, the reasoning in these cases is true here in spades: It is unreasonable to argue that an ad displayed on the outside of a bus traveling through Washington, D.C.—a bustling city in which passengers and outside observers are besieged by a cacophony of expressive, and quite often political and controversial, media— would somehow interfere with the operation of WMATA's bus system.    For decades WMATA has displayed controversial, public-issue advertisements.    And, as WMATA concedes, since D.C. is the seat of our federal government, its "market is distinct in the amount of issue oriented advertising" (R-20-3; JA-79[Bowersox Dep. at 30:3-11])—meaning, WMATA's advertising space is the *very* place these types of ads should be displayed.

In the final analysis, the display of advertisements like those at issue here is perfectly compatible with the forum.    The *manner* in which the speech is presented (displays on buses or dioramas) is also compatible with the purpose of the forum.    And finally, Plaintiffs will pay the required fees to run their ads, thus *promoting*

- 44 -

WMATA's revenue raising purposes. Given WMATA's revenue shortcomings (R-20-3; JA-80[Bowersox Dep. at 36:3-4 (testifying that on an annual basis, WMATA is not profitable)]), it is unreasonable to reject this revenue source under the circumstances. In short, even if the Court were to conclude that the forum was properly converted from a public to a nonpublic forum, the restriction on Plaintiffs' ads is unreasonable and thus violates the First Amendment.

## III.   PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR EQUAL PROTECTION CLAIM.

The relevant principle of law was articulated by the Supreme Court in *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92 (1972). In *Mosley*, the Court struck down a city ordinance that prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute. The Court stated, "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id.* at 96.

Here, the government (WMATA) has granted the use of a forum (its advertising space) for certain speakers (those who want to express a "commercial" message), but denied this same forum to speakers (Plaintiffs) whose messages ("issue-oriented" viewpoints) the government finds unacceptable.

As *Mosley* makes clear, such discrimination not only violates the Free Speech Clause of the First Amendment, it also violates the Equal Protection Clause of the Fourteenth Amendment. *See also Carey v. Brown*, 447 U.S. at 461-62.

## IV. PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF.

The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" sufficient to justify injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also N.Y. Magazine,* 136 F.3d at 127 (upon establishing a violation of the First Amendment, the plaintiff "established *a fortiori* . . . irreparable injury"). Consequently, Plaintiffs have established as a matter of law that they will continue to suffer irreparable harm absent the requested injunction.

WMATA argued, and the District Court agreed, that the "moratorium" and subsequent resolution modifying its advertising guidelines moot Plaintiffs' claims arising out of WMATA's pre-May 28, 2015 rejection of Plaintiffs' ads. (R-19-1[Defs.' Mem. at 4-7]; R-31; JA-153[Mem. Op. at 10 n.1]). They are mistaken.

The "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). As the Supreme Court noted, not only is a defendant "free to return to his old ways," but also the public has an interest "in having the legality of the practices settled." *Id.*

- 46 -

at 632; *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways.") (alterations and quotation marks omitted).  Moreover, "[a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct."  *W. T. Grant Co.*, 345 U.S. at 633.  In fact, the Court warned the lower courts to be particularly vigilant in cases such as this, stating, "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform . . . ."  *Id.* at 632 n.5; *see also Ne. Fla. Chapter of Assoc. Gen. Contractors of Am v. City of Jacksonville, Fla.*, 508 U.S. 656, 661-62 (1993) (refusing to hold the controversy moot where changes in the law were alleged to inflict the same injuries but only to a lesser degree and acknowledging that the rule that the voluntary cessation of illegal conduct will not deprive a tribunal of its jurisdiction to decide a claim is "well settled").

Here, the "moratorium" and subsequent resolution inflict the very same injury—WMATA has targeted Plaintiffs' speech for censorship using a prior restraint.  And as noted above, the timing of the "moratorium" and the hasty way in which it was passed plainly show that it was designed to prevent Plaintiffs from running their ads.  As noted by the Supreme Court, such changes do not moot the controversy.  Indeed, under the circumstances here—which include WMATA's

- 47 -

history of unlawfully restricting Plaintiffs' speech, the timing of the "moratorium,"

and the refusal by WMATA to accept Plaintiffs' ads upon submission—it would

be improper to deny injunctive relief on mootness grounds. *See, e.g., People*

*Against Police Violence v. City of Pitt.*, 520 F.3d 226, 231 n.2 (3d Cir. 2008)

(holding that "neither the City's initial representation that it would no longer

enforce Chapter 603 nor its formal repeal of that ordinance a few months later

deprived the District Court of jurisdiction" and considering, *inter alia*, the

allegedly "long history of unconstitutional conduct under the ordinance").

And while the Second Circuit in *American Freedom Defense Initiative v.*

*Metropolitan Transportation Authority*, 815 F.3d 105 (2d Cir. 2016), held that the

MTA had met its "heavy burden" of demonstrating mootness for purposes of

injunctive relief, the facts of that case are readily distinguishable.  Here is what the

Second Circuit said regarding the issue:

> [E]ven if the MTA had an incentive to revert to its old advertising
> standards and permit advertisements that are "political in nature," as
> AFDI argues is the case, there would still be no reasonable
> expectation that the MTA would return to its past practice of applying
> the incitement prohibition to the Ad, which is all that the district court
> enjoined:  As the MTA conceded at oral argument, its failure to
> appeal the district court's award of nominal damages to AFDI means
> that the MTA is now collaterally estopped from re-litigating the
> constitutionality of the application of the incitement prohibition to the
> Ad.  In sum, the combination of the amendments to the MTA's
> advertising standards, the MTA's representations to this Court, and
> the collateral estoppel effect of the district court's partial judgment on
> damages compels the conclusion that there is no reasonable

> expectation that the MTA will again reject the Ad under the
> incitement prohibition.

*Id*. at 110.  No such factors or incentives are present in this case.  Based on the loss

of revenue WMATA will suffer by rejecting "issue-oriented" ads, particularly in

light of its financial difficulties, it is reasonable to conclude that WMATA will

return to its old ways.  And there is no judgment that will have a collateral estoppel

effect on WMATA.  At a minimum, WMATA cannot meet its "heavy burden"

under the facts of this case to conclude that Plaintiffs' claims are moot.

The District Court's similar reliance on *Initiative and Referendum Institute

v. United States Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012), fares no better.

(*See* R-31; JA-153[Mem. Op. at 10 n.1]).  In *Initiative and Referendum Institute*,

the challengers sought to enjoin the enforcement of a provision of a postal

regulation as applied to *Grace* sidewalks (sidewalks that are public forums), but

the postal service "beat them to the punch by amending the regulation to exempt

*Grace* sidewalks."  *Id*. at 1074.  The district court held the challenge moot, and this

Court agreed, concluding as follows:

> It is implausible that the Postal Service would have gone through the
> cumbersome process of amending its regulation to exempt *Grace*
> sidewalks only to re-amend the regulation after this case is resolved to
> once again cover them, *especially when we have already said that it
> would be unconstitutional to do so*.
>
> Because the challenged regulation no longer applies to *Grace*
> sidewalks, the amendment "completely and irrevocably eradicated the
> effects of the alleged violation."

*Id.* (emphasis added).  Thus, similar to the case against the MTA discussed above, in *Initiative and Referendum Institute*, this Court "already said it would be unconstitutional" for the government to return to its old ways, thus supporting the government's claim of mootness.  No such factor exists here.

## V.    DEFENDANTS ARE LIABLE FOR VIOLATING PLAINTIFFS' CONSTITUTIONAL RIGHTS.

WMATA argued in the "alternative" that it can escape liability in this action because it is not a "person" under 42 U.S.C. § 1983 and its General Manager has statutory immunity.[14]  (R-19-1[Defs.' Mem. at 11-12]).  WMATA is mistaken.

As an initial matter, WMATA did not argue in its moving papers that it enjoys immunity, Eleventh Amendment or otherwise.  Section 80 of the WMATA Compact expressly provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function."   D.C. Code § 9-1107.01(80).  WMATA's leasing of its advertising space is a proprietary (as opposed to governmental) function.  *See Lebron*, 665 F. Supp. at 935 ("The rental of commercial advertising space is clearly a proprietary function. . . .  Thus, WMATA, under the clear language of section 80 [of the WMATA Compact], has waived its Eleventh Amendment immunity in this case.").

---

[14] This action is brought under 42 U.S.C. § 1983 *and* the First and Fourteenth Amendments.  (R-1; JA-11, 16-18[Compl. ¶¶ 1, 31-38]).

With regard to WMATA's claim that it is not a "person" for purposes of §
1983, the district court in *Lebron* held WMATA liable for damages. *Lebron*, 665
F. Supp. at 936 ("[T]he Court will serve the deterrent purposes of § 1983 by
requiring WMATA to compensate Lebron for all proven damages, and by
awarding nominal damages for the other minimal wrongs."). Granted, this
decision was issued prior to the Supreme Court's decision in *Will v. Michigan
Department of State Police*, 491 U.S. 58 (1989), and subsequent district court
decisions have agreed with WMATA.[15] Nonetheless, in light of the rationale
expressed in *Will*, WMATA in this instance is not a "State of the Union"—it is a
"person" under § 1983, just as municipalities and political subdivisions are
"persons" under this statute per *Monell v. New York City Department of Social
Services*, 436 U.S. 658 (1978). In *Monell*, the Court held that the word "person"
must be construed to include "bodies politic and corporate." *Id*. at 689-90, n.53.
WMATA fits this definition.

---

[15] *See Lucero-Nelson v. Wash. Metro. Area Transit Auth.,* 1 F. Supp. 2d 1, 7 (D.D.C.
1998) (dismissing § 1983 claim against WMATA because it is not a "person" under
the statute); *James v. Wash. Metro. Area Transit Auth.*, 649 F. Supp. 2d 424, 429
(D. Md. 2009) (same); *Plater v. Dist. of Columbia Dep't of Transp.*, 530 F. Supp.
2d 101, 104 (D.D.C. 2008) (same); *Disability Rights Council of Greater Wash. v.
Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 20 (D.D.C. 2006) (same); *Headen
v. Wash. Metro. Area Transit Auth.*, 741 F. Supp. 2d 289, 294 (D.D.C. 2010)
(same); *Tapp v. Wash. Metro. Area Transit Auth.*, No. 15-cv-0768 (KBJ), 2016 U.S.
Dist. LEXIS 135747, at *23 (D.D.C. Sept. 30, 2016) (same).

In *Will*, the Court held that States were not "persons."  In doing so, the Court considered the Eleventh Amendment, noted that "it is an established principle of jurisprudence that the sovereign cannot be sued in its own courts without its consent," and stated that "[w]e cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent."  *Will*, 491 U.S. at 67 (internal quotations and citation omitted).  The Court further noted that "[t]he legislative history of § 1983 does not suggest a different conclusion," *id*. at 68, finding "nothing substantial in the legislative history that leads us to believe that Congress intended that the word 'person' in § 1983 included the States of the Union."  *Id*. at 69.  The Court concluded that "*Monell* itself is not to the contrary."  *Id*. at 70.  Thus, per the Court, "[I]t does not follow that if municipalities are persons then so are States.  States are protected by the Eleventh Amendment while municipalities are not, and we consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes.'"  *Id*. (quoting *Monell*, 436 U.S. at 690 n.54).

WMATA is a unique entity—it is not a State of the Union.  It has substantial corporate and municipal characteristics that make it more like a local governmental unit or political subdivision than an arm of state government, particularly with regard to the activities at issue—activities for which there is no Eleventh

- 52 -

Amendment immunity.  As noted, the display of ads is a proprietary and not a governmental function.  It should be noted as well that the proposed ads are intended for display in Washington, D.C. and not in any of the signatory states. And an award of nominal damages[16] can come from ad revenue—not from any state treasury.  Nonetheless, an award of $1 in damages—the only damages at issue here—does no harm to a state treasury.  Moreover, attorneys' fees may be awarded under 42 U.S.C. § 1988 (the fee-shifting provision that applies for violating § 1983) even if paid out of the state treasury.  *Mo. v. Jenkins*, 491 U.S. 274, 279 (1989) (upholding fee award under § 1988 and stating that "it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment").

In short, Eleventh Amendment immunity has <u>not</u> been extended to the acts at issue here.  D.C. Code § 9-1107.01(80).  And Congress gave the federal courts concurrent *original* jurisdiction over the claims advanced in this case (*i.e.*, WMATA has consented to being sued in this Court).  D.C. Code § 9-1107.01(81). Thus, a claim against WMATA under § 1983 is appropriate.

Additionally, there is no basis for concluding that WMATA's General Manager should escape liability under § 1983.  WMATA's immunity argument on behalf of its General Manager is based on the D.C. Code (*see* R-19-1[Defs.' Mem.

---

[16] *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (awarding nominal damages for the violation of constitutional rights as a matter of law).

at 12 (citing D.C. Code § 9-1107.01(80), stating that the "exclusive remedy for . . . torts for which the Authority shall be liable . . . shall be by suit against the Authority")]), and not the U.S. Code.

Nonetheless, regardless of WMATA's assertion of statutory immunity, under *Ex Parte Young*, 209 U.S. 123 (1908), prospective injunctive relief against state officials for violating the Constitution provides an exception, and such claims may be advanced under § 1983, *see Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotations omitted).  Because Plaintiffs' claims for prospective relief are not moot, as discussed above, judgment can and should be entered against WMATA's General Manager for violating Plaintiffs' constitutional rights.

## CONCLUSION

The Court should reverse and enter judgment in Plaintiffs' favor.

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
Tel: (734) 635-3756

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
Tel: (646) 262-0500
Fax: (801) 760-3901

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7), the foregoing Brief is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 12,852 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii).

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.  I further certify that all of the participants in this case are registered CM/ECF users.  I further certify that eight (8) copies of this filing were sent this day via Federal Express overnight delivery to the Clerk of the Court.

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Appellants*