**ORAL ARGUMENT NOT YET SCHEDULED**

## NO. 17-7059

_____

### In the

# United States Court of Appeals
# for the District of Columbia Circuit

_____

AMERICAN FREEDOM DEFENSE INITIATIVE;
PAMELA GELLER; and ROBERT SPENCER,
*Plaintiffs-Appellants*,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
("WMATA") and PAUL J. WIEDEFELD, in his official capacity as
General Manager for WMATA,
*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
HONORABLE GLADYS KESSLER
CASE NO. Case No. 1:15-cv-01038-GK

_____

## JOINT APPENDIX

_____

DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
1155 F STREET, NW
WASHINGTON, DC 20004
(202) 220-1100

*Counsel for Appellees*

ROBERT JOSEPH MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MICHIGAN 48113
(734) 635-3756

*Counsel for Appellants*

# CASE NO. 17-7059

# TABLE OF CONTENTS

| **Description of Item** | **Record Entry No.** | **Appendix Page No.** |
|---|---|---|
| District Court Docket Sheet Case No. 1:15-cv-01038-GK ............................... | N/A | 1 |
| Complaint (07/01/2015) ......................................... | R.1 | 10 |
| Answer (09/18/2015) ......................................... | R.8 | 26 |
| Affidavit of Lynn Bowersox (08/05/2016) ......................................... | R.19-3 | 32 |
| Exhibit 1 - Declaration of Pamela Geller (09/05/2016) ..................................... | R20-2 | 39 |
|     Exhibit A – WMATA Webpage Advertising Opportunities ............................... | | 45 |
|     Exhibit B – Submitted ADFI Ad for display on buses ........................................... | | 47 |
|     Exhibit C – Submitted ADFI Ad for display on dioramas ...................................... | | 49 |
|     Exhibit D – Email Communication regarding submitted ads ............................... | | 51 |
|     Exhibit E – Transcript of WMATA Board of Directors Meeting on May 28, 2015 .......... | | 55 |
|     Exhibit F – Revised Agenda 1407th Meeting of the Board of Directors ................................ | | 58 |

| **Description of Item** | **Record Entry No.** | **Appendix Page No.** |
|---|---|---|
| Exhibit G – WMATA Resolution 2015-55 | | 61 |
| Exhibit 2 - Declaration of Robert J. Muise (09/05/16) .......................................................... | R.20-3 | 66 |
| Exhibit A – Deposition of WMATA through Lynn M. Bowersox..................................... | | 70 |
| Exhibit B - Transcript of WMATA Board of Directors Meeting on May 28, 2015 .......... | | 93 |
| Exhibit C - Revised Agenda 1407th Meeting of the Board of Directors ............................... | | 96 |
| Exhibit D – Motion by Chair of Board of Directors, May 28, 2015............................ | | 99 |
| Exhibit E – WMATA Position Description General Manager and Chief Executive Officer | | 101 |
| Exhibit F – History with AFDI Advertising | | 108 |
| Exhibit G – Email...................................... | | 111 |
| Exhibit H – WMATA's website past meeting schedule of the Board of Directors ............ | | 117 |
| Exhibit I – Emails from Phillip T. Staub, Associate General Counsel for WMATA .. | | 119 |
| Exhibit - Deposition of WMATA through Lynn M. Bowersox (10/03/2016) ...................................................... | R.25-2 | 122 |
| Order (03/28/2017) ...................................................... | R.30 | 142 |

| **Description of Item** | **Record Entry No.** | **Appendix Page No.** |
|---|---|---|
| Memorandum Opinion (03/28/2017) ...................................................... | R.31 | 144 |

Certificate of Service

USCA Case #17-7059     Document #1685468     Filed: 07/24/2017     Page 5 of 165

APPEAL,CLOSED,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:15-cv-01038-GK

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE et al v. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY et al | Date Filed: 07/01/2015 |
| | Date Terminated: 03/28/2017 |
| | Jury Demand: None |
| Assigned to: Judge Gladys Kessler | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: 17-07059 | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

| | | |
|---|---|---|
| **AMERICAN FREEDOM DEFENSE INITIATIVE** | represented by | **David Eliezer Yerushalmi** |

LAW OFFICES OF DAVID
YERUSHALMI, P.C.
2020 Pennsylvania Avenue, NW
Suite 189
Washington, DC 20006
(646) 262-0500
Fax: (801) 760-3901
Email:
dyerushalmi@americanfreedomlawcenter.org

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Joseph Muise**
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
3000 Green Road
Ann Arbor, MI 48113
(734) 635-3756
Fax: (801) 760-3901
Email:
rmuise@americanfreedomlawcenter.org

**JA 1**

USCA Case #17-7059     Document #1685468     Filed: 07/24/2017     Page 6 of 165

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PAMELA**            represented by   **David Eliezer Yerushalmi**
**GELLER**                            (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

                                      **Robert Joseph Muise**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT**            represented by   **David Eliezer Yerushalmi**
**SPENCER**                           (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

                                      **Robert Joseph Muise**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**WASHINGTON**        represented by   **Gerard Joseph Stief**
**METROPOLITAN**                      WASHINGTON METROPOLITAN AREA
**AREA TRANSIT**                      TRANSIT AUTHORITY
**AUTHORITY**                         Office of General Counsel
*WMATA*                               600 Fifth Street, NW
                                      Washington, DC 20001
                                      (202) 962-1463
                                      Fax: (202) 962-2550
                                      Email: GStief@WMATA.com
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**JA 2**

**Rex S. Heinke**
AKIN GUMP STRAUSS & HAUER &
FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
(310) 229-1000
Email: rheinke@akingump.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACK REQUA**          represented by   **Gerard Joseph Stief**
*in his official*                              (See above for address)
*capacity as Interim*                          *LEAD ATTORNEY*
*General Manager*                              *ATTORNEY TO BE NOTICED*
*and Chief Executive*
*Officer for WMATA*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/01/2015 | 1 | COMPLAINT against JACK REQUA, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY ( Filing fee $ 400 receipt number 0090-4159760) filed by AMERICAN FREEDOM DEFENSE INITIATIVE, ROBERT SPENCER, PAMELA GELLER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Summons for WMATA, # 3 Summons Summons for Requa)(Muise, Robert) (Entered: 07/01/2015) |
| 07/01/2015 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN FREEDOM DEFENSE INITIATIVE (Muise, Robert) (Entered: 07/01/2015) |
| 07/01/2015 | 3 | NOTICE of Appearance by David Eliezer Yerushalmi on behalf of All Plaintiffs (Yerushalmi, David) (Entered: 07/01/2015) |
| 07/01/2015 |  | Case Assigned to Judge Gladys Kessler. (rd) (Entered: 07/01/2015) |
| 07/01/2015 | 4 | SUMMONS (2) Issued Electronically as to JACK REQUA, |

USCA Case #17-7059     Document #1685468     Filed: 07/24/2017     Page 8 of 165

| | | |
|---|---|---|
| | | WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(rd) (Entered: 07/01/2015) |
| 07/27/2015 | 5 | WAIVER OF SERVICE by AMERICAN FREEDOM DEFENSE INITIATIVE, ROBERT SPENCER, PAMELA GELLER. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY waiver sent on 7/22/2015, answer due 9/20/2015. (Muise, Robert) (Entered: 07/27/2015) |
| 07/27/2015 | 6 | WAIVER OF SERVICE by AMERICAN FREEDOM DEFENSE INITIATIVE, ROBERT SPENCER, PAMELA GELLER. JACK REQUA waiver sent on 7/22/2015, answer due 9/20/2015. (Muise, Robert) (Entered: 07/27/2015) |
| 08/10/2015 | 7 | NOTICE of Appearance by Gerard Joseph Stief on behalf of All Defendants (Stief, Gerard) (Entered: 08/10/2015) |
| 09/18/2015 | 8 | ANSWER to Complaint by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.(Stief, Gerard) (Entered: 09/18/2015) |
| 09/21/2015 | 9 | ORDER setting an Initial Scheduling Conference for October 19, 2015, at 10:30 a.m. Signed by Judge Gladys Kessler on 9/21/15. (CL) (Entered: 09/21/2015) |
| 09/21/2015 | | Set/Reset Hearings: Initial Scheduling Conference set for 10/19/2015 10:30 AM in Courtroom 26A before Judge Gladys Kessler. (CL) (Entered: 09/21/2015) |
| 09/22/2015 | | MINUTE ORDER: The Initial Scheduling Order now set for October 19, 2015, is hereby rescheduled for October 26, 2015, at 3:00 p.m. Signed by Judge Gladys Kessler on 9/22/15. (CL) (Entered: 09/22/2015) |
| 09/22/2015 | | Set/Reset Hearings: Initial Scheduling Conference set for 10/26/2015 03:00 PM in Courtroom 26A before Judge Gladys Kessler. (CL) (Entered: 09/22/2015) |
| 10/14/2015 | 10 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Muise, Robert) (Entered: 10/14/2015) |
| 10/26/2015 | | Minute Entry for proceedings held before Judge Gladys Kessler: Initial Scheduling Conference held on 10/26/2015. Order to be |

USCA Case #17-7059      Document #1685468        Filed: 07/24/2017      Page 9 of 165

| | | |
|---|---|---|
| | | issued. (Court Reporter: Jeff Hook) (tth) (Entered: 10/26/2015) |
| 10/26/2015 | 11 | ORDER setting out the schedule that will govern further proceedings in this case (see Order for more details). Signed by Judge Gladys Kessler on 10/26/15. (CL) (Entered: 10/26/2015) |
| 10/26/2015 | | Set/Reset Deadlines: Initial Disclosure & Witness Lists due by 11/15/2015. Joinder of Parties/Amended Pleadings due by 11/23/2015. Proponents' Rule 26(a)(2) Disclosures due by 11/24/2015. Opponents' Rule 26(a)(2) Disclosures due by 1/8/2016. Discovery Completion due by 1/25/16. Cross Motions due by 3/24/2015. Response to Cross Motions due by 4/24/2015. Reply to Cross Motions due by 5/10/2015. Summary Judgment motions due by 2/24/2015. Response to Motion for Summary Judgment due by 3/24/2015. Reply to Motion for Summary Judgment due by 4/24/2015. (CL) (Entered: 10/26/2015) |
| 01/12/2016 | 12 | Joint MOTION for Extension of Time to Complete Discovery *and to Extend Subsequent Deadlines* by AMERICAN FREEDOM DEFENSE INITIATIVE, PAMELA GELLER, ROBERT SPENCER (Attachments: # 1 Text of Proposed Order)(Muise, Robert) (Entered: 01/12/2016) |
| 01/14/2016 | 13 | ORDER granting 12 the Joint Motion for Extension of Time to Complete Discovery (see Order for details); a telephone Status Conference is hereby set for April 12, 2016, at 10:30 a.m. Signed by Judge Gladys Kessler on 1/13/16. (CL) (Entered: 01/14/2016) |
| 01/14/2016 | | Set/Reset Deadlines/Hearings: Cross Motions due by 6/22/2016. Response to Cross Motions due by 7/25/2016. Reply to Cross Motions due by 8/8/2016. Discovery due by 4/25/2016. Summary Judgment motions due by 5/24/2016. Response to Motion for Summary Judgment due by 6/22/2016. Reply to Motion for Summary Judgment due by 7/25/2016. Telephone Status Conference set for 4/12/2016 at 10:30 AM in Chambers before Judge Gladys Kessler. (CL) (Entered: 01/14/2016) |
| 03/24/2016 | | MINUTE ORDER: Due to an adjustment in the Court's calendar, the telephone conference set in this case for April 12, 2016, at 10:30 a.m., is hereby rescheduled to April 13, 2016, at |

USCA Case #17-7059     Document #1685468          Filed: 07/24/2017     Page 10 of 165

| | | |
|---|---|---|
| | | 10:30 a.m.; if this date and time prove inconvenient for counsel, they are invited to file a Motion for Continuance. Signed by Judge Gladys Kessler on 3/23/16. (CL) (Entered: 03/24/2016) |
| 03/24/2016 | | Set/Reset Hearings: Telephone Conference set for 4/13/2016 at 10:30 AM in Courtroom 26A before Judge Gladys Kessler. (CL) (Entered: 03/24/2016) |
| 04/06/2016 | | MINUTE ORDER: Due to an emergency that necessitates the Judge's attention, the telephone conference set for Wednesday, April 13, 2016, is hereby VACATED; this telephone conference will be rescheduled at a later date. Signed by Judge Gladys Kessler on 4/6/16. (CL) (Entered: 04/06/2016) |
| 04/25/2016 | 14 | Consent MOTION for Extension of Time to Complete Discovery *and Subsequent Deadlines* by JACK REQUA, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (Stief, Gerard) (Entered: 04/25/2016) |
| 04/26/2016 | 15 | ORDER granting 14 Defendants' Unopposed Motion for Extension of Time to Complete Discovery (see Order for details). Signed by Judge Gladys Kessler on 4/26/16. (CL) (Entered: 04/26/2016) |
| 04/26/2016 | | Set/Reset Deadlines/Hearings: Discovery due by 5/25/2016. Status Conference set for 6/1/2016 at 10:15 AM in Courtroom 26A before Judge Gladys Kessler. Summary Judgment motions due by 6/24/2016. Response to Motion for Summary Judgment due by 7/25/2016. Reply to Motion for Summary Judgment due by 8/24/2016. Cross Motions due by 7/25/2016. Response to Cross Motions due by 8/24/2016. Reply to Cross Motions due by 9/7/2016. (CL) (Entered: 04/26/2016) |
| 06/01/2016 | | Minute Entry for proceedings held before Judge Gladys Kessler: Status Conference held on 6/1/2016. Order to be issued. (Court Reporter: Lisa Moreira) (tth) (Entered: 06/01/2016) |
| 06/02/2016 | 16 | ORDER setting out briefing schedule for Motions for Summary Judgment (see Order for details). Signed by Judge Gladys Kessler on 6/2/16. (CL) (Entered: 06/02/2016) |
| 06/02/2016 | | Set/Reset Deadlines: Summary Judgment motions due by 7/29/2016. Response to Motion for Summary Judgment due by |

| | | |
|---|---|---|
| | | 8/29/2016. Reply to Motion for Summary Judgment due by 9/19/2016. Cross Motions due by 8/29/2016. Response to Cross Motions due by 9/19/2016. Reply to Cross Motions due by 10/10/2016. (CL) (Entered: 06/02/2016) |
| 07/28/2016 | 17 | Consent MOTION for Extension of Time to File *Motion for Summary Judgment* by JACK REQUA, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (Attachments: # 1 Text of Proposed Order)(Stief, Gerard) (Entered: 07/28/2016) |
| 07/28/2016 | 18 | ORDER granting 17 Defendants' Consent Motion for Extension of Time to File Motions for Summary Judgment (see Order for details). Signed by Judge Gladys Kessler on 7/28/16. (CL) (Entered: 07/28/2016) |
| 07/28/2016 | | Set/Reset Deadlines: Summary Judgment motions due by 8/5/2016. Response to Motion for Summary Judgment due by 8/6/2016. Reply to Motion for Summary Judgment due by 9/26/2016. Cross Motions due by 9/6/2016. Response to Cross Motions due by 9/26/2016. Reply to Cross Motions due by 10/17/2016. (CL) (Entered: 07/28/2016) |
| 08/05/2016 | 19 | MOTION for Summary Judgment by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (Attachments: # 1 Memorandum in Support of Motion for Summary Judgment, # 2 Statement of Facts Which There is No Genuine Issue, # 3 Affidavit of Lynn Bowersox, # 4 Text of Proposed Order)(Stief, Gerard) (Entered: 08/05/2016) |
| 09/05/2016 | 20 | RESPONSE re 19 MOTION for Summary Judgment *and Cross-Motion for Summary Judgment* filed by AMERICAN FREEDOM DEFENSE INITIATIVE, PAMELA GELLER, ROBERT SPENCER. (Attachments: # 1 Statement of Facts, # 2 Exhibit 1--Geller Declaration w/ Exhibits A to G, # 3 Exhibit 2--Muise Declaration w/ Exhibits A to I, # 4 Text of Proposed Order)(Muise, Robert) (Entered: 09/05/2016) |
| 09/05/2016 | 21 | Cross MOTION for Summary Judgment by AMERICAN FREEDOM DEFENSE INITIATIVE, PAMELA GELLER, ROBERT SPENCER. (See Docket Entry 20 to view document). (znmw) (Entered: 09/06/2016) |

USCA Case #17-7059    Document #1685468    Filed: 07/24/2017    Page 12 of 165

| 09/23/2016 | 22 | Consent MOTION for Extension of Time to *File Opposition to Plaintiffs Cross Motion for Summary Judgment and Reply to Plaintiffs Opposition to Defendants Motion for Summary Judgment* by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (Attachments: # 1 Text of Proposed Order ORDER)(Stief, Gerard) (Entered: 09/23/2016) |
|---|---|---|
| 09/26/2016 | 23 | ORDER granting 22 Defendants' Consent Motion for Extension of Time; Defendant shall have up to and including October 3, 2016, in which to file their Opposition to Cross-Motion and Reply in Support of their Motion; Plaintiffs' shall have up to and including October 31, 2016, in which to file their Reply in Support of Cross-Motion. Signed by Judge Gladys Kessler on 9/26/16. (CL) (Entered: 09/26/2016) |
| 09/26/2016 | | Set/Reset Deadlines: Response to Cross Motions due by 10/3/2016. Reply to Cross Motions due by 10/31/2016. Reply to Motion for Summary Judgment due by 10/3/2016. (CL) (Entered: 09/26/2016) |
| 09/30/2016 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Rex S. Heinke, :Firm- Akin Gump Strauss Hauer & Feld, :Address- 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067. Phone No. - 310-229-1000. Fax No. - 310-229-1001 Filing fee $ 100, receipt number 0090-4693121. Fee Status: Fee Paid. by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (Attachments: # 1 Declaration of Rex Heinke, # 2 Text of Proposed Order)(Stief, Gerard) (Entered: 09/30/2016) |
| 10/03/2016 | 25 | Memorandum in opposition to re 21 MOTION for Summary Judgment, filed by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY. (Attachments: # 1 Statement of Facts, # 2 Exhibit)(Stief, Gerard) Modified link on 10/4/2016 (znmw). (Entered: 10/03/2016) |
| 10/03/2016 | 26 | NOTICE of Proposed Order by WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY re 25 Memorandum in Opposition, (Stief, Gerard) (Entered: 10/03/2016) |
| 10/03/2016 | 27 | REPLY to opposition to motion re 19 MOTION for Summary Judgment filed by WASHINGTON METROPOLITAN AREA |

| | | |
|---|---|---|
| | | TRANSIT AUTHORITY. (See Docket Entry 19 to view document). (znmw) (Entered: 10/04/2016) |
| 10/04/2016 | 28 | ORDER granting 24 the Motion for Leave of Rex S. Heinke to Appear Pro Hac Vice. Signed by Judge Gladys Kessler on 10/4/16. (CL) (Entered: 10/04/2016) |
| 10/31/2016 | 29 | REPLY to opposition to motion re 21 MOTION for Summary Judgment filed by AMERICAN FREEDOM DEFENSE INITIATIVE, PAMELA GELLER, ROBERT SPENCER. (Muise, Robert) (Entered: 10/31/2016) |
| 03/28/2017 | 30 | ORDER granting 19 Defendants' Motion for Summary Judgment; and denying 21 Plaintiffs' Motion for Summary Judgment. Signed by Judge Gladys Kessler on 3/28/17. (CL) (Entered: 03/28/2017) |
| 03/28/2017 | 31 | MEMORANDUM OPINION to the Order on the Motion and Cross-Motion for Summary Judgment. Signed by Judge Gladys Kessler on 3/28/17. (CL) (Entered: 03/28/2017) |
| 04/07/2017 | 32 | NOTICE OF APPEAL TO DC CIRCUIT COURT by AMERICAN FREEDOM DEFENSE INITIATIVE, PAMELA GELLER, ROBERT SPENCER. Filing fee $ 505, receipt number 0090-4906242. Fee Status: Fee Paid. Parties have been notified. (Muise, Robert) (Entered: 04/07/2017) |
| 04/10/2017 | 33 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date 4/7/17 re 32 Notice of Appeal to DC Circuit Court. (td) (Entered: 04/10/2017) |
| 04/12/2017 | | USCA Case Number 17-7059 for 32 Notice of Appeal to DC Circuit Court filed by ROBERT SPENCER, PAMELA GELLER, AMERICAN FREEDOM DEFENSE INITIATIVE. (td) (Entered: 04/18/2017) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 07/12/2017 10:12:25 |

| PACER | | Client |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE<br>1040 First Avenue<br>Room 121<br>New York, New York 10022<br><br>PAMELA GELLER<br>1040 First Avenue<br>Room 121<br>New York, New York 10022<br><br>ROBERT SPENCER<br>373 South Willow Street, #109<br>Manchester, New Hampshire 03103<br><br>       Plaintiffs,<br><br>    -v.-<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY (WMATA)<br>600 Fifth Street N.W.<br>Washington, D.C. 20001<br><br>JACK REQUA, in his official capacity as Interim<br>General Manager and Chief Executive Officer for<br>WMATA<br>600 Fifth Street N.W.<br>Washington, D.C. 20001<br><br>       Defendants. | **COMPLAINT**<br><br>[Civil Rights Action under<br>42 U.S.C. § 1983] |

Plaintiffs American Freedom Defense Initiative (hereinafter referred to as "AFDI"), Pamela Geller, and Robert Spencer (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Defendants Washington Metropolitan Area Transit Authority (WMATA) and Jack Requa in his official capacity as Interim General Manager and Chief Executive Officer for WMATA (collectively referred to as "Defendants" or "WMATA") and their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This case seeks to protect and vindicate fundamental constitutional rights.  It is a civil rights action brought under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, challenging Defendants' restriction on Plaintiffs' right to freedom of speech.  Defendants have adopted a policy that operates as a prior restraint on Plaintiffs' speech, prohibiting Plaintiffs from displaying advertisements on WMATA's property based on the content and viewpoint of Plaintiffs' message.

2.      Plaintiffs seek a declaration that Defendants violated their clearly established constitutional rights as set forth in this Complaint; a declaration that Defendants' restriction on Plaintiffs' speech violates the U.S. Constitution and 42 U.S.C. § 1983 as set forth in this Complaint; a preliminary and permanent injunction enjoining the enforcement of Defendants' speech restriction as set forth in this Complaint; and nominal damages for the past loss of Plaintiffs' constitutional rights.  Plaintiffs also seek an award of reasonable costs of litigation, including attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988 and other applicable law.

## JURISDICTION AND VENUE

3.      This action arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

4.      Pursuant to Section 81 of the Washington Metropolitan Area Transit Regulation Compact ("WMATA Compact"), federal district courts shall have concurrent original jurisdiction over suits against WMATA.  D.C. Code § 9-1107.01(81).

5.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the

## JA 11

general legal and equitable powers of this Court.  Plaintiffs' claim for nominal damages is authorized by 42 U.S.C. § 1983.

6.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PLAINTIFFS

7.      Plaintiff AFDI is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.  AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.

8.      AFDI achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the United States Constitution.

9.      AFDI exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including Washington, D.C.  AFDI purchases these advertisements to express its message on current events and public issues, including issues involving the suppression of free speech by Sharia-adherent Islamists and complicit government officials (hereinafter referred to as "AFDI's advertising campaign").

10.     Plaintiff Pamela Geller is the president of AFDI, and she engages in protected speech through AFDI's activities, including AFDI's advertising campaign.

11.     Plaintiff Robert Spencer is the vice president of AFDI, and he engages in protected speech through AFDI's activities, including AFDI's advertising campaign.

## DEFENDANTS

12.     Defendant WMATA is a government agency that was established through a congressionally approved interstate compact to provide public transportation in the Washington

D.C. metropolitan area.  One way in which WMATA raises revenue is by leasing the advertising space on its property.

13.     WMATA has waived Eleventh Amendment immunity in this case.  Section 80 of the WMATA Compact provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function."  D.C. Code § 9-1107.01(80).  The leasing of its advertising space is a proprietary function for immunity purposes under the Eleventh Amendment.

14.     Jack Requa is the Interim General Manager and Chief Executive Officer of WMATA.  As the Interim General Manager and Chief Executive Officer, Defendant Requa is responsible for enforcing the acts, policies, practices, and/or customs of WMATA, including the restriction on Plaintiffs' speech set forth in this Complaint.  At all relevant times, Defendant Requa was acting under color of state law.  Defendant Requa is sued in his official capacity.

## STATEMENT OF FACTS

15.     As a government agency, WMATA is mandated to comply with the First and Fourteenth Amendments to the U.S. Constitution.

16.     WMATA leases space on its property, including its Metrobuses and free-standing dioramas inside its subway stations, for use as advertising space.

17.     According to WMATA's website: "Metro provides a unique opportunity to reach the out-of-home market in the Washington metropolitan area.  The Metrobus and Metrorail system covers all of the District of Columbia and the suburbs of Maryland and Northern Virginia.  Exterior bus advertising penetrates 90% of the daily population and makes multiple impressions all over the region, throughout business districts, residential areas, and tourist attractions.  Advertising in the Metrorail system provides an opportunity to target business

executives, federal employees, students, and tourists.  Advertising displays are available on the sides, backs, and interiors of Metrobuses.  In the Metrorail system, backlighted advertising displays and two-sheet poster displays are available in Metro stations.  Advertising space is also available inside rail cars."  *See* http://www.wmata.com/business/advertising_with_metro.cfm (last visited on June 30, 2015).

18.    At the time Plaintiffs submitted the advertisements at issue here for display on WMATA's advertising space, WMATA leased its space for a wide array of political, religious, public-issue, public-service, and commercial advertisements, including advertisements expressing controversial views and addressing controversial issues.

19.    For example, WMATA has leased its advertising space for advertisements that criticize Israel and Jews, including an advertisement that sought to "End U.S. military aid to Israel."  WMATA has also displayed advertisements submitted by the Council on American-Islamic Relations (CAIR), a Hamas-linked, Muslim Brotherhood front organization, promoting CAIR's views on Islam and the Quran.

20.    At the time Plaintiffs submitted the advertisements at issue here, WMATA's advertising space was a public forum for Plaintiffs' speech.  Consequently, WMATA was required to display the advertisements pursuant to the First Amendment.

21.    In 2012, WMATA tried, unsuccessfully, to suppress Plaintiffs' speech by refusing to display Plaintiffs' pro-Israel / anti-jihad advertisement, thereby forcing Plaintiffs to file a federal civil rights lawsuit.  In that lawsuit, this Court held that WMATA violated Plaintiffs' First Amendment right to freedom of speech and enjoined WMATA's speech restriction.  *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73 (D.D.C. 2012).

22.     On May 20, 2015, and on behalf of all Plaintiffs, Plaintiff Geller submitted to WMATA's advertising agent for display on WMATA's buses and dioramas the advertisements at issue here.  As part of this submission, Plaintiffs stated that they "wish to submit the following ad to run on 20 Washington DC buses and 5 DC Dioramas including Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station (if available)."

23.     The proposed ad for display on WMATA's buses appears as follows:



24.     The proposed ad for display on WMATA's dioramas appears as follows:



25.     Both advertisements make the point that the First Amendment will not yield to Sharia-adherent Islamists who want to enforce so-called blasphemy laws here in the United States, whether through threats of violence or through the actions of complicit government officials, such as Defendants in this case.

26.     On or about May 22, 2015, WMATA's advertising agent responded to Plaintiff Geller's submission request, stating, in relevant part, "The copy has been submitted to the transit

**JA 15**

authority.  We are also looking into available inventory.  I will let you know about both as soon as I hear back."

27.     Because WMATA determined that it would not display Plaintiffs' advertisements on the basis of the content and viewpoint of Plaintiffs' message, on or about May 28, 2015, WMATA's Board of Directors took the unprecedented step of adopting a resolution that "directs management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious, and advocacy advertising until the end of the calendar year."

28.     As a result of this resolution, which was adopted for the purpose of suppressing Plaintiffs' speech, WMATA will not display Plaintiffs' advertisements.

29.     Pursuant to clearly established First Amendment jurisprudence, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury sufficient to warrant injunctive relief.

30.     Moreover, changes to a forum motivated by actual viewpoint discrimination, as in this case, are impermissible under the First Amendment.  Consequently, because the true purpose of WMATA's resolution was to silence Plaintiffs' disfavored speech, the federal courts are capable of taking prompt and measurably appropriate action to remedy this First Amendment violation.

### FIRST CLAIM FOR RELIEF

### (Freedom of Speech—First Amendment)

31.     Plaintiffs hereby incorporate by reference all stated paragraphs.

32.     By reason of the aforementioned speech restriction, including the resolution, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of

their right to engage in protected speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

33.     Defendants' restriction on Plaintiffs' speech is content- and viewpoint-based in violation of the Free Speech Clause of the First Amendment.

34.     Defendants' true purpose for adopting the resolution at issue here was to silence the viewpoint expressed by Plaintiffs' speech.  Consequently, the true purpose for adopting the resolution was to silence disfavored viewpoints in violation of the Free Speech Clause of the First Amendment.

35.     As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## SECOND CLAIM FOR RELIEF

### (Equal Protection—Fourteenth Amendment)

36.     Plaintiffs hereby incorporate by reference all stated paragraphs.

37.     By reason of the aforementioned speech restriction, including the resolution, created, adopted, and enforced under color of state law, Defendants have unconstitutionally deprived Plaintiffs of the equal protection of the law guaranteed under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983, in that Defendants are preventing Plaintiffs from expressing a message based on its content and viewpoint, thereby denying the use of a forum to those whose views Defendants find unacceptable.

## JA 17

38.     As a direct and proximate result of Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A)     to declare that Defendants' restriction on Plaintiffs' speech, including the adoption of the resolution at issue here, violates the First and Fourteenth Amendments to the U.S. Constitution as set forth in this Complaint;

B)     to preliminarily and permanently enjoin Defendants' speech restriction and its application to Plaintiffs' speech as set forth in this Complaint;

C)     to award Plaintiffs nominal damages for the past loss of their constitutional rights as set forth in this Complaint;

D)     to award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

E)     to grant such other and further relief as this Court should find just and proper.

**JA 18**

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

*/s/ Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

*/s/ David Yerushalmi*
David Yerushalmi, Esq. (DC Bar No. 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20001
david.yerushalmi@verizon.net
Tel: (646) 262-0500
Fax: (801) 760-3901

**JA 19**

# CIVIL COVER SHEET

JS-44 (Rev. 7/13 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| American Freedom Defense Initiative, Pamela Geller, and Robert Spencer | Washington Metropolitan Area Transit Authority and Jack Requa, in his official capacity |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** __88888__
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

American Freedom Law Center
Robert J. Muise, Esq.
PO Box 131098
Ann Arbor, MI 48113    (734) 635-3756

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ⊙ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

○ **A.** *Antitrust*

- ☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

- ☐ 151 Medicare Act

**Social Security**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

**Any nature of suit from any category may be selected for this category of case assignment.**

***(If Antitrust, then A governs)***

○ **E.** *General Civil (Other)*    OR    ○ **F.** *Pro Se General Civil*

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 27 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**Other Statutes**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization

- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

**JA 20**

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus – General** <br> ☐ **510 Motion/Vacate Sentence** <br> ☐ **463 Habeas Corpus – Alien Detainee** | ☐ **442 Civil Rights – Employment** (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions (if Privacy Act)** <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loan (excluding veterans)** |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **740 Labor Railway Act** <br> ☐ **751 Family and Medical Leave Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☒ **440 Other Civil Rights** <br> ☐ **445 Americans w/Disabilities – Employment** <br> ☐ **446 Americans w/Disabilities – Other** <br> ☐ **448 Education** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights – Voting (if Voting Rights Act)** |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi-district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Constitutional challenge under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   **DEMAND $** Nominal   **JURY DEMAND:**   Check **YES** only if demanded in complaint   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form

**DATE:** ___July 1, 2015___   **SIGNATURE OF ATTORNEY OF RECORD** /s/ Robert J. Muise

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.**   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# JA 21

Case 1:15-cv-01038-GK   Document 1-2   Filed 07/01/15   Page 1 of 2
USCA Case #17-7059      Document #1685468      Filed: 07/24/2017      Page 26 of 165
AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia ▼

| | |
|---|---|
| American Freedom Defense Initiative, Pamela Geller, and Robert Spencer <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> Washington Metropolitan Area Transit Authority and Jack Requa, in his official capacity <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 15-1038 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

                Robert J. Muise
                American Freedom Law Center
                PO Box 131098
                Ann Arbor, MI 48113

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

                _____
                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Washington Metropolitan Area Transit Authority

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## JA 23

Case 1:15-cv-01038-GK   Document 1-3   Filed 07/01/15   Page 1 of 2
USCA Case #17-7059     Document #1685468      Filed: 07/24/2017     Page 28 of 165
AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia ▼

| | |
|---|---|
| American Freedom Defense Initiative, Pamela Geller, and Robert Spencer | ) ) ) ) ) |
| _Plaintiff(s)_ | ) ) ) |
| v. | ) Civil Action No. 15-1038 |
| Washington Metropolitan Area Transit Authority and Jack Requa, in his official capacity | ) ) ) ) ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Jack Requa
600 Fifth Street, N.W.
Washington, D.C. 20001

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Robert J. Muise
American Freedom Law Center
PO Box 131098
Ann Arbor, MI 48113

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____     _____
_Signature of Clerk or Deputy Clerk_

**JA 24**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Jack Requa

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**JA 25**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE | : |
| | : |
| and | : |
| | : |
| PAMELA GELLER | : |
| | : |
| and | : |
| | : |
| ROBERT SPENCER | : |
| | : |
| Plaintiffs | : |
| | : |
| v. | : Case No. 1:15-cv-01038-GK |
| | : |
| WASHINGTON METROPOLITAN | : |
| AREA TRANSIT AUTHORITY ("WMATA") | : |
| 600 Fifth Street, N.W. | : |
| Washington, D.C.  20001 | : |
| | : |
| and | : |
| | : |
| JACK REQUA, in his official capacity as | : |
| Interim General Manager and | : |
| Chief Executive Officer for WMATA | : |
| 600 Fifth Street, N.W. | : |
| Washington, D.C. 20001 | : |
| | : |
| Defendants. | : |
| _____ | : |

<u>ANSWER OF DEFENDANTS WMATA AND REQUA</u>

Defendants Washington Metropolitan Area Transit Authority ("WMATA") and Jack

Requa, in his official capacity as Interim General Manager and Chief Executive Officer for

WMATA, hereby state their Answer to Plaintiffs' Complaint.

<u>Responses to Paragraphs in Complaint</u>

1.    Denied.

2.    Denied.

**JA 26**

3.  The first sentence of Paragraph 3 constitutes a statement of the case to which no response is deemed necessary.  To the extent any response is deemed necessary, it is denied.  With respect to the second sentence of Paragraph 3, Defendants admit only that this Court has jurisdiction over Defendant WMATA, subject to claims of immunity, and denies all other allegations.

4.  With respect to Paragraph 4, Defendants admit only that Section 81 of the WMATA Compact is the best evidence of its own contents, and denies all other allegations.

5.  Denied.

6.  With respect to Paragraph 6, Defendants admit only that venue is proper in this Court, and denies all other allegations.

7.  Denied for lack of information and belief.

8.  Denied.

9.  Denied.  By way of further answer, Defendants admit only that, in the past, AFDI has purchased advertising space on property of certain transit systems in the United States, including WMATA in the Washington, D.C. metropolitan area.

10.  Defendants deny the allegation that Ms. Geller is the president of AFDI for lack of information and belief.  By way of further answer, Defendants deny the remaining allegations of Paragraph 10.

11.  Defendants deny the allegation that Mr. Spencer is the vice president of AFDI for lack of information and belief.  By way of further answer, Defendants deny the remaining allegations of Paragraph 11.

**JA 27**

12.   Defendants admit the allegations of the first sentence of Paragraph 12.  With respect to the second sentence, Defendants admit only that WMATA raises certain revenue through its advertising program, and denies all other allegations.

13.   Denied.  By way of further answer, Defendants admit only that the full text of Section 80 of the WMATA Compact is the best evidence of its own contents.

14.   Defendants admit the allegations of the first sentence of Paragraph 14. Defendants deny the allegations of the second and third sentences of Paragraph 14.  The fourth sentence of Paragraph 14 constitutes a legal conclusion to which no response is necessary.

15.   Paragraph 15 constitutes a legal conclusion to which no response is necessary.

16.   With respect to Paragraph 16, Defendants admit only that WMATA leases limited space on its property, including spaces on its Metrobuses and dioramas inside Metrorail stations, for limited use as advertising space in accordance with its regulations.

17.   With respect to Paragraph 17, WMATA admits only that the information on its website is the best evidence of its own contents, and denies all other allegations.

18.   Denied.  By way of further answer, WMATA admits only that at the referenced time, WMATA leased space for advertisements in accordance with its regulations.

19.   Denied for lack of information and belief.

**JA 28**

20. Paragraph 20 constitutes legal conclusions to which no response is necessary.  To the extent any response is deemed necessary, it is denied.

21. Defendants deny the allegations of the first sentence of Paragraph 21.  With respect to the second sentence of Paragraph 21, Defendants admit only that the referenced decision is the best evidence of its own contents, and deny all other allegations.

22. Denied for lack of information and belief.

23. Denied for lack of information and belief.

24. Denied for lack of information and belief.

25. With respect to Paragraph 25, Defendants admit only that the referenced proposed advertisements are the best evidence of their own contents, and deny all other allegations.

26. Denied for lack of information and belief.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

<u>COUNT I</u>

31. Defendants incorporate by reference Answer Nos. 1-30, <u>supra</u>.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

<u>COUNT II</u>

36.   Defendants incorporate by reference Answer Nos. 1-35, <u>supra</u>.

37.   Denied.

38.   Denied.

Defendants deny all other allegations not specifically admitted or otherwise answered.

<u>First Affirmative Defense</u>

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

<u>Second Affirmative Defense</u>

Plaintiffs' claims are barred by sovereign, governmental, Eleventh Amendment, and/or qualified immunity.

<u>Third Affirmative Defense</u>

Should discovery provide a basis, Defendants reserve the right to argue that this case is barred by the statute of limitations and/or laches.

<u>Fourth Affirmative Defense</u>

Defendants reserve the right to argue that Plaintiffs' claims are barred by waiver or estoppel.

<u>Fifth Affirmative Defense</u>

WMATA's advertising program is fully consistent with the First Amendment and other constitutional provisions and all of WMATA's actions taken in this matter were appropriate.

<u>Sixth Affirmative Defense</u>

Defendants reserve the right to argue that each Plaintiff lacks standing to maintain this action.

**JA 30**

WHEREFORE, having fully answered the Complaint, Defendants request that this case be dismissed with prejudice and that Defendants be awarded all recoverable costs.

Respectfully submitted,

/s/ Gerard J. Stief
Gerard J. Stief #925933
Chief Counsel—Appeals & Special Litigation
WMATA
600 Fifth Street, N.W.
Washington, DC 20001
202-962-1463
202-962-2550 (fax)
gstief@wmata.com
Attorney for Defendants WMATA and Requa

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Answer was electronically transmitted this 18th day of September, 2015, to:

Robert J. Muise
P.O. Box 131098
Ann Arbor, MI 48113

David Yerushalmi
1901 Pennsylvania Ave., N.W.
Suite 201
Washington, D.C. 20006

/s/ Gerard J. Stief
Gerard J. Stief

**JA 31**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE, | |
| Plaintiffs, | |
| -v.- | Case No.  1:15-cv-01038-GK |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., | |
| Defendants. | |

**AFFIDAVIT OF LYNN BOWERSOX**

1. I make this Affidavit on personal knowledge and information available to me, and I am competent to testify to the matters contained herein.

2. I am the Assistant General Manager for Customer Service, Communications, and Marketing at the Washington Metropolitan Area Transit Authority ("WMATA").   Among my duties, I oversee the activities of WMATA's Office of Marketing and advertising program related to the Metrorail and Metrobus systems.

3. Attached hereto as Exhibit A is a true and accurate copy of the Motion which was approved by WMATA's Board of Directors on May 28, 2015 to close WMATA's commercial advertising space to all issue-oriented advertising, including political, religious, and advocacy advertising until the end of 2015 pending review and public comment.

4. The review directed by the Board of Directors was conducted under the auspices of my department.

5. Attached hereto as Exhibit B is a true and accurate copy of WMATA Board of Directors' Resolution No. 2015-55, which was approved by the Board on November 19, 2015.  This

Resolution, with its attached amended Guidelines Governing Commercial Advertising,

closed WMATA's commercial advertising space to all such issue-oriented advertising on a

permanent basis.  The Resolution also reflects certain of the results of the survey of the

riding public referenced therein.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed

on August 4, 2016.

Lynn Bowersox

~50:00

1°MD  2°MiG  all Aye

**MOTION BY CHAIR OF BOARD OF DIRECTORS, MAY 28, 2015**

The Board of Directors is responsible for establishing policies of the Washington Metropolitan Area Transit Authority. Pursuant to its powers under Compact Article V, 12 (j) to regulate the use of facilities owned or controlled by the Authority, the Board hereby directs management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year.

During this period, the Board will review what role such issue-oriented advertising has in WMATA's mission to deliver, safe, equitable and reliable transportation services to the Nation's Capital, and will seek public comment and participation for its consideration before making a final policy determination.

In accordance with the Board's authority, I move that:

The Board of Directors close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year.

A

**JA 34**

**PRESENTED AND ADOPTED:  November 19, 2015**

SUBJECT:   APPROVAL OF CLOSING OF COMMERCIAL ADVERTISING SPACE TO
ISSUE-ORIENTED ADVERTISING

**2015-55**

RESOLUTION
OF THE
BOARD OF DIRECTORS
OF THE
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

WHEREAS, In 1972, the Board of Directors adopted the Washington Metropolitan Area
Transit Authority's (WMATA) Commercial Advertising Guidelines; and

WHEREAS, On May 29, 2015, the Board of Directors temporarily closed WMATA's
commercial advertising space to any and all issue-oriented advertising, including, but not
limited to, political, religious and advocacy advertising until the end of the calendar year,
and directed Staff to seek public comment and participation regarding WMATA's
Commercial Advertising Program for the Board's consideration before making a final
policy determination regarding what measures are appropriate to maximize WMATA's
commercial advertising revenue stream consistent with WMATA's core mission of
providing safe, reliable public transportation; and

WHEREAS, In mid-September, staff engaged in a survey of the riding public to measure:
(1) the public's familiarity with the various types of advertising; (2) public acceptance of
various advertising methods; (3) public acceptance of issue-oriented advertising; and
(4) public acceptance to change to WMATA's advertising policy to allow alcohol ads; and

WHEREAS, The results show that: (1) 98% of the public is familiar with the types of
advertisements found on buses, trains and in stations; (2) 58% oppose issue-oriented
ads with that percent rising when the ads pose potential security concerns while 41% are
supportive of running issue-oriented ads; and (3) 20% are extremely supportive of
issue-oriented advertisements while 46% are extremely opposed; and

WHEREAS, Staff has drafted revisions to the Commercial Advertising Guidelines, attached
as Attachment A, closing access to ads that are issue-oriented, including political,
religious, and/or advocacy in nature; now, therefore be it

*RESOLVED*, That the Board of Directors hereby closes WMATA's Commercial Advertising
Space to issue-oriented ads, including political, religious and advocacy ads, and adopts
the changes to the Commercial Advertising Guidelines, as shown on Attachment A; and
be it finally

Motioned by Mr. Evans, seconded by Mr. Goldman
Ayes: 8 – Mr. Downey, Mr. Goldman, Mrs. Hudgins, Mr. Evans, Ms. Tregoning, Ms. Harley, Mr. Corcoran
and Mr. Dormsjo

*B*

**JA 35**

*RESOLVED*, That this Resolution shall be effective 30 days after adoption in accordance with § 8(b) of the WMATA Compact.

Reviewed as to form and legal sufficiency,

Mark R. Pohl
Acting General Counsel

WMATA File Structure No.:
18.4.2 Ads by Others in Metro Space

2

## Guidelines Governing
## Commercial Advertising

Adopted August 3, 1972
by
Board of Directors
Amended November 20, 2003

Amended by
General Manager/Chief Executive Officer
October 16, 2012

1.  All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless the inconsistencies among the various jurisdictions prevents such compliance. Advertising will not be accepted which is false, misleading or deceptive.

2.  Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations.

3.  Testimonials should be authentic and shall honestly reflect the response of the person making them.  (The sales contract shall provide for the indemnification of WMATA against action by any person quoted or referred to in any advertisement placed in the Metro system).

4.  Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration.

5.  Advertisers shall avoid illustrations or references which disregard normal safety precautions.

6.  Advertising offering premiums or gifts shall avoid representations which would enlarge the value of the item in the minds of the viewers.

7.  Use of Metro graphics or representations in advertising is subject to approval by WMATA.

8.  No implied or declared endorsement of any product or service or message by WMATA is permitted.

9.  Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

10.   Advertisements of alcohol and tobacco products are prohibited in accordance with Board Resolution 94-36.

11.   Advertisements that support or oppose any political party or candidate are prohibited.

12.   Advertisements that promote or oppose any religion, religious practice or belief are prohibited.

13.   Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.

14.   Advertisements that are intended to influence public policy are prohibited.

# EXHIBIT 1

USCA Case #17-7059      Document #1685468        Filed: 07/24/2017      Page 44 of 165

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; and ROBERT SPENCER, <br><br> Plaintiffs, <br><br> -v.- <br><br> WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, <br><br> Defendant. | Case No.  1:15-cv-01038-GK <br><br> DECLARATION OF PAMELA GELLER |

I, Pamela Geller, make this declaration pursuant to 28 U.S.C. § 1746 based on my personal knowledge and upon information and belief where noted:

1.      I am an adult citizen of the United States and a resident of the State of New York.

2.      Robert Spencer and I co-founded American Freedom Defense Initiative ("AFDI"), which is incorporated under the laws of the State of New Hampshire.  I am the President of AFDI, and Mr. Spencer is the Vice President.

3.      Mr. Spencer and I engage in political speech through AFDI's activities, including AFDI's advertising campaign, as described below.

4.      AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.

5.      AFDI exercises its right to freedom of speech and promotes its objectives through an advertising campaign which involves purchasing advertising space on transit authority property in major cities throughout the United States, including Washington, D.C.

# JA 40

6.      AFDI purchases advertisements on transit authority property to express its message on current events and public issues, including issues involving the suppression of free speech (hereinafter referred to as "AFDI's advertising campaign").

7.      WMATA leases space on its property, including its Metrobuses and free-standing dioramas inside its subway stations, for use as advertising space.

8.      According to WMATA's website:

> Metro provides a unique opportunity to reach the out-of-home market in the Washington metropolitan area.  The Metrobus and Metrorail system covers all of the District of Columbia and the suburbs of Maryland and Northern Virginia. Exterior bus advertising penetrates 90% of the daily population and makes multiple impressions all over the region, throughout business districts, residential areas, and tourist attractions.  Advertising in the Metrorail system provides an opportunity to target business executives, federal employees, students, and tourists. Advertising displays are available on the sides, backs, and interiors of Metrobuses. In the Metrorail system, backlighted advertising displays and two-sheet poster displays are available in Metro stations.  Advertising space is also available inside rail cars.

http://www.wmata.com/business/advertising_with_metro.cfm (last visited on August 24, 2015). A true and correct copy of this webpage is attached to this declaration as Exhibit A.

9.      At the time I submitted the advertisements at issue here for display on WMATA's advertising space (these advertisements were submitted on my behalf and on behalf of AFDI and Mr. Spencer), WMATA leased its space for a wide array of political, religious, public-issue, public-service, and commercial advertisements, including advertisements expressing controversial views and addressing controversial issues.

10.      For example, WMATA has leased its advertising space for advertisements that criticize Israel and Jews, including an advertisement that sought to "End U.S. military aid to Israel."  WMATA has also displayed advertisements submitted by the Council on American-Islamic Relations (CAIR), promoting CAIR's views on Islam and the Quran.

11.     At the time I submitted the advertisements at issue here, WMATA's advertising space was a public forum for our speech.  *See AFDI v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d at 78-79 ("Since WMATA conceded that it provides a public forum for advertising, the Court considers that aspect of the standard satisfied.") (hereinafter "*AFDI v. WMATA I*").

12.     In 2012, WMATA tried, unsuccessfully, to suppress our (AFDI's, Mr. Spencer's and my) speech by delaying, and thus refusing, to display our pro-Israel / anti-jihad advertisement, thereby forcing us to file a federal civil rights lawsuit.  In that lawsuit, this Court held that WMATA violated our First Amendment right to freedom of speech and enjoined WMATA's speech restriction.  *AFDI v. WMATA I*, 898 F. Supp. 2d at 83, 84.

13.     On May 20, 2015, I submitted, on behalf of all of the plaintiffs, to WMATA's advertising agent for display on WMATA's buses and dioramas the advertisements at issue here. As part of this submission, I stated that we "wish to submit the following ad to run on 20 Washington DC buses and 5 DC Dioramas including Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station (if available)."

14.     The ad I submitted for display on WMATA's buses appears as follows:



A true and correct copy of this ad is attached to this declaration as Exhibit B.

**JA 42**

15.      The ad I submitted for display on WMATA's dioramas appears as follows:



A true and correct copy of this ad is attached to this declaration as Exhibit C.

16.      Both advertisements make the point that the First Amendment will not yield to Sharia-adherent Islamists who want to enforce so-called blasphemy laws here in the United States, whether through threats of violence or through the actions of complicit government officials, who are all too willing to suppress speech that might offend Islam.

17.      On May 22, 2015, WMATA's advertising agent responded to my submission request, stating, in relevant part, "The copy has been submitted to the transit authority.  We are also looking into available inventory.  I will let you know about both as soon as I hear back."  A true and correct copy of this communication is attached to this declaration as Exhibit D.

18.      Because WMATA determined that it would not display our advertisements, on May 28, 2015, WMATA's Board of Directors took the unprecedented step of "direct[ing] management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious, and advocacy advertising until the end of the calendar year."

19.      This "moratorium," which was brought by way of a motion that evening, was not previously on the agenda of the Board of Directors.  Indeed, the Board members themselves

- 4 -

**JA 43**

questioned during the meeting the procedural propriety of the motion. Moreover, this was the first Board of Directors meeting scheduled following the submission of our "Support Free Speech" advertisements. See a copy of the transcript of the board meeting attached to this declaration as Exhibit E and a copy of the agenda for this meeting attached to this declaration as Exhibit F.

20.     The approval of this unprecedented motion fundamentally altered (temporarily) the way WMATA had been doing business for decades. *See, e.g., Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893 (D.C. Cir. 1984).

21.     As a result of this "moratorium," which was approved for the purpose of delaying and thus suppressing our speech, WMATA will not display our advertisements.

22.     On November 19, 2015, WMATA passed a resolution which established advertising guidelines that WMATA will use to now prevent the display of AFDI's advertisements on a more permanent basis. A copy of this resolution is attached to this declaration as Exhibit G.

23.     We (the plaintiffs in this case) want to display our advertisements on WMATA property, and wanted to do so when the ads were originally submitted. However, WMATA refused to display the ads, and continues to refuse to do so today, thereby causing us irreparable harm.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this **30** day of August 2016.

Pamela Geller

- 5 -

**JA 44**

# EXHIBIT A



USCA Case #17-7059      Document #1685468          Filed: 07/24/2017      Page 51 of 165

# EXHIBIT B



USCA Case #17-7059 Document #1685468 Filed: 07/24/2017 Page 53 of 165

# EXHIBIT C



# EXHIBIT D

---------- Forwarded message ----------
From: **Marcus, Howard** <howard.marcus@outfrontmedia.com>
Date: Fri, May 22, 2015 at 11:41 AM
Subject: RE: DC Diorama and Bus Campaign: Free Speech
To: Pamela Geller <pamelageller@gmail.com>

Pam,

The copy has been submitted to the transit authority. We are also looking into available inventory. I will let you know about both as soon as I hear back.

Thank you!

Howard

**Howard Marcus** | Account Executive

**JA 52**

Direct: 212-297-6467 |  OutfrontMedia.com

405 Lexington Ave. New York, NY 10174

**OUTFRONT Media** (formerly CBS Outdoor)

**From:** Pamela Geller [mailto:pamelageller@gmail.com]
**Sent:** Wednesday, May 20, 2015 5:11 PM
**To:** Marcus, Howard
**Cc:** David Yerushalmi; Robert Muise AFLC; spencerrobert42@yahoo.com
**Subject:** DC Diorama and Bus Campaign: Free Speech


Howard, I wish to submit the following ad to run on 20 Washington DC buses and 5 DC Dioramas including Foggy Bottom,Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station (if available).



Diorama



 bus



--

**JA 53**

Yours in liberty,
Pamela Geller
President, American Freedom Defense Initiative (AFDI)
Editor, Publisher Atlas Shrugs
PamelaGeller.com

Pamela Geller on Facebook
@PamelaGeller on Twitter


American Freedom Defense Initiative is dedicated to freedom of speech, freedom of conscience, individual rights and equality for all before the law.

**JA 54**

# EXHIBIT E

Board of Directors Meeting, 5/28/15, audio 49:37 – 52:45:

Speaker 1: I have a motion that I would like to offer, it's is not on the agenda, but, unless Mr. Goldman wants to offer it, I'm

Speaker 2: It's his motion of the chair, it is just a matter of procedure whether we have to reopen the agenda in order to entertain that motion you have made.  Do we need to do anything procedurally?

Speaker 1: That is what I was asking is to reopen and add an item to the agenda, which I will offer.  I move this item: The Board of Directors is responsible for establishing policies of the Washington Metropolitan Area Transit Authority.  Pursuant to its powers under Compact Article V 12(j), who regulate the use of facilities owned by, owned or controlled by the Authority, the Board hereby directs management to close WMATA's advertising space to any and all issue-oriented advertising including but not limited to political, religious and advocacy advertising until the end of this calendar year.  During this period, the Board will review what role such issue-oriented advertising has and WMATA's mission to deliver safe, equitable and reliable transportation services to the nation's capital and will seek public comment and participation for its consideration before making a final policy determination.  In accordance with that authority of the Board, I move that the Board of Directors close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to political, religious and advocacy advertising until the end of calendar year 2015.

Speaker _: I second

Speaker _: Price

Speaker 1: Is there a discussion of the motion?

Mr. Goldman: I just think the only discuss I would have is that we've seen the use of the advertising space in recent months with a great deal of issue advertising things that go from talking about open skies agreements with certain Mid-East countries to the animal experimentation practices at some of our national science institutes, so I think there is a need to sort of pull back and take a look at these ads and just decide on them, a board policy going forward as to which ads we would want to have, if all in the space or none or something in between, and I think we need to…

Speaker 1: Or maybe all or none

Mr. Goldman: …suspend practice while we do that reassessment.

Speaker 1: All of the ads will be suspended.  We will get a report back on the implications of this as we move forward, particularly any contract amendments that might be required with the place or the advertisement group that for the ad space.

Speaker 1: Any further discussions?

Speaker 1: All in favor,

Speaker _: I

**JA 56**

Speaker 1: Any oppose?

Speaker 1: Hearing none, the motion carries.

# EXHIBIT F

*REVISED*
**Agenda**
**1407th Meeting of the Board of Directors**
**May 28, 2015**
**1 p.m.**



I.   Call to Order

II.   Approval of Agenda .................................................. Mr. Downey

**III.   Certification of Executive Sessions ......................Mrs. Hudgins**
   **A.   May 14, 2015**
   **B.   May 28, 2015**

IV.   Approval of Minutes .................................................. Mr. Downey
   A.   April 23, 2015 Board Meeting
   B.   April 23, 2015 Executive Session
   C.   May 14, 2015 Executive Session

V.   Public Comment

VI.   Report by Accessibility Advisory Committee ................. Mr. Sheehan

VII.   Report by Riders' Advisory Council  ............................ Ms. Hermanson

VIII.   Report by Chair ........................................................ Mr. Downey
   A.   Salute to Service – Mildred Burrell
   B.   Approval of Accessibility Advisory Committee Appointments
   C.   Approval of Riders' Advisory Council Appointments

IX.   Report by GM/CEO .................................................. Mr. Requa
   A.   GM/CEO Monthly Report
   B.   Employee Spotlight – Tina Moore, Rail
      Operator

X.   Report by Planning, Program Development and............ Ms. Tregoning
   Real Estate Committee
   A.   Approval of Capitol Heights Joint Development
      Term Sheet
   B.   Approval of Grosvenor Joint Development Term
      Sheet

**Washington Metropolitan Area Transit Authority**

600 Fifth Street, NW
Washington, DC  20001
202/962-1234

By Metrorail:
Judiciary Square—Red
Line
Gallery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
Routes D1, D3, D6, P6,
70, 71, 80, X2

*A District of Columbia, Maryland and Virginia Transit Partnership*

**JA 59**

1407th Meeting of the Board of Directors
May 28, 2015
Page 2

XI.  Report by Customer Service and Operations ................ Mrs. Hudgins
     Committee
     A.  Approval of Public Hearing for Takoma Langley
         Crossroads Transit Center

XI.  Report by Finance and Administration Committee......... Mr. Euille
     A.  Approval of FY2016 Operating Budget and
         FY2016-FY2021 Capital Improvement Program
     B.  Approval of Revisions to Drug and Alcohol
         Policy and Change in Delegation
     C.  Approval of Revised Budget for Silver Line –
         Phase I and Phase II
     D.  Approval to Accept FY2014 NVTA Funding for
         Traction Power Upgrades

XII.  Report by Governance Committee............................. Mrs. Hynes
      A.  Approval of Revised Board Committee
          Assignments

XIII. Consent Item
      A.  Approval of Renewal of Line of Credit..................... Mr. Anosike

XIV.  Reports by
          D.C. ............................................................... Mr. Evans
          WSTC............................................................... Mr. Goldman
          NVTC ............................................................... Mrs. Hudgins
          Federal Government ......................................... Mr. Downey

XV.   Adjournment

**JA 60**

USCA Case #17-7059 Document #1685468 Filed: 07/24/2017 Page 65 of 165

# EXHIBIT G

**PRESENTED AND ADOPTED:  November 19, 2015**


SUBJECT:    APPROVAL OF CLOSING OF COMMERCIAL ADVERTISING SPACE TO
ISSUE-ORIENTED ADVERTISING

**2015-55**

RESOLUTION
OF THE
BOARD OF DIRECTORS
OF THE
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY


WHEREAS, In 1972, the Board of Directors adopted the Washington Metropolitan Area
Transit Authority's (WMATA) Commercial Advertising Guidelines; and

WHEREAS, On May 29, 2015, the Board of Directors temporarily closed WMATA's
commercial advertising space to any and all issue-oriented advertising, including, but not
limited to, political, religious and advocacy advertising until the end of the calendar year,
and directed Staff to seek public comment and participation regarding WMATA's
Commercial Advertising Program for the Board's consideration before making a final
policy determination regarding what measures are appropriate to maximize WMATA's
commercial advertising revenue stream consistent with WMATA's core mission of
providing safe, reliable public transportation; and

WHEREAS, In mid-September, staff engaged in a survey of the riding public to measure:
(1) the public's familiarity with the various types of advertising; (2) public acceptance of
various advertising methods; (3) public acceptance of issue-oriented advertising; and
(4) public acceptance to change to WMATA's advertising policy to allow alcohol ads; and

WHEREAS, The results show that: (1) 98% of the public is familiar with the types of
advertisements found on buses, trains and in stations; (2) 58% oppose issue-oriented
ads with that percent rising when the ads pose potential security concerns while 41% are
supportive of running issue-oriented ads; and (3) 20% are extremely supportive of
issue-oriented advertisements while 46% are extremely opposed; and

WHEREAS, Staff has drafted revisions to the Commercial Advertising Guidelines, attached
as Attachment A, closing access to ads that are issue-oriented, including political,
religious, and/or advocacy in nature; now, therefore be it

*RESOLVED*, That the Board of Directors hereby closes WMATA's Commercial Advertising
Space to issue-oriented ads, including political, religious and advocacy ads, and adopts
the changes to the Commercial Advertising Guidelines, as shown on Attachment A; and
be it finally


**Motioned by Mr. Evans, seconded by Mr. Goldman**
**Ayes: 8 – Mr. Downey, Mr. Goldman, Mrs. Hudgins, Mr. Evans, Ms. Tregoning, Ms. Harley, Mr. Corcoran**
**and Mr. Dormsjo**

*RESOLVED*, That this Resolution shall be effective 30 days after adoption in accordance with § 8(b) of the WMATA Compact.

Reviewed as to form and legal sufficiency,

_____

Mark R. Pohl
Acting General Counsel

WMATA File Structure No.:
18.4.2 Ads by Others in Metro Space

### Guidelines Governing
### Commercial Advertising

Adopted August 3, 1972
by
Board of Directors
Amended November 20, 2003

Amended by
General Manager/Chief Executive Officer
October 16, 2012

1.   All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless the inconsistencies among the various jurisdictions prevents such compliance. Advertising will not be accepted which is false, misleading or deceptive.

2.   Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations.

3.   Testimonials should be authentic and shall honestly reflect the response of the person making them.  (The sales contract shall provide for the indemnification of WMATA against action by any person quoted or referred to in any advertisement placed in the Metro system).

4.   Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration.

5.   Advertisers shall avoid illustrations or references which disregard normal safety precautions.

6.   Advertising offering premiums or gifts shall avoid representations which would enlarge the value of the item in the minds of the viewers.

7.   Use of Metro graphics or representations in advertising is subject to approval by WMATA.

8.   No implied or declared endorsement of any product or service or message by WMATA is permitted.

9.   Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

USCA Case #17-7059      Document #1685468          Filed: 07/24/2017      Page 69 of 165

10.   Advertisements of alcohol and tobacco products are prohibited in accordance with Board Resolution 94-36.

11.   Advertisements that support or oppose any political party or candidate are prohibited.

12.   Advertisements that promote or oppose any religion, religious practice or belief are prohibited.

13.   Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.

14.   Advertisements that are intended to influence public policy are prohibited.

**JA 65**

USCA Case #17-7059      Document #1685468           Filed: 07/24/2017      Page 70 of 165

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FREEDOM DEFENSE
INITIATIVE; PAMELA GELLER; and
ROBERT SPENCER,

         Plaintiffs,

     -v.-

WASHINGTON   METROPOLITAN   AREA
TRANSIT AUTHORITY,

         Defendant.

Case No.  1:15-cv-01038-GK

DECLARATION OF ROBERT J. MUISE

     I, Robert J. Muise, make this declaration pursuant to 28 U.S.C. § 1746 based on my personal knowledge and upon information and belief where noted:

     1.     I am an adult citizen of the United States and co-counsel for Plaintiffs in this case. Consequently, I have personal knowledges of the papers and filings in this case.

     2.     Attached to this declaration as Exhibit A are true and correct excerpts from the deposition of Lynn Bowersox, who was testifying on behalf of Defendant Washington Metropolitan Area Transit Authority ("WMATA") pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

     3.     Attached to this declaration as Exhibit B is a true and accurate excerpt of the transcription of the audio recording (49:37-52/45) of the May 28, 2015, WMATA Board of Directors meeting in which the "moratorium" motion on "issue-oriented" advertising was passed.

     4.     Attached to this declaration as Exhibit C is a true and accurate copy of the agenda for the May 28, 2015, WMATA Board of Directors meeting in which the "moratorium" motion on "issue-oriented" advertising was considered and passed.  As noted by the exhibit, this motion was not on the published agenda for the meeting.

**JA 67**

5.     Attached to this declaration as Exhibit D is a true and correct copy of the "Motion by Chair of Board of Directors, May 28, 2015" that was produced by Defendants during the course of discovery and marked as Bates # 10.  This motion had printed on it "Approved Unanimously May 22, 2015," yet the meeting to consider it was not scheduled to take place until May 28, 2015, and this motion was not on the Board's published agenda.

6.     The General Manager and Chief Executive Officer for WMATA is responsible for "[a]dminister[ing] and interpret[ing]" WMATA's policies, which includes WMATA's advertising policies used to censor Plaintiffs' speech in this case.  This information is found in a position description that was posted by WMATA on its website, a true and correct copy of which is attached to this declaration as Exhibit E.   The position description was posted at http://www.wmata.com/Images/Mrel/MF_Uploads/GMCEO-PD.pdf.

7.     Attached to this declaration as Exhibit F is a document titled, "History with AFDI Advertising," which Defendants produced during the course of discovery in this case and marked as Bates # 384-85.  Per the testimony of Ms. Bowersox (Bowersox Dep. at 23-24), this document was prepared prior to the May 28, 2015, meeting of the WMATA Board of Directors.  Also per Ms. Bowersox's testimony, Mr. Mort Downey, the Chairman of the WMATA Board of Directors at the time, sent Ms. Bowersox an email on May 26, 2015, with a copy of a news article titled, "Pamela Geller submits Prophet Muhammad cartoon ads for display on Washington, D.C., Metro buses, trains."  In the email, which is marked as Bates # 293-97, Mr. Downey states in reference to the article, "We should be prepared for a discussion with Board on Thurs."  Ms. Bowersox responds, "We are."   A true and correct copy of this email is attached to this declaration as Exhibit G.

- 2 -

# JA 68

8.      The "History with AFDI Advertising" document shows that at the time Plaintiffs submitted their advertisement and before the "moratorium" went into effect, there was known availability for the placement of Plaintiffs' advertisements.

9.      The May 28, 2015, meeting of the WMATA Board of Directors was the first scheduled meeting following Plaintiffs' submission of their advertisements at issue here. Attached to this declaration as Exhibit H is a true and correct copy of a screen shot of WMATA's website setting forth the past meeting schedule of its Board of Directors.  This information can be found at WMATA's website under "Board Meeting and Committee Agendas" at http://www.wmata.com/about_metro/board_of_directors/meetings.cfm (last visited on Aug. 24, 2016).

10.      I was also co-counsel for these same plaintiffs in *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73 (D.D.C. 2012) (granting injunction for violating the First Amendment) (hereinafter "*AFDI v. WMATA I*").

11.      In *AFDI v. WMATA I*, WMATA agreed to settle our claim for attorneys' fees brought pursuant to 42 U.S.C. § 1988 by paying my law firm, the American Freedom Law Center, $35,000.  True and correct emails from Mr. Phillip T. Staub, Associate General Counsel for WMATA, demonstrating the agreement to pay attorneys' fees are attached to this declaration as Exhibit I.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 31st day of August 2016.

_____
Robert J. Muise

- 3 -

# JA 69

# EXHIBIT A

**In The Matter Of:**

*American Freedom Defense Initiative, et al. vs.*

*Washington Metropolitan Area Transit Authority, et al.*

*Lynn M. Bowersox*

*April 13, 2016*



**Bingham Farms/Southfield ● Grand Rapids**

Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BOXERSOX_LYNN M..txt*

*Min-U-Script® with Word Index*

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 7 of 56
American Freedom Defense Initiative, et al vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al             April 13, 2016
USCA Case #17-7059   Document #1683468   Filed: 07/24/2017   Page 76 of 165

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3  - - - - - - - - - - - - - - - - - x
 4  AMERICAN FREEDOM DEFENSE          :
 5  INITIATIVE; PAMELA GELLER; and    :
 6  ROBERT SPENCER,                   :
 7       Plaintiffs                   :
 8  v.                               : Case No.
 9  WASHINGTON METROPOLITAN AREA      : 1:15-cv-01038-GK
10  TRANSIT AUTHORITY, et al,         :
11       Defendants                   :
12  - - - - - - - - - - - - - - - - - x
13
14  Deposition of Washington Metropolitan Area Transit
15        Authority through 30(b)(6) witness
16              LYNN M. BOWERSOX
17               Washington, D.C.
18          Wednesday, April 13, 2016
19                  10:10 a.m.
20
21
22
23  Job No.: 109182
24  Pages 1 through 128
25  Reported by:  Marilyn Feldman, RPR
```

Page 2

```
 1       Deposition of LYNN M. BOWERSOX, held at the
 2  offices of:
 3
 4
 5       WASHINGTON METROPOLITAN AREA TRANSIT
 6       AUTHORITY
 7       600 Fifth Street, NW
 8       Washington, D.C. 20001
 9       202.962.2569
10
11
12       Pursuant to notice, before Marilyn Feldman,
13  Registered Professional Reporter and Notary Public
14  in and for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFFS:
 3       DAVID YERUSHALMI, ESQUIRE
 4       AMERICAN FREEDOM LAW CENTER
 5       1901 Pennsylvania Avenue, NW
 6       Suite 201
 7       Washington, D.C.  20006
 8       646.262.0500
 9
10  ON BEHALF OF DEFENDANTS:
11       GERARD J. STIEF, ESQUIRE
12       WASHINGTON METROPOLITAN AREA TRANSIT
13       AUTHORITY
14       CHIEF, APPEALS AND SPECIAL LITIGATION
15       OFFICE OF GENERAL COUNSEL
16       600 Fifth Street, NW
17       Washington, D.C.  20001
18       202.962.1463
19
20
21
22
23
24
25
```

Page 4

```
 1            C O N T E N T S
 2  EXAMINATION OF LYNN M. BOWERSOX              PAGE
 3     By Mr. Yerushalmi                          5
 4
 5
 6
 7
 8            E X H I B I T S
 9        (Attached to the Transcript)
10  DEPOSITION EXHIBIT                          PAGE
11  Exhibit 1  Binder containing documents        5
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 8 of 56
American Freedom Defense Initiative, et al. v.                                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.                            April 13, 2016
USCA Case #16-7051   Document #1681468   Filed: 07/24/2017   Page 77 of 165

Page 5

1   P R O C E E D I N G S
2   (Deposition Exhibit 1 was marked for
3   identification and was attached to the transcript.)
4   LYNN M. BOWERSOX
5   having been duly sworn, testified as follows:
6   EXAMINATION BY COUNSEL FOR PLAINTIFFS
7      BY MR. YERUSHALMI:
8   Q.  Could you please state and spell your
9   name for the record?
10  A.  Lynn M. Bowersox, B-o-w-e-r-s-o-x.
11  Q.  Some ground rules before we get started
12  here.  First of all, I'm near deaf, as one of these
13  older gentlemen, so you'll have to speak up because
14  I didn't hear you pronounce your name.
15  A.  Got it.
16  Q.  If you would raise your voice even though
17  we are in a small, close quarter room, some
18  atmospherics wipe out noises and you have a soft
19  voice.
20     Have you ever had your deposition taken
21  before?
22  A.  I have.
23  Q.  How many times?
24  A.  Twice.
25  Q.  When was the last occasion?

Page 6

1   A.  More than six years ago.
2   Q.  In those depositions were you a named
3   party or a witness?
4   A.  Witness.
5   Q.  Was it related to your work here at
6   WMATA?
7   A.  No.
8   Q.  Some ground rules for depositions might
9   be in order.  You see there is a young lady to your
10  left taking down all of what we say in a
11  transcription and as a result you need to articulate
12  with words any answers or responses.  Nods of the
13  heads, um-hmms or uh-huhs, they simply won't record.
14     The second ground rule is because she
15  cannot take down both of us speaking at the same
16  time, if you would have the courtesy to wait until
17  I'm done asking my question, I will also attempt to
18  give you the same courtesy.  It's typical in
19  conversations that we interrupt each other because
20  we know what we'll be saying, but we'll both try to
21  avoid that if we can.
22     Are you suffering any mental disease or
23  physical illness that would prevent you from
24  understanding my questions and answering them
25  accurately?

Page 7

1   A.  No.
2   Q.  Are you under the influence of any
3   alcohol or drug that would impede your ability to
4   answer my questions truthfully?
5   A.  No.
6   Q.  You understand you have taken an oath to
7   tell the truth, the whole truth, and nothing but the
8   truth as you would in trial?
9   A.  Yes.
10  Q.  You understand that the transcription of
11  this deposition can be used subsequently either in
12  motion practice or at trial to verify or challenge
13  your testimony at that time; do you understand that?
14  A.  Yes, I do.
15  Q.  Before you is an exhibit, a 3-ring
16  notebook that we have marked exhibit 1.  We are
17  going to go through some of these documents.  The
18  first thing I would like you to do is open to the
19  first document that is tabbed notice of deposition
20  and just review that and when you are done, let me
21  know when you have looked at it.
22  A.  I have completed the review.
23  Q.  Are you familiar with this document?
24  A.  I am.
25  Q.  When did you first see this document?

Page 8

1   A.  I saw a version of this document about
2   two weeks ago in meeting with counsel in preparation
3   for this deposition.  It has subsequently been
4   amended to reflect at least one change, which is a
5   location change I note, but it was essentially this
6   document.
7   Q.  Do you understand what this litigation is
8   about?
9   A.  Generally, yes.
10  Q.  What is your understanding?
11  A.  That the American Freedom Defense
12  Initiative is in some way challenging WMATA's
13  current policy with respect to the acceptance of
14  certain advertisements that we take in the system.
15  Q.  When you say WMATA, which is an
16  abbreviation W-M-A-T-A, you are referring to the
17  Washington Metropolitan Area Transit Authority,
18  correct?
19  A.  That's right.
20  Q.  You are an employee of WMATA?
21  A.  I am.
22  Q.  What is your current position at WMATA?
23  A.  I'm the assistant general manager for
24  customer service, communications, and marketing.
25  Q.  Do you understand that this notice of

American Freedom Defense Initiative, et al vs.   Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.   April 13, 2016

Page 9

1 deposition that we have just reviewed in exhibit 1
2 requires the attendance of what we call a 30(b)(6)
3 witness for WMATA?
4 A. I do.
5 Q. And you understand that you are
6 testifying here today not based upon your own
7 personal knowledge or personal experience but as a
8 representative of the institution WMATA?
9 A. I do.
10 Q. Did you review the subject matter that
11 you were going to be testifying here today
12 previously?
13 A. Yes.
14 Q. And those are the items 1 through 6 in
15 the notice of deposition?
16 A. Yes.
17 Q. What did you do to prepare to answer
18 those questions on behalf of the institution WMATA?
19 A. I reviewed the documents, I met with our
20 counsel on this matter, and I met with two
21 colleagues, one Jennifer Ellison who is the board
22 office secretary to confirm my recollection of
23 certain dates and process with respect to this
24 matter; and I met -- I actually spoke by phone with
25 Donna Murray on my staff who handles the day-to-day

Page 10

1 management of the advertising process with our
2 outside vendors to refresh my memory about certain
3 general matters with respect to our advertising
4 practice.
5 Q. When you refer to your counsel, you are
6 referring to Gerard Stief who is in the room today?
7 A. I am.
8 Q. How do you spell Jennifer Ellison?
9 A. Both names?
10 Q. Please.
11 A. J-e-n-n-i-f-e-r and Ellison is
12 E-l-l-i-s-o-n.
13 Q. And the same for Donna Murray.
14 A. D-o-n-n-a, and Murray is M-u-r-r-a-y.
15 Q. Just remind me again -- you did
16 indicate but I wasn't focusing on that part of your
17 answer -- Jennifer Ellison's title and role here at
18 WMATA.
19 A. She is secretary to the board of
20 directors, corporate secretary I believe is her
21 formal title to the board of directors.
22 Q. And Donna Murray?
23 A. Manager of advertising, WMATA's
24 advertising program.
25 Q. You indicated that you reviewed

Page 11

1 documents. What documents did you review?
2 A. Those that were indicated in the
3 deposition notice that were produced based on
4 discovery requests and litigation help from our
5 counsel's office.
6 Q. Let me ask you to turn to the tab in
7 exhibit 1 identified as documents after new policy.
8 A. Um-hmm.
9 Q. You will note that at the bottom of the
10 documents pages there is what we called a Bates
11 stamp --
12 A. Um-hmm.
13 Q. -- and it's identified as WMATA-AFDI 1
14 and the very last document is 410.
15 A. Okay.
16 Q. And they run serially. Are these the
17 documents that you reviewed? And I will just
18 represent to you these are all of the documents
19 produced by WMATA in response to document requests
20 which parallel the subject matter of the deposition
21 today.
22 A. Without reading every word, it appears
23 that these are the same documents.
24 Q. You indicated you met with Mr. Stief in
25 preparation. I don't want to ask you what he said

Page 12

1 to you and what you said to him, but I would like to
2 know when you met with him, what dates,
3 approximately when, in preparation for this
4 deposition.
5 A. Two weeks ago we met to review the
6 scheduling for the deposition and then again
7 yesterday to update the location and process for the
8 deposition.
9 Q. Did you have any discussion regarding any
10 substance other than process with Mr. Stief?
11 A. We did review certain documents for
12 completeness.
13 Q. Approximately how long was the meeting in
14 which you had a substantive discussion with Mr.
15 Stief?
16 A. Yesterday? About 30 minutes.
17 Q. Was there any discussion prior to
18 yesterday?
19 A. That was two weeks ago. Was there a
20 substantive discussion? Yes.
21 Q. How long was that meeting?
22 A. Approximately an hour.
23 Q. Would you describe for me in as much
24 detail as you can your actual duties as the
25 assistant general manager, department of customer

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 10 of 56
American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016
USCA Case #17-5038      Document #1685468      Filed: 07/24/2017      Page 79 of 165

|  | Page 13 |
|---|---|

1 services, communications and marketing?
2 **A. So to be responsive to your question,**
3 **could I ask you, do you mean narrowly with respect**
4 **to the advertising program or do you mean generally**
5 **with all of my duties?**
6 Q. Let's start at a higher altitude and give
7 me generally everything and then once you have done
8 that I'll ask you to focus in on the advertising
9 because I will assume, unless you correct me, that
10 that's really why you are here today as the
11 representative of WMATA.
12 **A. Right. I serve on the executive**
13 **management team with the general manager and CEO. I**
14 **report to him and to the board on matters related to**
15 **my portfolio as described by my title. I have a**
16 **department that has in excess of 50 staff, a budget**
17 **of about $20 million, and many of the program areas**
18 **that are externally facing the institution.**
19 **I manage communications that include**
20 **media relations, external events, community**
21 **relations, public engagement, customer research, and**
22 **then the marketing and advertising program as well**
23 **as certain employee communications and other**
24 **functional areas on a day-to-day basis.**
25 Q. Let's hone in on the advertising aspect,

|  | Page 14 |
|---|---|

1 if you could hone in on your duties there.
2 **A. With respect to advertising, I'm**
3 **responsible for a competitive process to contract**
4 **with an outside agency that manages the sale of**
5 **transit assets, and by transit assets I mean for**
6 **example interior and exterior advertisements on**
7 **buses and trains and in our rail stations, and those**
8 **assets generate non-fare revenues for WMATA that**
9 **support our core mission of delivering**
10 **transportation services for the region.**
11 **It's my job to ensure that WMATA is**
12 **getting as much revenue as it can for these assets**
13 **and that the competitive process is properly**
14 **overseen and that then once the contract is awarded**
15 **that the contract is properly managed in WMATA's**
16 **best interests.**
17 Q. Thank you. Let me ask you to turn to the
18 document section of exhibit 1 and let me ask you to
19 turn to page 112, that's the Bates stamp at the
20 bottom. That's not a real clear picture. What I'll
21 probably do is show you the pictures in the actual
22 complaint in a minute.
23 **A. Okay.**
24 Q. But do you recognize this proposed
25 advertisement?

|  | Page 15 |
|---|---|

1 **A. I do.**
2 Q. Do you recognize this as the proposed
3 advertisement that my client submitted to WMATA?
4 **A. I do.**
5 Q. And do you recall when it was that my
6 client submitted that proposal?
7 **A. I don't recall specifically. I'm sure in**
8 **one of the documents that they provided, I could**
9 **look at it and I would be refreshed by it, but I**
10 **don't recall the specific date.**
11 Q. The complaint states that the ad was
12 submitted on May 20, 2015. Do you have any reason
13 to suggest that that's incorrect in any way?
14 **A. No.**
15 Q. In fact, does that not sound pretty close
16 to what your memory tells you?
17 **A. Yes, it would be spring 2015 for sure and**
18 **probably the April-May time frame. That sounds**
19 **reasonable.**
20 Q. At the time that the ad was submitted,
21 what was the ad policy for WMATA, do you know? And
22 I will tell you that I will allow you to cheat and
23 you can turn to beginning at page 11 of exhibit 1
24 under the document, the Bates stamp 11, and it has
25 commercial guidelines that were adopted in 1972 and

|  | Page 16 |
|---|---|

1 amended in 2003 and amended again in 2012, and I
2 think those were the ones that were extant at the
3 time that our ad was submitted. Do you have any
4 reason to think that's not the case?
5 **MR. STIEF:** She would know better than I.
6 **A. No. This looks like what was in place at**
7 **the time, um-hmm.**
8 Q. Good. So could you tell me what the
9 policy was with regard to issue oriented
10 advertising?
11 **A. With very few exceptions except those**
12 **noted here, around at that time tobacco and alcohol**
13 **subsequently changed, and anything that was**
14 **factually inaccurate, the policy of the organization**
15 **was to accept all issue advocacy ads as well as**
16 **commercial advertisements for products.**
17 Q. I'm flipping through more pages than I
18 normally do in a deposition only because we got a
19 flurry of documents at the end of the day and I'm
20 sort of double-checking. While I appreciate the
21 updated production, it was a bit last minute so I'm
22 not quite as fluid as I might otherwise be.
23 In follow up to your answer to the last
24 question, did WMATA allow pretty much all issue
25 oriented ads? The proposed ad that my client

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 11 of 56
USCA Case #16-7078   Document #1685466   Filed: 07/24/2017   Page 80 of 165
American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.              April 13, 2016

Page 17

1  submitted on May 20, 2015 was compliant with WMATA
2  policies at the time, correct?
3  A.  To the best of my knowledge, yes.
4  Q.  There was no reason to reject my client's
5  proposed ads at the time, correct?
6  A.  Yes.
7  Q.  Yes, I'm correct?
8  A.  Yes, you are correct.
9  Q.  Let me ask you to turn to the last
10  document in exhibit 1 which is behind the tab
11  privilege withdrawn documents, the very last tab.
12  A.  Um-hmm.
13  Q.  I am just going to represent to you that
14  the first page of this document, which is not Bates
15  stamped, is the e-mail, cover e-mail that I received
16  from WMATA counsel Mr. Stief and following that is
17  the attachment he sent me on Monday.
18  A.  Yes.
19  Q.  I actually see he has included that in
20  the most recent production and it's a document
21  marked exhibit 384.  So let's flip back in exhibit 1
22  to the documents section, Bates 384.
23  A.  Um-hmm.
24  Q.  Now in Mr. Stief's e-mail to me he writes
25  and I'm looking at exhibit 1 on the page behind the

Page 18

1  tab privilege withdrawn documents, "re the attached
2  document, we originally included it on the privilege
3  log which we sent you because we were not sure at
4  the time who prepared it and to whom it was sent."
5  Parenthetically I speaking.  What that means
6  is he didn't produce it, he simply identified it by
7  date and probably sender on the privilege log and
8  then on the grounds it might have been an
9  attorney-client communication or work product.
10      Then he goes on in his e-mail and says,
11  "however, we have since learned it was prepared by
12  Donna Murray for Lynn Bowersox and therefore we are
13  dropping the claim of privilege and sending it to
14  you."
15  A.  That's right.
16  Q.  When was that discovered?
17  A.  So I was on personal leave between the
18  first meeting that I indicated I had with counsel
19  Steve and the latest meeting that I had with him,
20  which was yesterday, and when I returned from
21  vacation on Monday I had this document and he had
22  this document and we were able to reconcile what the
23  document was, for whom it was prepared -- it was
24  prepared for me by my staff and I think that's the
25  point at which -- I don't want to speculate but I

Page 19

1  think that's the point at which he concluded it was
2  not a privileged document.
3  Q.  Now the document itself is just two
4  pages, correct, 384 and 385?
5  A.  Yes.
6  Q.  And you indicated you had asked your
7  staff to prepare it.
8  A.  I did.
9  Q.  Mr. Stief's e-mail suggests Donna Murray.
10  Is Donna Murray part of your staff?
11  A.  She is.
12  Q.  Is she the only one who worked on it --
13  A.  Yes, I believe she is the only one who
14  worked on it.
15  Q.  I would ask you to slow your answer down
16  so we finish completely.
17  A.  Sure.
18  Q.  Do you know when this was prepared?
19  A.  It would have been in the May 2015 time
20  frame.  I can't say specifically on what day, but I
21  remember requesting the document from her and it was
22  in that time frame.  It was background information
23  for me in preparation for another meeting.
24  Q.  Now in the complaint we agreed that the
25  allegation was that my client submitted her ad,

Page 20

1  AFDI, my client, submitted their ad, proposed ad on
2  May 20, 2015.  Do you recall?
3  A.  Yes.
4  Q.  Apparently it took two days to get to
5  WMATA because I see here that in the second
6  paragraph of Bates 384 it says, "on Friday May 22,
7  2015, AFDI submitted new copy."  Do you see that?
8  A.  I do.
9  Q.  Does that refresh your recollection?
10  A.  It doesn't because the copy doesn't come
11  directly to WMATA, it comes to Outfront, our agency
12  that handles the day-to-day advertising, and so I
13  don't know whether that refers to the fact that it
14  took two days for the copy to reach us from Outfront
15  or whether the copy changed in terms of what
16  Outfront received.  I'm not sure specifically how
17  that -- what that is meant to convey.  But whatever
18  happened, this ad that you refer to came forward at
19  that period of time.
20  Q.  Okay.
21  A.  And I would just add there were a number
22  of different messages coming from AFDI in that
23  period, there was not just one ad, that's why it's
24  hard for me to say which ad came on which day.  They
25  had multiple campaigns going.

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 12 of 56

American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.               April 13, 2016

USCA Case #16-7081   Document #1685466   Filed: 07/24/2017   Page 81 of 165

Page 21

1   Q.   But the ad in this litigation came on May
2   21 or May 22, 2015?
3   A.   That's right.
4   Q.   Now in this Bates 384 it speaks of
5   diorama availability for June 2015 and below that
6   July 2015.  That only suggests prospectively into
7   the future, correct?
8   A.   Yes.
9   Q.   The memo that was prepared by Ms. Murray
10  was done pretty contemporaneously with the
11  submission by my client?
12  A.   It was.
13  Q.   Why did you ask your staff to put this
14  memo together?
15  A.   Because when prior ads from AFDI had
16  appeared on our system, I was asked by various
17  people, particularly board members, for further
18  information about the ads, where they might run,
19  that kind of thing, and so I was preparing to
20  respond to questions that I thought I might get.
21  Q.   In anticipation of those questions?
22  A.   Yes.
23  Q.   Regarding those prior questions by mostly
24  board members you say --
25  A.   Well, in this instance I think that's the

Page 22

1   most relevant stakeholder group, but certainly we
2   got questions from the media, we get questions from
3   the community, business and leader community, from
4   leaders in religious communities, so often the
5   public information office here would have to field
6   questions about these campaigns.  But in this
7   particular instance, with respect to this two-pager,
8   I was preparing for the board to ask me questions
9   about it.
10  Q.   And in the past when the board would make
11  inquiry about where the ads would run and the like
12  as you described it, did they articulate why they
13  sought that information?
14  A.   No.  Usually the questions would be why
15  do we take such ads, what's our policy, how much
16  money do we get for these ads, and so forth.
17  Q.   Did any of those queries include the
18  board member's own opinion about whether the ads
19  should run or not?
20  A.   No.
21  Q.   They were just neutral questions?
22  A.   They were seeking information.
23  Q.   But they didn't articulate a bias one way
24  or the other?
25  A.   No, no.

Page 23

1   Q.   Were these inquiries done by face-to-face
2   meeting, telephone, e-mail, text?
3   A.   In this particular instance, prior to
4   this ad, the last AFDI ad, I remember getting an
5   e-mail from a board member asking about it, but I
6   also was preparing for a board meeting that would be
7   in person where I thought I would get in-person
8   questions, verbally.
9   Q.   Regarding that e-mail that you referred
10  to receiving prior to this memo, do you know if it
11  was produced?
12  A.   I believe so, I believe it's referenced
13  from either Mr. Downey or Mr. Goldman in this
14  document.  I don't remember who the "from" is and
15  who is copied, but those were the board members who
16  I think communicated with us about it.
17  Q.   And the two names I should be searching
18  for are what?
19  A.   Goldman and Downey.
20  Q.   How do you spell Downey?
21  A.   D-o-w-n-e-y.  If you look at Bates stamp
22  293 --
23  Q.   Okay.
24  A.   -- you see an e-mail from Mr. Downey who
25  was then our board chairman to me reacting to a news

Page 24

1   article about the ad and suggesting that I prepare
2   for discussion with the board on May 28, and my
3   response is we are, and that is approximately the
4   time when I asked for the history on the AFDI
5   advertising for which Donna produced the 2-page fact
6   sheet.
7   Q.   Now this e-mail clearly references the ad
8   that my client submitted that's relevant to this
9   litigation, correct?
10  A.   Yes.
11  Q.   I had thought you had indicated that you
12  had received at least one prior query from a
13  previous situation or ad.
14  A.   There is another e-mail here that I
15  believe was the prior campaign that I think, if you
16  are still searching for Goldman, I might be able to
17  find it.  Generally our board has changed -- has had
18  significant changes over the last year, changes in
19  personnel, in appointees to the board, and it was
20  not unusual when people were new to the board or had
21  not previously understood our advertising policy
22  that I would get such queries when ads of an
23  advocacy nature would arise, not just from AFDI.  It
24  could be for example you know a PETA ad, P-E-T-A,
25  that would be advocating against NIH's

Case 1:15-cv-01038-GK  Document 20-3  Filed 09/05/16  Page 13 of 56

American Freedom Defense Initiative, et al. vs.      John M. Bowersox
Washington Metropolitan Area Transit Authority, et al.      April 13, 2016

USCA Case #16-7051      Document #1685466      Filed: 07/24/2017      Page 82 of 165

Page 25

1  experimentation on mammals.  It could be advertising
2  for conferences where marijuana was being discussed.
3  It was routine for me to answer board queries about
4  issue advocacy advertisement.  So I think that there
5  is a Goldman e-mail I reviewed over the course of
6  the last week that is here that is a query about
7  this campaign.  Which specific creative execution, I
8  don't recall.
9      So if you look on Bates stamp 210 there
10  is an e-mail from me to Mr. Goldman and Mr. Downey
11  which I believe is responding to the e-mail that I
12  referenced which speaks to the most recent AFDI ads
13  over the last month.  So it suggests it was about
14  more than just the one in question.  That's my
15  recollection.
16  Q.  Do you recall this is in response to an
17  earlier e-mail?
18  A.  I don't know if it was -- now that I look
19  at it, I'm not sure if it was an e-mail or if it was
20  a verbal query.
21  Q.  Let me ask you to turn back to exhibit 1,
22  the Bates 384, the memo.  And if we turn to 385, the
23  second page, in the memo that your staff prepared --
24  let me withdraw that and ask you directly, did you
25  in fact provide this memo to a board member or the

Page 26

1  board members?
2  A.  No, I did not.
3  Q.  What did you do with this memo?
4  A.  I used it as information for my own
5  preparation for a meeting.
6  Q.  What meeting was that?
7  A.  That was an executive session meeting of
8  the board in which they considered taking a step
9  back from our current ad policy and allowing the
10  staff to lead a review of the policy and put a
11  temporary hold in place prohibiting any issue
12  advertising while the matter was reviewed and
13  considered.
14  Q.  And when was that executive session?
15  A.  I believe it was May 28.
16  Q.  Who was at that executive session?
17  A.  Board members and our then acting general
18  manager Jack Requa, myself, and our general counsel
19  Mark Pohl.  Not all board members were in attendance
20  but I think if you need to know names, Mr. Stief
21  could provide you with the list.
22      MR. YERUSHALMI: Mr. Stief, would you
23  provide me with those names?
24      MR. STIEF: I could do that, yes.
25  Q.  You said the acting general manager, who

Page 27

1  was that again?
2  A.  Jack Requa, R-e-q-u-a.
3  Q.  Is he still the acting general manager
4  today?
5  A.  No.
6  Q.  Who is the acting or permanent general
7  manager today?
8  A.  The general manager today is Paul
9  Wiedefeld.
10  Q.  And he is the permanent general manager?
11  A.  Yes.
12  Q.  Was Jack Requa the acting general manager
13  during all the time relevant to this litigation?
14  A.  Yes.
15  Q.  Who was the general counsel who was at
16  this meeting?
17  A.  Mark Pohl, P-o-h-l.
18  Q.  And Mark is M-a-r-k?
19  A.  Yes.
20  Q.  Did you in fact use this memo as an
21  informational guidepost for you when you had this
22  executive session?
23  A.  I did not because the session was very
24  rushed, they had many matters of business to go
25  through, and I recall only being asked one question

Page 28

1  by the board with respect to the temporary closing
2  of the issue advocacy form and that question was --
3      MR. STIEF: Let me stop you for a second
4  here.
5      MR. YERUSHALMI: Unless there is a
6  privilege --
7      MR. STIEF: It is a privilege matter.
8  The board executive sessions would be protected by
9  deliberative process privilege.  There's also
10  issues, as I think you can tell from privileges we
11  have asserted, of attorney-client -- possibly
12  attorney work product presentation that's in there.
13      I don't have a problem with the witness
14  describing generally the issues that went on, the
15  matters that were considered, but I want to make
16  sure I'm asserting the fact that there is a
17  privilege as to specific statements by board
18  members, by the acting general counsel, etc., there
19  based on the privilege.
20      MR. YERUSHALMI: Let me ask the question
21  and then you'll assert the privilege.
22      MR. STIEF: That's fine.  And I
23  apologize, I did kind of cut her off because I
24  thought she was getting into that specific area
25  there, but I recognize she may not have finished her

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 14 of 56
American Freedom Defense Initiative, et al. vs.                John M. Bowersox
Washington Metropolitan Area Transit Authority, et al.          April 13, 2016
USCA Case #17-7059    Document #1685498    Filed: 07/24/2017    Page 83 of 165

Page 29

1 answer to the last question.
2 Q.  You indicated you were asked one question
3 by the board and you were about ready to tell me
4 what the question was.  Who asked you on the board,
5 do you recall?
6 A.  I do.
7     MR. YERUSHALMI: I'm not getting into the
8 substance.
9     MR. STIEF: Okay.  You can answer.
10 A.  Mr. Price.
11 Q.  Mr. Price is a board member, officer,
12 director?
13 A.  Board member.
14 Q.  Director, board member?
15 A.  Yes.
16 Q.  Is he what we would call an outside
17 director?
18 A.  Yes.
19 Q.  Did Mr. Price ask that question of you
20 directly?
21 A.  He did.
22 Q.  What was that question?
23     MR. STIEF: I have to object on this
24 point because this is getting into the actual
25 discussion that went on.  I think that's clearly

Page 30

1 covered in this instance by the deliberative process
2 that's going on.
3 Q.  Let's stay on page 385 of the exhibit and
4 under the rubric issue oriented advertising in
5 Washington, it states, "as the seat of the federal
6 government, the D.C. market is distinct in the
7 amount of issue oriented advertising."  Do you see
8 that?
9 A.  I do.
10 Q.  Is that true?
11 A.  Yes.
12 Q.  The next sentence reads, "on an annual
13 basis our issue oriented advertising sales have been
14 as high as 40 percent in the years 2008-2009, but
15 average approximately 10 to 12 percent of sales, 2
16 million in revenue."  Is that statement true?
17 A.  Yes.
18 Q.  What are the average revenues from all
19 advertising on WMATA annually, do you know?
20 A.  Approximately $20 million.
21 Q.  So 2 million on 20 million represents 10
22 percent, correct?
23 A.  Yes.
24 Q.  That's a substantial amount, right?
25 A.  Yes.

Page 31

1 Q.  The next sentence reads, "the bulk of
2 those ads are lobbying efforts and are station
3 dominations" -- and are -- I guess it's leaving out
4 the word "at."  Would you agree with me there, it
5 are at station dominations?
6 A.  It's slang, marketing jargon.  A station
7 dom, a station domination is where one advertiser
8 purchases all of the available assets to have a
9 visible presence in the station.
10 Q.  All right.  Let me reread how it's
11 written in marketing slang.  "The bulk of those ads
12 are lobbying efforts and are station dominations at
13 Capital South, Union Station, Navy Yard, and the
14 Pentagon."  Is that correct?
15 A.  Yes.
16 Q.  "Most recent examples include Airline
17 Pilots and Owners Association and War Room
18 Strategies campaigns lobbying against Open Skies,
19 and PETA's campaigns against NIH using live monkeys
20 for testing."  Is that statement correct?
21 A.  Yes.
22 Q.  The next sentence reads, "this type of
23 lobbying makes up the bulk, 7 to 8 percent, of the
24 advertising revenues in issue oriented ads."  Is
25 that statement correct?

Page 32

1 A.  Yes.
2 Q.  Now you asked Ms. Murray to prepare this
3 memo in anticipation of this board meeting and in
4 anticipation that you would receive queries
5 regarding my client's advertisements, correct?
6 A.  Among other things, yes.
7 Q.  Do you recall where you had e-mailed Mr.
8 Downey and I think Mr. Goldman -- the meeting where
9 he e-mailed you, I want to look at that again, the
10 one that was the precipitator for this memo.
11     MR. STIEF: Would it help either or both
12 of you if I got you some post-its that you could put
13 on the ones that --
14     MR. YERUSHALMI: It might help, yes.
15     MR. STIEF: Okay.  We'll go off the
16 record.
17     (Off the record 10:53-10:55 a.m.)
18     BY MR. YERUSHALMI:
19 Q.  Turning to Bates 293 in exhibit 1, this
20 was the e-mail from Mr. Downey that precipitated you
21 preparing the memo, correct?  I thought that was
22 your earlier testimony.
23 A.  So you see that my response is that we
24 are -- even to the e-mail that he provided, I was
25 preparing to make a recommendation to the board in

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 15 of 56

USCA Case #16-7051      Document #1685468            Filed: 07/24/2017      Page 84 of 165

American Freedom Defense Initiative, et al. vs.                John M. Bowersox
Washington Metropolitan Area Transit Authority, et al.          April 13, 2016

Page 33

1 its session, so it's not triggered by the e-mail, my
2 preparation, but it's relevant to it.
3 Q.  What was your recommendation that you
4 were preparing?
5 A.  For the board to suspend -- to change its
6 policy on a temporary basis, to suspend the
7 acceptance of issue oriented advertising.
8 Q.  Turning back to Bates 385, the sentence
9 "MTA New York is changing their policy to position
10 themselves as a limited public forum banning both
11 religious and political ads."  Do you see that?
12 A.  Yes.
13 Q.  Do you know the distinction between a
14 designated public forum and a limited public forum?
15 A.  I am not an attorney so I don't
16 understand the legal distinction, but I understand
17 it as a general business matter.
18 Q.  I would say that most attorneys and the
19 Supreme Court doesn't understand the difference.
20 But why don't you tell me what you understand that
21 difference to be.
22 A.  So my understanding is that as a public
23 entity that receives taxpayer monies, once we, WMATA
24 in this instance, have established a forum under
25 which people can buy advertisements, that those

Page 34

1 advertisements are part of the public forum that is
2 protected under free speech, under the -- by the
3 First Amendment, and the limitations on that, to
4 create a limited public forum are very, very
5 narrowly interpreted because running afoul of the
6 First Amendment is not something that public
7 agencies are meant to do.  And so the limited public
8 forums are -- have been tried in other places but
9 that was not the application here.  We had a public
10 forum that was open to all controversial issues.
11 That's to the best of my knowledge.
12 Q.  Okay.  The next sentence reads, "this
13 action would prohibit the type of lobbying ads that
14 are so prevalent in our market."  Is that statement
15 true?
16 A.  I think it's true to the best of Donna's
17 understanding of what's permissible, um-hmm.
18 Q.  "However, strictly defined religious ads
19 are a very insignificant portion of our revenues."
20 Is that part of the sentence true?
21 A.  Yes.
22 Q.  "Each year around Christmas and Easter
23 the Catholic archdiocese buys transit space
24 encouraging folks to come back to church."  Is that
25 statement true?

Page 35

1 A.  Yes.
2 Q.  The last sentence is really a question,
3 "the question then becomes if AFDI's ads can always
4 be defined as religious ads."  Do you see that?
5 A.  I do.
6 Q.  What did Ms. Murray mean, do you know, by
7 that question?
8 A.  I believe what she meant was to create a
9 distinction between religious and political.
10 Q.  Why is she referencing AFDI's ads?
11 A.  I don't know.  My best guess is in the
12 context of this, in this she's looking at the MTA's
13 practice and at that time the MTA's practice in New
14 York was something that was in the news, also with
15 respect to your client, and so she's interpreting
16 what she read in newspaper clippings.
17 Q.  Except she had described the MTA as
18 banning both religious ads and political ads, yet
19 she seems to only limit the query to AFDI ads in the
20 context of religious ads.
21 A.  I can't speculate as to why that might
22 be.
23 Q.  Did you discuss this memo with Ms. Murray
24 at all?
25 A.  Not recently.

Page 36

1 Q.  At any time?
2 A.  At the time she produced it.
3 Q.  On an annual basis is WMATA profitable?
4 A.  No.
5 Q.  On an annual basis, how much of a percent
6 of the gross revenue does WMATA run in the red?
7 A.  On an operating basis or on a capital
8 basis or what?
9 Q.  Let's do it on an operating basis.
10 A.  WMATA's operating budget is approximately
11 1.8 billion dollars annually, of which roughly 7-800
12 million dollars comes back through fare revenue.
13 Q.  Through?
14 A.  Fair revenues, through people who buy
15 tickets to ride.  It then has another roughly $100
16 million of other commercial revenues of which
17 advertising is a portion.  The remainder of the
18 operating budget is made up by contributions from
19 the jurisdictions that we serve, the local
20 governments, and through pass-throughs from state
21 governments, Commonwealth of Virginia, Maryland,
22 District of Columbia, certain counties in this
23 region.
24 Q.  So when the local governments, either the
25 District or these other states and counties, provide

American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.               April 13, 2016

Page 37

1 additional revenues to WMATA, those are actually
2 revenues that they have taken from taxpayers,
3 correct?
4 A.  Yes.
5 Q.  So these are tax subsidies essentially,
6 correct?
7 A.  Yes.
8 Q.  Does WMATA receive sufficient tax
9 subsidies to cover its budget shortfall every year?
10 A.  Yes.
11 Q.  Does it ever have any surplus?
12 A.  Yes.
13 Q.  What occasions WMATA to have a surplus
14 from these tax revenues?
15 A.  Well, it's an evolving -- the budget is
16 an evolving matter, so the subsidy may not be the
17 source of the surplus.  The fare box revenue may --
18 if ridership is better than projected, for example,
19 that might create a surplus.  If costs are managed
20 more tightly than budgeted, for example, that could
21 create a surplus.
22    There have been years in which surpluses
23 were created intentionally as reserves for
24 anticipated costs associated with collective
25 bargaining agreement associations.

Page 38

1 Q.  You indicated that at the time my
2 client's ad was submitted that public issue oriented
3 ads were accepted by WMATA, correct?
4 A.  Yes.
5 Q.  And for purposes of our discussion here,
6 let's just call that context a designated public
7 forum.
8 A.  Okay.
9 Q.  How long had WMATA had a designated
10 public forum prior to my client submitting the ads
11 at issue in this litigation?
12    MR. STIEF: I'll just note a continuing
13 objection to the extent that it might not
14 technically be a designated public forum, but with
15 the understanding that that's what you are calling
16 it, you can answer the question.
17 A.  So to the extent that I understand it,
18 since the '70s, since the initial board policy was
19 adopted that you referenced earlier, it had
20 established a forum.
21 Q.  So there is no misunderstanding and
22 keeping in mind Mr. Stief's continuing objection,
23 it's your understanding that WMATA has had an
24 advertising policy that allows ads such as the ad at
25 issue in this litigation since the 1970s?

Page 39

1 A.  Yes.
2 Q.  Prior to the institution of the
3 moratorium that put a hold on public issue ads in
4 around May of 2015, were there problems or issues
5 that arose of concern to WMATA regarding the display
6 of political or public issue advertisement?
7 A.  Yes.
8 Q.  What were those problems or issues that
9 were of concern to WMATA?
10 A.  So let me speak to the period since
11 November 2010 when I arrived at WMATA as an
12 employee.  That's the period during which I have had
13 responsibility for the advertising area and I can
14 speak with some degree of expertise about those
15 matters.  But I'm aware generally that historically
16 in the '80s and '90s, the source of concern arose
17 very, very strongly over issue ads that were
18 offensive to some, some that created caricatures of
19 then President Reagan, there were some that created
20 controversy around pro life and pro choice, there
21 were some considered by some people disrespectful of
22 the Catholic church.  So generally I'm aware of
23 those, although I don't remember the specific ads.
24    Since 2010, the issues have been of
25 concern -- the one that created the most

Page 40

1 consternation was one that was disrespectful of
2 President Obama with respect to his health care
3 policies and that one, just to characterize what
4 concern means, created a lot of feedback from our
5 employees, from our riders, from the elected
6 officials in the surrounding region, from the
7 community leaders and from the business leaders in
8 this region, all of whom wrote or called, talked to
9 us, talked to the media, etc., expressing their
10 dissatisfaction with our running of such ads,
11 accepting them on the system.
12    Other ads that created concern included
13 the one that I mentioned earlier, PETA had from time
14 to time ads that were disturbing to some people
15 showing animal cruelty.  The Open Skies ad was quite
16 controversial that is described here in war room
17 strategies in the Airline Association.  Condom
18 advertising in some messaging that was geared
19 towards AIDS awareness and prevention, anything to
20 do with marijuana legalization, sometimes sexual
21 orientation and rights of all people could be
22 controversial.  We had -- routinely we were flagging
23 controversial ads monthly to every other month basis
24 that would arise some concern from some aspect of
25 the community.

Case 1:15-cv-01038-GK Document 20-3 Filed 09/05/16 Page 17 of 56
American Freedom Defense Initiative, et al. vs.                    Lynn M, Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016
USCA Case #16-7051   Document #1683468   Filed: 07/24/2017   Page 86 of 165

---

**Page 49**

1  identified here today existed throughout your tenure
2  since November 2010, correct?
3  A.  Yes.
4  Q.  What was the precipitating event that
5  brought you to suggest a moratorium in May of 2015?
6  A.  I don't think there was any single event,
7  it was cumulative.
8  Q.  So it was not my client's ad per se?
9  A.  Not per se.
10  Q.  What percentage of your issue was related
11  to my client's advertisement?
12  A.  I would say that the timing of that ad
13  was a factor in making that recommendation.  I had
14  before me a number of controversial ads that had
15  come in through the pipeline and then that one was
16  sort of -- that ad coming from AFDI, my concerns
17  about that ad, certainly it -- 60 to 70 percent of
18  the timing of my recommendation.
19  Q.  Like the straw that broke the camel's
20  back?
21  A.  That's well said.
22  Q.  I note that there was a specific decision
23  by WMATA not to take down noncompliant ads that were
24  running on the date that the moratorium went into
25  effect, correct?

---

**Page 50**

1  A.  Yes.
2  Q.  Why was that?
3  A.  It was our belief that as a good faith
4  matter we had engaged contractually with those
5  advertisers to provide the space, the asset, to them
6  and we didn't want to act in bad faith so we allowed
7  those ads to stay up until their term expired.  What
8  we did instead was to say we weren't accepting
9  anything new that wasn't already installed in the
10  system.
11  Q.  Let me ask you to turn to Bates 1 under
12  the documents in exhibit 1.  Are you familiar with
13  this document?
14  A.  I am.
15  Q.  In fact, this is a memorandum that you
16  prepared for Mr. Requa, the interim GM/CEO?
17  A.  As clarification, this is the standard
18  format we use to provide memos to our board of
19  directors through our GM/CEO, so this would have
20  been prepared to Mr. Requa but the audience for it
21  would have included the board of directors.
22    I routinely produced these memos, subject
23  matter potentially controversial advertising, to
24  alert them about campaigns advertised on the system
25  so that they would not be surprised.

---

**Page 51**

1  Q.  So you did this routinely for other ads
2  as well --
3  A.  I did.
4  Q.  -- since you began in November 2010?
5  A.  I have, that's right.
6  Q.  Let me ask you to turn to Bates 9 and
7  Bates 10.
8  A.  Um-hmm.
9  Q.  There are some obvious differences
10  between these two documents.  One that comes to my
11  mind at least is there's some handwriting on Bates 9
12  and on Bates 10 there is an approved unanimously
13  with a date.  Do you see that?
14  A.  Yes.
15  Q.  Would you describe to me what these two
16  documents are?
17  A.  I don't know what the handwriting is
18  about on Bates 9.
19  Q.  Setting aside what are the differences,
20  just what are the two documents?
21  A.  Sure.  So a motion by the chair was
22  provided by the board office so that the board could
23  act in public session to implement a moratorium on
24  controversial advertising, issue oriented
25  advertising.

---

**Page 52**

1  Q.  Would it be fair to say that Bates 9 is
2  the draft and Bates 10 was where it had been
3  approved?
4  A.  Seems like a reasonable conclusion, yes.
5  Q.  You indicated that the executive session
6  in which you recommended to the board there should
7  be a moratorium occurred on May 28, correct?
8  A.  Yes.
9  Q.  So the executive session -- and you said
10  it was rush, correct?
11  A.  Yes.
12  Q.  -- and there was only one question
13  directed to you by director Mark Price, director
14  Mark Price, regarding this moratorium issue.
15  A.  Just to clarify, Mr. Price is not Mark.
16  Mark Pohl is the general counsel.  Mr. Price's first
17  name is Corbet.
18  Q.  Thank you for the correction.
19  A.  But the rest of your statement is
20  correct.
21  Q.  What was the timing relationship between
22  this executive session on May 28 and the actual
23  board meeting in which this memorandum at Bates 10
24  was approved?
25  A.  They were an hour apart.  So a motion was

---

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 18 of 56
USCA Case #16-7051   Document #1685468   Filed: 07/24/2017   Page 87 of 165
American Freedom Defense Initiative, et al. vs.                    John M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016

Page 53

1  prepared subsequent to the executive session at the
2  direction of the board.
3  Q.  So you made your suggestion.  There was
4  one question directed toward you about this from
5  Mark Pohl --
6  A.  There was one question directed to me by
7  Mr. Price.  There were other questions that Mr. Pohl
8  may have answered.
9  Q.  I stand corrected.  That's my mistake.
10  A.  And then a motion was prepared.
11  Q.  So in executive session the issue was
12  approved to present as a motion to the open board
13  meeting?
14  A.  That's correct.
15  Q.  Now an executive session and open board
16  meeting, the same board members attend both?
17  A.  Generally speaking.  The executive
18  session presentation of this matter was conducted
19  under a bylaw that we have that contractual matters
20  can be considered outside of the public space.  So
21  because I have a contract with an outside agency, a
22  private company, and to us it's a consideration in
23  whatever is being discussed, that's why it's
24  contemplating the executive session.  So the matter
25  then must go before the board in public session in

Page 54

1  order for a vote to be taken because that cannot
2  happen in the executive session in this instance.
3     So what typically happens is most of the
4  board members who participate in executive session
5  also go to the public session but I can't say with
6  certainty which board members attended which ones on
7  that particular day.  I'd have to research the
8  matter.
9  Q.  Now prior to the executive session -- let
10  me withdraw that and ask you who was Mort Downey and
11  what is his position?
12  A.  He is a director on our board and during
13  the period in question he was the chairman of the
14  board.
15  Q.  When you received his e-mail on May 26 at
16  Bates 293 where he writes, "we should be prepared
17  for a discussion with board on Thursday" and he
18  included the article regarding my client's
19  submission of the Prophet Mohammad cartoon ad -- and
20  I also am using that word as a proper noun,
21  prophet -- what did you understand about that
22  e-mail?
23  A.  So what that -- what I inferred from his
24  e-mail was that I would be questioned by board
25  members about what they should expect in terms of

Page 55

1  advertising on the Metro system and would there be
2  similar issues that were being reported in New York.
3  Q.  And you inferred that because you had no
4  verbal, oral discussions with Mr. Downey or other
5  board members prior to --
6  A.  That's right, but it wasn't the first
7  time AFDI had advertised on our system and so I was
8  accustomed to seeing news reports on our system from
9  others and having that provoke questions from board
10  members.
11  Q.  Relative to this date, May 26, when did
12  you decide that it was time to seek a moratorium on
13  public issue ads?
14  A.  So it's something that I had been
15  contemplating for a number of months and had been
16  seeking counsel's input into and had been looking at
17  the business case for it, and at the same time I was
18  examining the business case for the reinstatement of
19  alcohol advertising and was weighing whether or not
20  the revenues from alcohol advertising might offset
21  the loss of revenues from issue advertising.
22     And ultimately when the board acted to
23  extend the moratorium, it accepted a recommendation
24  from me to reinstate the permissive use of alcohol
25  advertising which we have since begun.

Page 56

1  Q.  Do you know why alcohol advertising was
2  prohibited to begin with?
3  A.  I don't.  It predates my arrival at
4  WMATA.
5  Q.  You have no understanding why it was?
6  A.  There were certain board members at the
7  time who had a concern about the community impacts
8  of alcohol advertising.  That's all I know.
9  Q.  Not its effect on young people, underage
10  drinkers?
11  A.  I'm sure that was part of his concern.
12  Q.  When did this process of yours begin when
13  you began thinking about and looking into the
14  question of a moratorium?
15  A.  I don't know how to put a date on it.
16  I'm going to say it was roughly in January of 2015
17  and I know that only because that's when I started
18  researching the economics of alcohol advertising.
19  Q.  You indicated that you had sought counsel
20  from legal counsel, correct?
21  A.  Yes.
22  Q.  Did you speak with anyone else or
23  communicate in any fashion with anyone else at WMATA
24  regarding this process that you were going through
25  from January 2015 until May of 2015?

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 19 of 56
USCA Case #16-7051   Document #1683468   Filed: 07/24/2017   Page 88 of 165
American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016

|  | Page 57 |
| --- | --- |

1   A.   Yes, my staff.
2   Q.   Who at your staff did you have
3   communications with regarding this process of yours?
4   A.   My direct reports.  I did talk to the
5   director of marketing and I also spoke to our chief
6   spokesperson who handles the media about it.
7   Q.   Could you put some names on these people?
8   A.   Jawauna Greene, G-r-e-e-n-e.
9   Q.   And she is what?
10  A.   Director of marketing.  And Dan Stessal,
11  S-t-e-s-s-a-l.
12  Q.   And his title?
13  A.   Chief spokesperson and director of
14  communications.
15  Q.   And you had conversations with each of
16  these individuals or written --
17  A.   Conversations.
18  Q.   And these would have taken place in the
19  beginning of this process, January-February 2015?
20  A.   Yes, throughout the process.  I indicated
21  that I was considering alcohol advertising as a
22  possible replacement of revenue for controversial
23  ads.  I asked for their input and recommendations
24  and for them to also get a sense of what other
25  properties were doing along these lines.

|  | Page 58 |
| --- | --- |

1   Q.   Prior to the executive session on May 28,
2   2015 at which you recommended this moratorium, did
3   any of the participants at that meeting know you
4   were going to make this recommendation?
5   A.   Mr. Requa certainly did, the acting
6   general manager, and I believe that he had a
7   conversation with Mr. Downey in general about the
8   issues coming before the board of the executive
9   community.  Whether or not he said Lynn is making
10  this specific recommendation, I don't know, but I
11  don't think it came as a surprise.
12  Q.   Were all the members who were at the open
13  session, at the executive session, all the
14  directors?
15  A.   Again that's something I'd have to
16  research.  I don't recall.
17  Q.   Are there minutes of the executive
18  session?
19  A.   I believe there is.
20  Q.   You say certainly Mr. Requa knew of the
21  recommendations you were going to make.
22  A.   He did.
23  Q.   How did he know that?
24  A.   I briefed him.
25  Q.   Verbally?

|  | Page 59 |
| --- | --- |

1   A.   Yes.
2   Q.   When?
3   A.   The briefing for board meetings begins
4   two weeks prior to each meeting, so I'd have to go
5   back and look at the precise date, but in general
6   the time frame would have been about two weeks prior
7   to that meeting.
8   Q.   When you say you would have to go back to
9   the precise date that you briefed him --
10  A.   I'd have to look at the calendar.
11  Q.   Do you have one briefing or several
12  briefings?
13  A.   Multiple, and they are about all of the
14  issues before the board, not about individual
15  issues.
16  Q.   So there would be no record as to when
17  you actually briefed him on this specific issue?
18  A.   That's right.
19  Q.   Is your memory good enough so that if you
20  could look at that calendar you could come up with a
21  date?
22  A.   Yes.
23  Q.   Now you indicated that you believed Mr.
24  Requa spoke about this issue with Mr. Downey?
25  A.   In general, yes, he would have briefed

|  | Page 60 |
| --- | --- |

1   him on the matters he was bringing forward to the
2   board.
3   Q.   And that's because Mr. Downey at the time
4   was the chairman?
5   A.   That's right.
6   Q.   Do you know when he briefed him?
7   A.   I do not.
8   Q.   Are you assuming he briefed him or do you
9   know that?
10  A.   I assume he briefed him.  It was his
11  practice to brief him.
12  Q.   So you had no personal knowledge that he
13  did?
14  A.   No.
15  Q.   Was there any indication at the executive
16  session that Mr. Downey in fact knew about this
17  issue in advance?
18  A.   Well, he knew about the issue to the
19  extent that he had e-mailed me and said be prepared
20  to discuss this with the board.  So whether he knew
21  what my specific recommendation was or that
22  generally we were going to be speaking to the issue,
23  I don't know, but he was not surprised to have the
24  issue brought forward.
25  Q.   At the executive session how did you

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 20 of 56

American Freedom Defense Initiative, et al vs.          Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016

USCA Case #16-7064      Document #1685488      Filed: 07/24/2017      Page 89 of 165

Page 61

1   articulate your recommendation?
2       MR. STIEF:  You can testify as to what
3   your recommendation was without getting into the
4   dialogue that occurred there.  You can answer the
5   question with respect to how it was communicated,
6   which I think is the question.
7   A.  Verbally.
8   Q.  Was it on your initiative?
9   A.  Yes.
10  Q.  Toward the end of the meeting, the
11  middle, the beginning?
12  A.  Towards the end.
13  Q.  In this rushed state of affairs?
14  A.  There was a lot on the agenda, yes, and
15  they had more business than they had time for, so
16  the matter did not get a lot of discussion.
17  Q.  How long was the executive session?
18  A.  I'd have to research that for you.
19  Typically they last about an hour.
20  Q.  And it was about an hour before the open
21  session, so you went right from the executive
22  session into the open session?
23  A.  That's right.
24  Q.  At the open session, the motion that was
25  drafted up after the executive session that appears

Page 62

1   on Bates 9 and then on Bates 10 was approved
2   unanimously I see, correct?
3   A.  Let me look at 9 and 10.  Yes.
4   Q.  Let me ask you to turn to Bates 400.  For
5   the record, Mr. Stief -- I should have done this
6   earlier -- we now have with the kind of flurry of
7   e-mails and additional production over the last 48
8   hours -- from Bates 1 through 410 from WMATA.  Is
9   that everything that you all have produced to date?
10      MR. STIEF: To the best of my knowledge.
11  Q.  Are these the minutes for that May 28,
12  2015 open session?
13  A.  Yes.
14  Q.  Now I note that after Mr. Downey called
15  the meeting to order at 1:15 -- let's just pause
16  there for a minute on Bates page 400.  Do you see
17  the list of directors and alternate directors?
18  A.  Yes.
19  Q.  They were all in attendance, is that what
20  that indicates?
21  A.  Yes.
22  Q.  What is an alternate director?
23  A.  So the principal directors are on the
24  left-hand side and they are voting members of the
25  board.  The alternate directors vote if one of the

Page 63

1   principals is unavailable or unable to vote on a
2   matter.
3   Q.  Unable because they might recuse
4   themselves for having an interest?
5   A.  Indeed, right.
6   Q.  Now other than the board members
7   present -- I count 14 both directors and alternate
8   directors -- who else was in attendance at this open
9   session?
10  A.  So our open sessions are open to the
11  public, so typically the media attends --
12  Q.  Let me just pause you.  From the WMATA
13  official side.
14  A.  Sure.  Many staff attend.
15  Q.  You were there?
16  A.  I was there.  Typically the CFO attends,
17  the board secretary, the then chief of staff was
18  there.  Typically most of the senior staff attends.
19  Q.  Mark Pohl was there?
20  A.  Yes.
21  Q.  Was Mr. Stief there?
22  A.  I don't remember seeing Mr. Stief there,
23  no.
24  Q.  After the list of the present members of
25  the board, it indicates an approval of agenda.  Do

Page 64

1   you see that?
2   A.  Yes.
3   Q.  Is there a copy of that agenda somewhere?
4   A.  I'm sure there is.
5   Q.  I don't believe it was produced so that's
6   why I'm asking.
7   A.  I see.  I'm sure we can get that for you.
8   Yes, we can get that for you.  Our agendas are
9   posted online on our website, they are public
10  documents.
11  Q.  Do you know the website address for --
12  A.  WMATA.com and in the header you click
13  under "about" and there is a board of directors page
14  where the agendas should appear by date.
15      MR. STIEF: Is it under board of
16  directors or is it under secretary?
17  A.  Under board of directors.
18      MR. STIEF: Okay.
19  Q.  I got it.  Well, that's neatly organized.
20  That's one of the best websites I have seen under
21  transit authorities.
22  A.  Thank you.
23  Q.  Is this under your responsibility?
24  A.  Yes, it is.
25  Q.  Good for you.  I am going to show you the

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 21 of 56

American Freedom Defense Initiative, et al v.          Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.             April 13, 2016

USCA Case #17-7059      Document #1683468      Filed: 07/24/2017      Page 90 of 165

Page 65

1  Web page you have described to me and I'm at the May
2  28 meeting.
3  A.  Yes.
4  Q.  Could you navigate through that?
5  A.  Sure.  So these are committees, executive
6  session.  Here is the board of directors meeting so
7  that's what we want.  And the approval of the agenda
8  by Mr. Downey was an action item and so --
9  Q.  That's the agenda, thank you very much.
10  A.  Sure.
11  Q.  Just for purposes of the record, that's
12  at WMATA.com/about_metro/board_of_directors/board_
13  documents/052815_1052815agendafinal.pdf.
14  MR. STIEF: Let's go off the record.
15  (Off the record 11:50-12:05 p.m.)
16  BY MR. YERUSHALMI:
17  Q.  On the minutes of the May 28 board
18  meeting open session, I note that under the rubric
19  consent item at Bates 404, Mr. Downey's motion
20  regarding the moratorium is addressed.  Do you see
21  that?
22  A.  Yes.
23  Q.  Now it's my understanding that a consent
24  item is an item that did not appear in the formal
25  agenda as revised; is that correct?

Page 66

1  A.  I believe that's true, yes.
2  Q.  Indeed when I looked online at the agenda
3  at the website address that we identified earlier
4  that you located, there is no agenda item for this
5  matter, correct?
6  A.  I would have to review the screen but I
7  think that's right.
8  Q.  Well, why don't you do that just so I'm
9  not mistaken.
10  A.  Sure.  That's correct.
11  Q.  When was the revised agenda for the May
12  28 meeting prepared?
13  A.  I do not know, I'd have to research that.
14  Q.  I'm sorry, you'd have to --
15  A.  Research that.
16  Q.  The motion moved by Mr. Downey at the
17  bottom of Bates 404 of the documents section of
18  exhibit 1 is rather terse, correct?
19  A.  As it's presented on 404 or the motion
20  itself?
21  Q.  Yes.
22  A.  Which, the motion itself?
23  Q.  The motion itself.  Let me explain my
24  question.
25  A.  I was going to say I wouldn't

Page 67

1  characterize it as terse, but it's concise.
2  Q.  As I understand it, your recommendation
3  that was accepted by the executive session was that
4  there should be a moratorium or halt to public issue
5  ads until additional research could be done and a
6  formal decision taken; is that correct?
7  A.  That's right.
8  Q.  Was that approved by the executive
9  session unanimously?
10  A.  They did not take a formal vote.
11  Q.  They did not?
12  A.  No, but there appeared to be consensus
13  among members.
14  Q.  And it appears in the minutes of the May
15  28 open session meeting that it was raised as the
16  last item on the consented agenda, correct?
17  A.  Yes.
18  Q.  But all it states, if you'll follow me at
19  the bottom of page 404, is that Mr. Downey moved,
20  seconded by Mr. Goldman, to close WMATA's ad space
21  to any and all issue oriented advertising.  The
22  motion was unanimously approved.  Do you see that?
23  A.  Yes.
24  Q.  Now that doesn't say anything about a
25  moratorium, it just says closed.  So that's why I

Page 68

1  suggested it's terse to the point of being
2  misleading, correct?
3  MR. STIEF: Object to the form and
4  foundation.  You can answer the question.
5  A.  I think it's not as specific as it should
6  be about the temporary nature of the action.
7  Q.  At the open session was the temporary
8  nature of the action discussed?
9  A.  Yes, because the motion was read and the
10  motion itself indicates that it's a temporary
11  moratorium.  Do you recall what the Bates number is
12  for the motion?
13  Q.  Yes, that's Bates 10.
14  A.  Thank you.  It's specific in the motion
15  that it's closed until the end of the calendar year.
16  Q.  Let's be specific now and maybe even too
17  lawyerly for you -- and I don't mean that as an
18  insult in any way -- but the actual motion doesn't
19  mention -- oh, I'm sorry, it does mention until the
20  end of the year.  I stand corrected.  So you are
21  probably more lawyerly than I.
22  A.  I'll not take that as an insult.
23  Q.  You should not.  Touche, as they say.
24  Mrs. Mary Hynes is an alternate director yet she's
25  listed here as having voted in favor of the motion,

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 22 of 56
American Freedom Defense Initiative, et al. vs.   Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.   April 13, 2016
USCA Case #17-7059   Document #1685468   Filed: 07/24/2017   Page 91 of 165

Page 69

1  although I don't see any missing director, if you
2  look at Bates 400.
3  A.  So it would have required -- she would
4  have been voting that day because the only Virginia
5  representative among the principals that's listed is
6  Ms. Katherine Hudgins, so they were missing one
7  other principal board member from Virginia so that's
8  why Ms. Hynes would have voted.
9  Q.  I see.  So the directors listed who were
10  present aren't all of the directors.
11  A.  That's correct.
12  Q.  Are we missing just one director on that
13  list?
14  A.  It appears so.
15  Q.  And who did Ms. Hynes replace?
16  A.  I have to research this back.  In May of
17  2015 I believe that would have been Jim Corcoran
18  from Virginia.  However, there was a change last
19  year in Virginia principals from Jim Dyke to Jim
20  Corcoran and I want to be absolutely sure it was
21  Corcoran and not Dyke.  But one of those two would
22  have been the Virginia governor's appointee to the
23  board and she would have voted in their stead.
24  Q.  Could you spell those two names?
25  A.  C-o-r-c-o-r-a-n, James, and also James

Page 70

1  Dyke, D-y-k-e.
2  Q.  Was there any discussion of the motion at
3  the open session?
4  A.  I don't recall but sessions are recorded
5  for audio purposes and that's something that we
6  could review.
7     MR. STIEF: If I may just ask her one
8  question that might help you.  Are those audio
9  transcripts of the sessions also on the Internet?
10  A.  I think they are, I think they are, but I
11  don't know how far back it goes.
12  Q.  Okay.
13  A.  How long we retain them.
14  Q.  I am going to turn to the website page
15  with the meetings where you found the agenda on my
16  tablet here.
17  A.  Okay.
18  Q.  I note there is a board of directors
19  hyperlink where you found the agenda and there is a
20  little speaker indicating that there's audio.  For
21  the life of me, I can't find whatever the audio
22  is --
23  A.  On May 28, if you click on that little
24  speaker it comes up.
25  Q.  On the speaker itself, okay.

Page 71

1  A.  Yes.  Then you have to open it and it
2  should be there.
3  Q.  What we are going to do now is I have
4  opened up exactly where you have indicated and we
5  are going to listen to the recording and when we
6  find out, we'll ask the court reporter to start
7  transcribing.
8     (Off the record.)
9     MR. YERUSHALMI: Let me pause here.
10  That's early on in the meeting so I'm going to skip
11  down until the end.
12     MR. STIEF: Let's go off the record.
13     (Off the record.)
14  Q.  We'll go back on the record.  We worked
15  our way through the recording of the open session of
16  the May 28 board meeting and we are now at 49
17  minutes 36 seconds into the recording.
18  A.  Okay.
19  Q.  And as your able counsel indicated,
20  that's probably what's a handwritten notation on
21  Bates 9 where it says approximately 50 minutes.  I'm
22  going to turn this on now.  You were at this
23  meeting, correct?
24  A.  I was.
25  Q.  I am going to ask the court reporter to

Page 72

1  record this.  We are going to hear two male voices.
2  I believe one is the chair --
3  A.  It is.
4  Q.  That's the first voice -- and the second
5  one is Mr. Goldman, also a board member, correct?
6  A.  Yes.
7  Q.  Okay.  So we are going to begin now.
8     (Recording:  VOICE: "I have a motion that
9  I'd like to offer that's not on the agenda but if
10  Mr. Goldman wants to offer it -- (inaudible).
11     VOICE: It's a matter of procedure whether we have
12  to open the agenda in order to entertain that motion
13  because do we need to do anything procedurally.
14     VOICE 1: That's why I was asking do we open an
15  added item which I will offer.  I move this
16  item" --)
17  Q.  The one speaking right now "I move,"
18  that's the chair?
19  A.  Yes.
20  Q.  And the other one we heard earlier was
21  Mr. Downey, not Mr. Goldman?
22  A.  So Mr. Downey is the chairman.
23  Q.  I'm sorry.
24  A.  So the first voice was the chairman Mr.
25  Downey, the second voice was the vice chairman Mr.

American Freedom Defense Initiative, et al. vs.   John M. Bowersox
Washington Metropolitan Area Transit Authority, et al.   April 13, 2016

|  | Page 73 |
| --- | --- |

1 Goldman, and then it comes back and you hear Mr.
2 Downey again.
3 Q.   Okay.
4 A.   After the discussion of the procedural
5 matter, sounds like the chairman is about to offer
6 the motion.
7 Q.   In other words, that first discussion was
8 that Mr. Goldman apparently wasn't certain that they
9 had reopened the agenda properly, correct?
10 A.   That's right, that was his question.
11 Q.   Okay.  Let's go on.  (Recording:  VOICE:
12 Is responsible for establishing policies of the
13 Washington Metropolitan Transit Authority pursuant
14 to its powers under compact article 512-J regulate
15 the use of facilities owned by or controlled by the
16 authority.  The board hereby directs management to
17 close WMATA's advertising space to any and all issue
18 oriented advertising including but not limited to
19 political, religious, and advocacy advertising until
20 the end of this calendar year.  During this period
21 the board will review what role such issue oriented
22 advertising has and WMATA's mission to deliver safe,
23 equitable, and reliable transportation services to
24 the nation's capital and will seek public comment
25 and participation for its consideration before

|  | Page 74 |
| --- | --- |

1 making a final policy determination.  In accordance
2 with that authority of the board, I move that the
3 board of directors close WMATA's advertising space
4 to any and all issue oriented advertising, including
5 but not limited to political, religious, and
6 advocacy advertising until the end of calendar year
7 2015.)
8 Q.   Now essentially what Mr. Downey was doing
9 was reading the motion verbatim?
10 A.   That's right.
11 Q.   With some errors in the way he read it,
12 but more or less essentially verbatim, correct?
13 A.   That's right.
14 Q.   Okay.  (Recording:  VOICE: (Inaudible.)
15 Is there discussion of the motion?  Mr. Goldman?
16    VOICE: I think the only discussion I have had is we
17 have seen use of the advertising space in recent
18 months for a great deal of issue advertising things
19 that go from talking about open skies agreements
20 with certain mid east countries to the animal
21 experimentation practices at some of our national
22 science institutes.  So I think there is a need that
23 to sort of pull back and take a look at these ads
24 and just decide on a board policy going forward as
25 to which ads we would want to have all in the space

|  | Page 75 |
| --- | --- |

1 or none or something in between --  VOICE:  Or maybe
2 all or none.  VOICE:  -- and suspend practice while
3 we do that reassessment.  VOICE:  All of these ads
4 will be suspended.  We'll get a report back
5 (inaudible) any contract amendments that might be
6 required to place the advertising group (inaudible).
7 Any further discussion?  All in favor?  Any opposed?
8 Motion carries.)
9    So that was the end of the discussion,
10 correct?
11 A.   Yes.
12 Q.   Other than Mr. Goldman's remarks and kind
13 of Mr. Downey's commentary toward the end, there was
14 no other discussion regarding this motion?
15 A.   Not to my knowledge.
16 Q.   And there was no discussion at the
17 executive session other than the one question
18 directed to you, correct?
19    MR. STIEF: She can answer that question,
20 but if it got into the actual discussion, that would
21 be covered by privilege.
22 A.   There was discussion with general counsel
23 Pohl.
24 Q.   Was he the one who asked the question --
25 A.   (Shaking head no.)

|  | Page 76 |
| --- | --- |

1 Q.   It was Mr. Price?
2 A.   Yes.
3 Q.   Just for the record, I would like to
4 thank the court reporter who was trying to get that
5 down.  I appreciate some of it was hard to hear or
6 inaudible.
7    MR. STIEF: It's your deposition, but we
8 can give the court reporter a copy of this.  But I
9 agree with you there's a couple of words that were
10 flubbed.
11    MR. YERUSHALMI: Indeed if you have a
12 transcription of the meeting, that would be fine
13 too.
14    MR. STIEF: You can ask the witness but I
15 don't believe it has been normally transcribed.
16 A.   No.
17 Q.   As I understand, the board's directive to
18 you and to your subordinates was to conduct this
19 investigation --
20 A.   Yes.
21 Q.   -- to determine if in fact your initial
22 thoughts that were the genesis for this moratorium
23 in fact would create the basis for a new policy,
24 correct?
25 A.   Yes.

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 24 of 56
USCA Case #16-7051   Document #1685468   Filed: 07/24/2017   Page 93 of 165
American Freedom Defense Initiative, et al vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016

---

Page 101

1  I don't know, but we get calls, you know random
2  calls, for example crank calls saying there's a bomb
3  that's going to go off in this station and to that
4  threat we sent canine units and we examine things
5  and we clear it.  (Knocking on the table.)  That's a
6  knock on the table for those of us who are a little
7  bit jaded.  But thank goodness that's not happened
8  in this system and we have not been made aware that
9  there was a legitimate threat in that regard.
10  Q.  Have any of these threats been related in
11  any way that you know of to an advertisement?
12  A.  Not to my knowledge.
13    MR. STIEF:  I'll just note an objection.
14  I think we are really getting outside of the scope
15  of this 30(b)(6) deposition.  I'm not going to stop
16  her from answering as to her personal knowledge, but
17  this certainly is getting beyond the areas that she
18  would have been prepared for.
19    MR. YERUSHALMI:  Well, I'll just voice my
20  objection to a speaking objection.  But just on
21  response, it's her institutional knowledge, not
22  personal knowledge, regarding whether or not there
23  has before been any threat of violence relating to
24  an ad I would say is particularly relevant, but we
25  can debate that at some other point.

---

Page 102

1  Q.  Was one of your concerns when you
2  proposed the moratorium to the executive session the
3  possibility of violence arising from any of my
4  client's ads?
5  A.  Can you repeat the question?
6    (Record read.)
7  A.  Yes.
8  Q.  Specifically what was that concern?
9  A.  As I said with respect to the cartoon
10  drawing, there had been violence over that issue in
11  Texas just prior to the ad placement sought by your
12  client.  I had a concern that there might be other
13  similar reactions were that ad to appear in our
14  system.
15  Q.  Were you concerned about generic violence
16  arising from that ad or did you have specific
17  concern about a certain reaction from a certain
18  group?
19  A.  Just generic.
20  Q.  So it happened in Texas and therefore it
21  might happen in the future?
22  A.  It could.
23  Q.  Nothing more choate than that though?
24  A.  No.
25  Q.  Have there been any ads rejected under

---

Page 103

1  the new policy, do you know?
2  A.  Yes.
3  Q.  What kinds of ads so --
4    MR. STIEF:  By the new policy you are
5  referring to post November 19; is that correct?
6    MR. YERUSHALMI:  Yes.
7  A.  So our process is that ads come through
8  the Outfront agency and they come in and if they
9  appear to be issue oriented ads, they are sent to a
10  panel of three attorneys in our counsel's office for
11  review.  As an example of something that we haven't
12  taken recently, there was a pharmaceutical company
13  which on its face had an ad that appeared to be
14  educational about a disease but was really more
15  about advocacy on behalf of federal funding for
16  research and so that qualified it as an issue
17  oriented ad and so it was rejected.
18  Q.  I have highlighted on my screen of my
19  tablet the filed complaints in this matter,
20  paragraphs 23 and 24 were the two proposed ads by my
21  client to WMATA buses that were rejected to appear.
22  They are both the same artwork and copy, just in
23  different formats, correct?
24  A.  Yes.
25  Q.  Are these the two ads that you know to

---

Page 104

1  have been rejected that are at issue in this
2  litigation?
3  A.  Yes.
4  Q.  We can increase the size if you want.
5  A.  Thank you.
6  Q.  Can you see everything there?
7  A.  Yes.
8  Q.  In fact, it's an ad that reads at the top
9  in red "support free speech," correct?
10  A.  Yes.
11  Q.  And there is a picture of a man with a
12  turban, kind of an angry-looking man with a beard
13  holding a sword in his left hand and saying "you
14  can't show me."  Do you see that?
15  A.  Yes, yes.
16  Q.  And then there is a quote in the form of
17  a quoted bubble from a man's hand actually drawing
18  it that says "that's why I draw you," correct?
19  A.  Yes.
20  Q.  And then there's the name of the
21  cartoonist who drew this at the bottom right.  Do
22  you see that?
23  A.  Yes.
24  Q.  And then there's two AFDI logos on the
25  bottom of that on the left and right sides.  See

---

Case 1:15-cv-01038-GK   Document 20-3   Filed 09/05/16   Page 25 of 56
American Freedom Defense Initiative, et al. vs.                          Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.                   April 13, 2016

USCA Case #17-7059      Document #1685468      Filed: 07/24/2017      Page 94 of 165

Page 105

1  that?
2  A.  Yes.
3      MR. STIEF: Better turn it toward her.
4  Q.  Then at the bottom there is a disclaimer
5  that WMATA generally requires for public issue ads
6  that reads, "this is a paid advertisement
7  sponsored by AFDI. The advertising space is a
8  designated public forum and does not imply WMATA's
9  endorsement of any views expressed."  Do you see
10 that?
11 A.  Yes.
12 Q.  This ad has been rejected by WMATA under
13 the new policy, correct?
14     MR. STIEF: Object to the form and
15 foundation in that and a prior question, but she can
16 answer.
17 A.  I'm not sure whether -- I actually don't
18 know whether it has been resubmitted for
19 consideration since the new policy was adopted.  But
20 as to my knowledge, it was coming in -- first it was
21 submitted under the old policy.
22 Q.  And it was rejected under the old policy,
23 correct?
24     MR. STIEF: Same objection.  You can
25 answer.

Page 106

1  A.  Not specifically, no.  Under the old
2  policy it would have been accepted just as other of
3  your client's ads were accepted, but the moratorium
4  placed a hold on all issue oriented ads, all
5  controversial ads, and so it was not allowed to
6  proceed during the period of the moratorium because
7  it fell into that category.
8  Q.  But as we have now tracked, WMATA
9  understood it was submitted at least as early as May
10 22, 2015, correct?
11 A.  Yes.
12 Q.  The moratorium did not go into effect
13 until May 28, correct?
14 A.  That's right.
15 Q.  So in fact, WMATA did not permit this ad
16 to be placed for that period of time, correct?
17     MR. STIEF: Same objection and I'll note
18 it as a continuing objection so I don't keep
19 interrupting.
20 A.  It was one of several that were in the
21 pipeline at the time the moratorium was enacted, so
22 there was a corn farmers/corn growers ad, as I
23 recall, there was an open skies ad from the airline
24 pilots, as I recall, under the same circumstances
25 they were asking to be placed, but we hadn't been --

Page 107

1  so anything that had not been installed and wasn't
2  already in the pipeline did not go forward,
3  including your client's ad.
4  Q.  I understand that.  However, WMATA was
5  aware that my client's ad was presented for
6  submission at least as of May 22; is that correct?
7  A.  That's correct.
8  Q.  And you have testified that at that point
9  in time WMATA knew the ad was compliant with the ad
10 policies in existence at that time, correct?
11 A.  Yes.
12 Q.  There was no reason for WMATA to reject
13 the ad at that time, correct?
14     MR. STIEF: Objection, form and
15 foundation.  You can answer.
16 A.  There was no reason.
17 Q.  Turning to the new policy, would you
18 point to me where in the new policy there would be a
19 provision that would reject this ad as it was
20 presented and as it existed in the complaint at
21 paragraphs 23 and 24?
22 A.  In the new policy?
23 Q.  Yes, ma'am.
24 A.  So I believe that it would be under the
25 resolve clause of the resolution under the new

Page 108

1  policy.  So it's the first page that the commercial
2  advertising space is closed to issue oriented ads
3  including political, advocacy, and religious ads.
4  So this ad would be an advocacy ad and therefore
5  precluded.
6  Q.  What about this ad is advocacy?
7  A.  Just so you know, I do not make that
8  determination but I'll represent the authority on
9  this.  We have a panel of three attorneys who
10 interpret the board policy and determine what is
11 issue oriented, political, religious, and advocacy.
12 They would give me that guidance.  But I believe
13 that this ad would come under advocacy because it
14 advocates free speech and it does not try to sell
15 you a commercial product.  But that's not a legal
16 interpretation, that's merely my business
17 interpretation.
18 Q.  Who are these three attorneys?
19 A.  Their names are Sonia Bacchus,
20 B-a-c-c-h-u-s; Phil Staub, P-h-i-l S-t-a-u-b; and
21 Mark Pohl, the general counsel, make up that panel.
22 Q.  They are all in house?
23 A.  Yes.
24 Q.  Who made the conscious decision to hold
25 my client's advertisement, that is to say not

Case 1:15-cv-01038-GK  Document 20-3  Filed 09/05/16  Page 26 of 56
USCA Case #16-7051  Document #1685468  Filed: 07/24/2017  Page 95 of 165
American Freedom Defense Initiative, et al. vs.                    Donn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.               April 13, 2016

Page 113

1  Q.  Or Ms. Murphy.
2  A.  Murray.  I don't know if it was verbal or
3  by e-mail, but at some point it must have
4  transmitted the ad.
5  Q.  I don't see any communication in the
6  documents produced.  Do you know if that document
7  still exists?
8  A.  I don't.
9    MR. YERUSHALMI: Will you check, Mr.
10  Stief, to see if that still exists?
11    MR. STIEF:  I can look into it.
12  Q.  Since the passage of the new policy in
13  November of 2015, has WMATA approved commercial ads
14  that also contained advocacy issues or religious
15  issues or political issues?
16  A.  Not to my knowledge.
17  Q.  Ultimately after you consult with this
18  panel of three lawyers, if necessary, it's your
19  decision whether an ad runs or not?
20  A.  So yes, I mean it is.  There's a process
21  for appealing that decision, but yes, ultimately it
22  lies with me.
23  Q.  In other words, putting aside any
24  administrative appeal, you are the final
25  decision-maker?

Page 114

1  A.  Yes.
2  Q.  Is it your understanding of the new
3  policy passed in November of 2015 that an
4  advertisement that is selling a commercial product
5  that includes an advocacy message would be
6  acceptable?
7  A.  No.
8  Q.  In other words, the commercial aspect of
9  the advertisement doesn't override the issued
10  advocacy or political messaging or the religious
11  messaging; is that correct?
12  A.  I believe that's correct.
13  Q.  So if my client were to be selling
14  T-shirts with that same ad, WMATA would reject that
15  ad?
16  A.  I would ask counsel's input into that
17  because I believe that there is a concern about an
18  ad that appears to be selling a commercial product
19  as a Trojan horse, if you will, for an advocacy
20  message.
21  Q.  If a book publisher, reputable book
22  publisher, were advertising books or sought to
23  advertise books on WMATA and books that were
24  patently political, advocating a specific political
25  message, would they run afoul of the new policy?

Page 115

1  A.  Again I would consult counsel on that
2  matter because I think that's a matter of
3  interpretation of the board's policy.  But
4  potentially, yes, they could be running afoul of
5  that policy.
6  Q.  What is your understanding as the final
7  decision-maker of where that line is drawn?
8  A.  I don't have a hypothetical view of it.
9  I try to view it on a case-by-case basis.
10    MR. YERUSHALMI: Let's take a break and I
11  think we can wrap up.
12    (Off the record 1:38-1:45 p.m.)
13    BY MR. YERUSHALMI:
14  Q.  Let me ask you to turn to Bates 362 in
15  exhibit 1 under the documents tab.
16  A.  I am there.
17  Q.  Are you familiar with this e-mail?
18  A.  Yes.
19  Q.  And Mr. Langdon was your contact at
20  Outfront Media?
21  A.  Mr. Langdon handles the day-to-day
22  management of our account at Outfront Media, yes.
23  Q.  Now you have cc'd Mark Pohl, general
24  counsel, correct?
25  A.  Yes.

Page 116

1  Q.  Sonia Bacchus who is also on that three
2  attorney panel, correct?
3  A.  Yes.
4  Q.  And the woman with whom you consulted,
5  correct, about this time you testified to earlier?
6  A.  Yes.
7  Q.  And then your counsel here, Mr. Stief,
8  and a Jawauna Greene, and she's the other attorney
9  that's on that --
10  A.  No.  She's the director of marketing, so
11  the advertising work falls in her department and
12  she's the supervisor of Donna Murray.
13  Q.  And Donna Murray was the staff member who
14  did the memo earlier?
15  A.  Yes.
16  Q.  And who was Allison Roberts?
17  A.  I'm not sure who she is and why she's on
18  this list.  John Pasek works in the board of
19  directors office.  I don't know.
20    MR. STIEF:  Just to clarify, if you don't
21  mind, Pasek works in the board of directors office
22  or for the board secretary?
23  A.  It's one and the same, board secretary.
24    MR. STIEF:  Sorry for interrupting.
25  Q.  How is it that you don't know who Allison

Case 1:15-cv-01038-GK  Document 20-3  Filed 09/05/16  Page 27 of 56

American Freedom Defense Initiative, et al. vs.                    Lynn M. Bowersox
Washington Metropolitan Area Transit Authority, et al.            April 13, 2016

USCA Case #16-7051    Document #1682468    Filed: 07/24/2017    Page 96 of 165

Page 117

1  Roberts is?
2  A.  That's a good question.  It may be a typo
3  on my part.  Is there an attorney named Allison
4  Roberts?
5      MR. STIEF: Can I answer?
6      MR. YERUSHALMI: Yes.
7      MR. STIEF: No.
8  A.  But there is a procurement person named
9  Allison Roberts.  Allison Roberts in procurement is
10  perhaps who is copied here by me because she may be
11  the contracting officer for our agreement with
12  Outfront Media, that would be my best estimate of
13  why she's on here.
14  Q.  Let me ask you to turn to Bates 363, the
15  next page over.
16  A.  All right.
17  Q.  Actually there is an e-mail thread that
18  extends to 364.  Do you see that?
19  A.  Yes.
20  Q.  Did the e-mail from the individual whose
21  name -- whose e-mail address is redacted, the
22  substance of which appears on Bates 364, impact your
23  decision-making process to suggest the moratorium?
24  A.  Not specifically, no.
25  Q.  Did it in any way?

Page 118

1  A.  No.  I don't even -- I can't say that I
2  wasn't aware of it, but as you can see, this came
3  from my staff through an e-mail thread after the
4  28th, so I don't know that I was even specifically
5  aware of this.  I was aware of general sentiments
6  like this but I don't know that I would have read
7  this e-mail prior to making the recommendation to
8  the board.
9      It may help you to know Reuben Musgrave
10  answers correspondence that comes in.  He is located
11  at a different site so when e-mails from the public
12  come in to the general manager, it's Reuben's job to
13  collect them and draft responses.  So I often don't
14  see individual e-mails at all and sometimes not
15  until after the response is provided for my review.
16  Some e-mails are not even answered by me, their
17  response comes from others.
18  Q.  Could you turn to Bates 370?
19  A.  Sure.
20  Q.  Now this looks to me to be a kind of form
21  note that you in fact sent out or at least it was
22  sent out under your signature to several of these
23  individuals; is that correct?
24  A.  Yes.
25  Q.  And that's because you were getting a lot

Page 119

1  of questions, comments, inquiries?
2  A.  That's right.  And so after the board's
3  action, Jeremy Franklin, who manages the call
4  center, would have been instructed by me to provide
5  everybody with a timely response.  That would have
6  been consistent on this matter.
7  Q.  Various documents that occurred, Bates
8  372 through 374, what are these documents?
9  A.  We have a customer relationship
10  management software system and it allows for our
11  customer service representatives to input
12  information when customers call or e-mail us about
13  their concerns, and that's how we track and report
14  and make sure we have customer service responses to
15  matters, and you are seeing cases that were taken
16  when people called in and expressed a concern.
17  Q.  Indeed as I have gone through all these
18  documents, there weren't really that many
19  complaints.
20  A.  Not in this time frame.
21  Q.  In fact, relative to the added issue in
22  this litigation, there weren't that many complaints.
23  A.  Relatively, no.  The ad that triggered
24  the most public complaints was the one involving
25  President Obama previously.  So if I use that as the

Page 120

1  high water mark, no.
2  Q.  I count 6 or 7 letters, e-mails,
3  complaints mails even with all of me clients?
4  A.  That's true.
5  Q.  None of which threatened violence or
6  anything else, correct?
7  A.  To my knowledge, no.
8  Q.  Go to Bates 375 in exhibit 1.
9  A.  Um-hmm.
10  Q.  Who is Dan Stessel?
11  A.  He is our chief spokesperson, he is
12  director of communications.  So when they get
13  questions, they are directed to him or someone on
14  his staff.
15  Q.  This was somebody from The Washington
16  Post --
17  A.  Yes.
18  Q.  -- whose job was to deal with Loose Lips
19  issues?
20  A.  Right.  Will has a column in the
21  Washington City Paper that perhaps holds itself to
22  different standards than The Washington Post.
23  Q.  A gossip column as we used to call them?
24  A.  Yes, except it's more about political
25  gossip, that's right.

# EXHIBIT B

Board of Directors Meeting, 5/28/15, audio 49:37 – 52:45:


Speaker 1: I have a motion that I would like to offer, it's is not on the agenda, but, unless Mr. Goldman wants to offer it, I'm

Speaker 2: It's his motion of the chair, it is just a matter of procedure whether we have to reopen the agenda in order to entertain that motion you have made.  Do we need to do anything procedurally?

Speaker 1: That is what I was asking is to reopen and add an item to the agenda, which I will offer.  I move this item: The Board of Directors is responsible for establishing policies of the Washington Metropolitan Area Transit Authority.  Pursuant to its powers under Compact Article V 12(j), who regulate the use of facilities owned by, owned or controlled by the Authority, the Board hereby directs management to close WMATA's advertising space to any and all issue-oriented advertising including but not limited to political, religious and advocacy advertising until the end of this calendar year.  During this period, the Board will review what role such issue-oriented advertising has and WMATA's mission to deliver safe, equitable and reliable transportation services to the nation's capital and will seek public comment and participation for its consideration before making a final policy determination.  In accordance with that authority of the Board, I move that the Board of Directors close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to political, religious and advocacy advertising until the end of calendar year 2015.

Speaker _: I second

Speaker _: Price

Speaker 1: Is there a discussion of the motion?

Mr. Goldman: I just think the only discuss I would have is that we've seen the use of the advertising space in recent months with a great deal of issue advertising things that go from talking about open skies agreements with certain Mid-East countries to the animal experimentation practices at some of our national science institutes, so I think there is a need to sort of pull back and take a look at these ads and just decide on them, a board policy going forward as to which ads we would want to have, if all in the space or none or something in between, and I think we need to…

Speaker 1: Or maybe all or none

Mr. Goldman: …suspend practice while we do that reassessment.

Speaker 1: All of the ads will be suspended.  We will get a report back on the implications of this as we move forward, particularly any contract amendments that might be required with the place or the advertisement group that for the ad space.

Speaker 1: Any further discussions?

Speaker 1: All in favor,

Speaker _: I

**JA 94**

Speaker 1: Any oppose?

Speaker 1: Hearing none, the motion carries.

# EXHIBIT C

*REVISED*
**Agenda**
**1407th Meeting of the Board of Directors**
**May 28, 2015**
**1 p.m.**



I.    Call to Order

II.   Approval of Agenda .................................................. Mr. Downey

**III.   Certification of Executive Sessions .......................Mrs. Hudgins**
   **A.   May 14, 2015**
   **B.   May 28, 2015**

IV.   Approval of Minutes.................................................. Mr. Downey
   A.  April 23, 2015 Board Meeting
   B.  April 23, 2015 Executive Session
   C.  May 14, 2015 Executive Session

V.   Public Comment

VI.   Report by Accessibility Advisory Committee ................. Mr. Sheehan

VII.   Report by Riders' Advisory Council  ........................... Ms. Hermanson

VIII.   Report by Chair ........................................................ Mr. Downey
   A.  Salute to Service – Mildred Burrell
   B.  Approval of Accessibility Advisory Committee Appointments
   C.  Approval of Riders' Advisory Council Appointments

IX.   Report by GM/CEO .................................................. Mr. Requa
   A.  GM/CEO Monthly Report
   B.  Employee Spotlight – Tina Moore, Rail
       Operator

X.   Report by Planning, Program Development and............ Ms. Tregoning
   Real Estate Committee
   A.  Approval of Capitol Heights Joint Development
       Term Sheet
   B.  Approval of Grosvenor Joint Development Term
       Sheet

**Washington
Metropolitan Area
Transit Authority**

600 Fifth Street, NW
Washington, DC 20001
202/962-1234

By Metrorail:
Judiciary Square—Red
Line
Gallery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
Routes D1, D3, D6, P6,
70, 71, 80, X2

*A District of Columbia,
Maryland and Virginia
Transit Partnership*

1407th Meeting of the Board of Directors
May 28, 2015
Page 2

XI.    Report by Customer Service and Operations ................ Mrs. Hudgins
       Committee
       A.  Approval of Public Hearing for Takoma Langley
           Crossroads Transit Center

XI.    Report by Finance and Administration Committee......... Mr. Euille
       A.  Approval of FY2016 Operating Budget and
           FY2016-FY2021 Capital Improvement Program
       B.  Approval of Revisions to Drug and Alcohol
           Policy and Change in Delegation
       C.  Approval of Revised Budget for Silver Line –
           Phase I and Phase II
       D.  Approval to Accept FY2014 NVTA Funding for
           Traction Power Upgrades

XII.   Report by Governance Committee............................ Mrs. Hynes
       A.  Approval of Revised Board Committee
           Assignments

XIII.  Consent Item
       A.  Approval of Renewal of Line of Credit..................... Mr. Anosike

XIV.   Reports by
           D.C.  ............................................................... Mr. Evans
           WSTC................................................................ Mr. Goldman
           NVTC ............................................................... Mrs. Hudgins
           Federal Government ......................................... Mr. Downey

XV.    Adjournment

**JA 98**

USCA Case #17-7059      Document #1685468          Filed: 07/24/2017      Page 103 of 165

# EXHIBIT D

## MOTION BY CHAIR OF BOARD OF DIRECTORS, May 28, 2015

The Board of Directors is responsible for establishing policies of the Washington Metropolitan Area Transit Authority. Pursuant to its powers under the Compact, Article V, 12 (j) to regulate the use of facilities owned or controlled by the Authority, the Board hereby directs management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year.

During this period, the Board will review what role such issue-oriented advertising has in WMATA's mission to deliver, safe, equitable and reliable transportation services to the Nation's Capital, and will seek public comment and participation for its consideration before making a final policy determination.

In accordance with the Board's authority, I move that:

> The Board of Directors close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year.

**APPROVED UNANIMOUSLY**

May 22, 2015

WMATA-AFDI 000010

# EXHIBIT E

CODE NO: 0001

# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POSITION DESCRIPTION

### GENERAL MANAGER AND CHIEF EXECUTIVE OFFICER
### GMGR

DATE: _____                            FLSA: EXEMPT

REVIEWED:
GMGR : _____
HRCB:  _____

REPORTS TO:  Board of Directors

SUMMARY:

The General Manager and CEO, as a statutory officer of the Authority, is responsible for the overall day-to-day administration and operation of the Authority's activities subject to policy direction from the Board of Directors.  The General Manager, appointed by the Board of Directors, is delegated the authority for implementation and interpretation of policies and programs established by the Board.

MAJOR DUTIES:

Develops and implements, with Board approval, the Authority's annual operating and capital budgets.

Leads the development and implementation of the three-year business plan in support of the Authority's strategic plan.

Initiates and awards, as delegated by the Board, all procurements based on the board approved budget.

Builds and maintains an uncompromising safety culture based upon continual improvement.

Holds leadership and the organization accountable to achieve strategic goals and business plan objectives through performance based management.

Serves as the agency's lead customer service advocate; instills the value of service throughout the organization, and ensures that the proper training, tools and

Page 1 of 6

## JA 102

CODE NO: 0001

management are provided to enable consistent service delivery levels.

Oversees and ensures the Authority's effective response to emergency management incidents ranging from major service disruptions and significant weather events to incidents involving national security of the capital region.

Leads the development and implementation of an effective risk management framework designed to both address current and potential risks that would prevent the Authority from achieving its business goals and objectives.

Develops and maintains strong relationships at the highest level with a wide array of key stakeholders, including the executive and legislative bodies from Maryland, Virginia and the District of Columbia, a number of cities and counties, and the federal government.   Plays a key role with the Board on developing funding arrangements with these entities.

Serves as WMATA's principal spokesperson before congressional committees, the Department of Transportation, the participating jurisdictions within WMATA's operating compact, the public, and local and national media outlets.

Attracts, retains and develops high caliber talent to maintain and enhance WMATA's leadership strengths today, as well as to provide bench strength for future succession purposes across the organization.

Develops and maintains a strong working relationship and open communications with the Board and particularly with its Chairman.

Promotes an emphasis on safety across the entire organization that will lead to a safe environment for all customers, staff, suppliers and any other constituencies potentially impacted by WMATA's operations.   Contributes to the pro-active identification and implementation of safety improvements.

Provides leadership to ensure proper levels of security are consistently maintained throughout all WMATA operations.

Leads the development and execution of a strategy to best deploy capital for investments in equipment, facilities, and personnel needed to enhance WMATA's safety and quality of service.

Administers and interprets the policies of the Board, and establishes new policies and/or modification of existing policies where necessary to improve WMATA's operations.

Page 2 of 6

JA 103

**CODE NO: 0001**

Leads WMATA's executive leadership team to create and maintain a climate where all employees are empowered to deliver high performance.

Oversees the planning, coordination and execution of WMATA's joint land development activities.

Oversees the management of all labor relations activities to ensure that WMATA actively engages and maintains strong working relationships with its entire workforce.

Liaises with emergency services and other regulatory organizations as required.

Ensures full compliance with federal and jurisdictional funding and regulatory agencies.

The above duties and responsibilities are not intended to limit specific duties and responsibilities of any particular position.  It is not intended to limit in any way the right of supervisors to assign, direct and control the work of employees under their supervision.

<u>KNOWLEDGE, SKILLS, AND ABILITIES</u>:

Demonstrated knowledge of, abilities to and/or hands-on experience in:

<u>Leadership</u>

- Creates and communicates a clear strategy and compelling view for the future of the business.

- Excellent people management skills, and in particular the ability to communicate with staff and managers at all levels of the organization.

- Develops a climate of open communication across the organization with employees at all levels to share information and influence decisions.

- Knows how to direct, motivate and manage others.  Sets clear goals and objectives and understands the need to prioritize and can manage multiple activities.

- Excellent problem-solving and analytical skills, and able to implement change.

- Innovative leader who strives for best in class and continual improvement in

**Page 3 of 6**

CODE NO: 0001

all aspects of the business, but is especially focused on service performance and delivery.

- Works collaboratively with team-oriented leadership style, with experience influencing diverse components of the company.

<u>Board Relations</u>

- Works collaboratively with the Board, engaging the members as partners in maintaining or attaining needed resources; developing strategic plans and strategies to achieve goals; setting Authority key performance indicators; and building effective external relationships.

- Establishes strong relationships with each board member, ensuring engagement that effectively takes advantage of their knowledge and skills.

- Ensures effective communication to keep the Board informed of day-to-day operational matters, as well as larger policy initiatives and concerns.

<u>External Relations</u>

- Communicates effectively with a wide range of audiences, including customers, jurisdictional partners, congressional members, elected officials, union leadership and other stakeholders.

- Proven success in working with multiple political entities, local jurisdictions, stakeholders, as well as federal regulators to build coalitions and achieve business goals and objectives.

- Possesses the vision, tough-mindedness, and political savvy to effectively manage across functional teams with a structure that requires influencing at all levels, both internally and externally.

<u>Operational Excellence</u>

- Demonstrated success developing and implementing operational excellence programs, directly providing hands-on leadership of key projects and teams to create an environment of sustainable, safe, and continuous improvement.

<u>Financial Management</u>

- Proven success in effectively developing, leading and implementing large

Page 4 of 6

**CODE NO: 0001**

scale operating and capital budgets, programs and projects.

- **Possesses a working knowledge of regulatory requirements applicable to the transportation industry.**

<u>Customer Orientation</u>

- **Maintains a deep understanding of customers' requirements, goals, and issues and acts as customer advocate, taking initiative to overcome obstacles, solve customer problems, and improve overall customer satisfaction and demand.**

<u>Analytical Thinking</u>

- **Can break down complex problems and identify solutions based on analysis of multiple sources of data.**

<u>MINIMUM QUALIFICATIONS AND EXPERIENCE:</u>

Graduation from an accredited college or university with a Bachelor's Degree in Business Administration, Financial Management, Engineering or other related fields. Master's degree preferred.

A minimum of 20 years of extensive and diversified executive management experience of increasing responsibility developing and executing complex and varied programs in a large public service delivery entity or private corporation. Transit experience preferred.

Demonstrated impressive success in driving operational excellence in businesses with major capital infrastructures, large scale unionized workforces, and significant government regulation and oversight.  Experience overseeing the development and implementation of comprehensive financial programs and financial systems for a multi-dimensional organization.   Possess knowledge of and experience with federal, state and local government processes and generally accepted principles and practices of public administration and transportation system operations.

In lieu of a bachelor's degree, a minimum of 24 years of executive management experience is required.

**Page 5 of 6**

**CODE NO: 0001**

**MEDICAL GROUP:**
**Ability to satisfactorily complete the medical examination for this class.  Must be able to perform the essential functions of this job either with or without reasonable accommodation(s).**

USCA Case #17-7059      Document #1685468           Filed: 07/24/2017      Page 112 of 165

# EXHIBIT F

**HISTORY WITH AFDI ADVERTISING**

Since September 2012, AFDI has contracted for advertising space in the Metro system eight (8) distinct times, running six (6) distinct sets of copy.  The total value of these eight contract was $65,200.

On Friday, May 22, 2015, AFDI submitted new copy portraying the winning cartoon from their Draw Muhammed contest.  The advertiser has asked for the copy to run on twenty (20) Metrobuses running in DC; and five (5) Metrorail dioramas.  Their preferred placement for dioramas includes:  Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station.  L'Enfant Plaza is the only station in their request with space available during the month of June.  The value of this new contract is $20,500 for 4 weeks.

Diorama Availability for June 2015 (4 week period), starting 6/15:

Cheverly
Eisenhower Ave
Glenmont
Huntington
Prince George's Plaza
Rockville
Wheaton
White Flint
L'Enfant Plaza

Diorama Availability for July 2015 (4 week period), starting 7/6:

Archives
Ballston
Cheverly
Clarendon
Court House
Dupont Circle
Eastern Market
Eisenhower Ave
Federal Center, SW
Forest Glen
Friendship Heights
Georgia Ave
Glenmont
Grosvenor
Huntington
Judiciary Square
King Street
Landover
Medical Center
Potomac Ave.
Prince George's Plaza
Rockville

WMATA-AFDI-000384

Tenleytown
Van Ness
Virginia Square
Wheaton
White Flint

**Issue Oriented Advertising in Washington**

As the seat of the federal government, the DC Market is distinct in the amount of issue oriented advertising.  On an annual basis, our issue oriented advertising sales have been as high as 40% (2008/2009), but average approximately 10% - 12% of sales, $2m in revenue.  The bulk of those ads are lobbying efforts and are station dominations at Capitol South, Union Station, Navy Yard and the Pentagon.  Most recent examples include Airline Pilots and Owners Association and War Room Strategies campaigns lobbying against Open Skies; and PETA's campaigns against NIH using live monkeys for testing.  This type of lobbying makes up the bulk (7% - 8%) of the advertising revenues in issue oriented ads.

**Change in Policy**

MTA/NY is changing their policy to position themselves as a "limited public forum, "banning both religious and political ads.   This action would prohibit the type of lobbying ads that are so prevalent in our market; however, strictly defined religious ads are a very insignificant portion of our revenues.  Each year around Christmas and Easter, the Catholic Archdiocese buys transit space encouraging folks to come back to church.  The question then becomes if AFDI's ads can always be defined as religious ads?

WMATA-AFDI-000385

# EXHIBIT G

| From: | Bowersox, Lynn |
| Sent: | Tuesday, May 26, 2015 6:39 PM |
| To: | MortDowney@verizon.net |
| Subject: | Re: Pamela Geller |
| Attachments: | image002.jpg; image003.jpg; image005.png; image006.jpg |

We are.

Sent from my iPhone

On May 26, 2015, at 5:29 PM, "MortDowney@verizon.net" <MortDowney@verizon.net> wrote:

We should be prepared for a discussion with Board on Thurs

# Pamela Geller submits Prophet Muhammad cartoon ads for display on Washington, D.C., Metro buses, trains

BY SASHA GOLDSTEIN

NEW YORK DAILY NEWS

Published: Tuesday, May 26, 2015, 3:33 PM
Updated: Tuesday, May 26, 2015, 5:06 PM

- A

- A

- A

21          16                         1

SHARE THIS URL
<image001.jpg>MIKE STONE/REUTERS
**Political blogger Pamela Geller, American Freedom Defense Initiative's Houston-based founder, speaks at the Muhammad Art Exhibit and Contest on May 3. The winning cartoon has been submitted as part of an ad campaign on Washington, D.C., Metro buses and trains.**

A cartoon image of the Prophet Muhammad could be coming to a bus near you.

Free-speech firebrand Pamela Geller has submitted an ad to the Washington, D.C. transit authority featuring the winning image from the "Draw Muhammad" cartoon contest held earlier this month in Garland, Texas.

"Drawing Muhammad is not illegal under American law, but only under Islamic law," Geller, the 56-year-old head of the American Freedom Defense Initiative, said in a statement posted to Breitbart.com. "Violence that arises over the cartoons is solely the responsibility of the Islamic jihadists who perpetrate it. Either America will stand now against attempts to suppress the freedom of speech by violence, or will submit and give the violent the signal that we can be silenced by threats and murder.

1

**JA 112**

WMATA-AFDI-000293



KAREN BLEIER/AFP/GETTY IMAGES

**A Metro bus, featuring a controversial ad from the American Freedom Defense Initiative, drives on a street in Washington, DC on May 21, 2014. More controversial ads, featuring a cartoon of the Prophet Muhammad, could be coming to the nation's capital.**

"We cannot submit to the assassin's veto."

The ad campaign features the winning cartoon, which depicts a bearded, turban-wearing Muhammad wielding a sword as he growls," You can't draw me!"

A voice bubble coming from the direction of the cartoonist reads, "That's why I draw you."

The D.C. ad campaign features the winning cartoon, below the message, "Support Free Speech," written in all caps in red coloring. Geller wants the images to "run on buses and train dioramas in the Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, and Shady Grove Stations."

WMATA-AFDI-000294



BRANDON WADE/AP

**Personnel remove the bodies of the two gunmen from outside the Garland community center.**

A WMATA spokesman said the agency received the ad on Friday and it is "currently under our standard review process."

"I have no indication of the outcome at this point," spokesman Mike Tolbert told the Daily News.

Muslims consider any depiction of the Prophet Muhammad, cartoonish or not, to be supremely disrespectful and offensive.

The artist, Bosch Fawstin, won $10,000 prize for winning the contest.

The May 3 event at a suburban Dallas community center was just coming to a close when two self-avowed jihadists, Elton Simpson and Nadir Soofi, pulled up and opened fire on security guards patrolling the parking lot.
The two men, roommates who drove from Phoenix, Ariz., intending to attack the event, were both killed in the ensuing shootout. A security guard suffered minor wounds, but no one else was reported injured.


<image004.jpg>REX CURRY/REUTERS
**The shooting in Garland came after the "Draw Muhammad" cartoon event, which awarded $10,000 to artist Bosch Fawstin for his depiction.**

The Islamic State claimed responsibility for the attack, though experts believe the duo was influenced, not directed, by the terror group.

Organizers, including Geller - who has become a lightning rod for critics who think she promotes anti-Islam views - knew they'd be targeted but refused to back down.
"This threat illustrates the savagery and barbarism of the Islamic State," Geller told the Daily News in a statement she later posted on her website. "They want me dead for violating Sharia blasphemy laws. What remains to be seen is whether the free world

WMATA-AFDI-000295

will finally wake up and stand for the freedom of speech, or instead kowtow to this
evil and continue to denounce me."

The WMATA's guidelines for commercial and public service advertising are available
here.

Geller took to blogging after the 9/11 attacks and gained notoriety for her opposition to
the controversial "Ground Zero Mosque."

She recently fought the MTA over her right to post public transit ads featuring a man
in a Middle Eastern headdress with the quote, "Killing Jews is worship that draws us
closer to Allah," and the tagline, "That's his jihad. What's yours?"

Geller previously bankrolled bus ads in Washington, D.C., that featured photos of Nazi
dictator Adolf Hitler talking with a Muslim leader beside the message "Islamic Jew-
hatred: It's in the Quran." In San Francisco, her group ran ads showing American
Journalist James Foley moments before he was beheaded by ISIS terrorists last year.

Who is Pamela Geller?



All the jarring ads deliver a message railing against what the group sees as the spread
of Islam in the West.

The Southern Poverty Law Center calls Geller "the anti-Muslim movement's most
visible and flamboyant figurehead.".



4

**JA 115**

WMATA-AFDI-000296

"She's relentlessly shrill and coarse in her broad-brush denunciations of Islam and makes preposterous claims," the group said of Geller in a profile on its website.

**ON A MOBIE DEVICE?** WATCH THE VIDEO HERE.
sgoldstein@nydail

**JA 116**

WMATA-AFDI-000297

# EXHIBIT H



# EXHIBIT I

**Robert Muise - AFLC**

| | |
|---|---|
| **From:** | Staub, Phillip T. <PStaub@wmata.com> |
| **Sent:** | Tuesday, November 06, 2012 11:56 AM |
| **To:** | dyerushalmi@americanfreedomlawcenter.org; Robert Muise |
| **Cc:** | Heppen, Bruce P.; Shaffer, David |
| **Subject:** | RE: AFDI v. WMATA Costs |
| **Attachments:** | Costs email redacted.pdf |

Gentlemen,

For your information, our freedom of information attorneys have decided the the attached redacted email must be released in accordance with our regulations.  Our freedom of information regulations can be viewed here: http://www.wmata.com/about_metro/docs/pi_9_3_1.pdf

The attached will be enclosed with WMATA's response on or about November 8.

Regards,
Phill

Phillip T. Staub
Associate General Counsel
Washington Metropolitan Area Transit Authority 600 Fifth St., NW Washington, D.C. 20001 Direct Dial: 202 962-2555
Fax: 202 962-2550

🖨 Please consider the environment before printing this email

This electronic message may contain information that is confidential or privileged. The information is intended for the use of the recipient named above. If you are not the intended recipient, be aware that any disclosure, copying, dissemination or use of the information is prohibited and no privilege is waived. If you have received this information in error, please (1) notify me immediately, (2) do not use, copy, disclose or disseminate this information in any way; and (3) collect all copies of the information that may have been inadvertently disseminated.



**From:**
**Sent:** Wednesday, October 17, 2012 3:21 PM
**To:**
**Cc:**
**Subject:** AFDI v. WMATA Costs



This is to confirm that today we reached a settlement of fees & costs under which WMATA will pay $35,000 in total.  We will need a 1099 from your firm in order to process the payment; I will start preparing the accompanying paperwork.

Regards,

Associate General Counsel
Washington Metropolitan Area Transit Authority 600 Fifth St., NW Washington, D.C. 20001 Direct Dial: 

🖶 Please consider the environment before printing this email

This electronic message may contain information that is confidential or privileged. The information is intended for the use of the recipient named above. If you are not the intended recipient, be aware that any disclosure, copying, dissemination or use of the information is prohibited and no privilege is waived. If you have received this information in error, please (1) notify me immediately, (2) do not use, copy, disclose or disseminate this information in any way; and (3) collect all copies of the information that may have been inadvertently disseminated.

**JA 121**

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - x

4    AMERICAN FREEDOM DEFENSE            :

5    INITIATIVE; PAMELA GELLER; and    :

6    ROBERT SPENCER,                     :

7        Plaintiffs                      :

8    v.                                  :    Case No.

9    WASHINGTON METROPOLITAN AREA       :    1:15-cv-01038-GK

10   TRANSIT AUTHORITY, et al,          :

11       Defendants                     :

12   - - - - - - - - - - - - - - - - - x

13

14   Deposition of Washington Metropolitan Area Transit

15         Authority through 30(b)(6) witness

16                LYNN M. BOWERSOX

17                Washington, D.C.

18            Wednesday, April 13, 2016

19                  10:10 a.m.

20

21

22

23   Job No.: 109182

24   Pages 1 through 128

25   Reported by:  Marilyn Feldman, RPR

Bienenstock Court Reporting & Video
Ph: 248.644.8888    Toll Free:  888.644.8080

Lynn M. Bowersox - April 13, 2016           19

1    think that's the point at which he concluded it was

2    not a privileged document.

3         Q    Now the document itself is just two

4    pages, correct, 384 and 385?

5         A    Yes.

6         Q    And you indicated you had asked your

7    staff to prepare it.

8         A    I did.

9         Q    Mr. Stief's e-mail suggests Donna Murray.

10   Is Donna Murray part of your staff?

11        A    She is.

12        Q    Is she the only one who worked on it --

13        A    Yes, I believe she is the only one who

14   worked on it.

15        Q    I would ask you to slow your answer down

16   so we finish completely.

17        A    Sure.

18        Q    Do you know when this was prepared?

19        A    It would have been in the May 2015 time

20   frame.  I can't say specifically on what day, but I

21   remember requesting the document from her and it was

22   in that time frame.  It was background information

23   for me in preparation for another meeting.

24        Q    Now in the complaint we agreed that the

25   allegation was that my client submitted her ad,

Lynn M. Bowersox – April 13, 2016          21

1       Q       But the ad in this litigation came on May

2  21 or May 22, 2015?

3       A       That's right.

4       Q       Now in this Bates 384 it speaks of

5  diorama availability for June 2015 and below that

6  July 2015.  That only suggests prospectively into

7  the future, correct?

8       A       Yes.

9       Q       The memo that was prepared by Ms. Murray

10  was done pretty contemporaneously with the

11  submission by my client?

12      A       It was.

13      Q       Why did you ask your staff to put this

14  memo together?

15      A       Because when prior ads from AFDI had

16  appeared on our system, I was asked by various

17  people, particularly board members, for further

18  information about the ads, where they might run,

19  that kind of thing, and so I was preparing to

20  respond to questions that I thought I might get.

21      Q       In anticipation of those questions?

22      A       Yes.

23      Q       Regarding those prior questions by mostly

24  board members you say --

25      A       Well, in this instance I think that's the

Lynn M. Bowersox - April 13, 2016          39

1        A    Yes.

2        Q        Prior to the institution of the

3  moratorium that put a hold on public issue ads in

4  around May of 2015, were there problems or issues

5  that arose of concern to WMATA regarding the display

6  of political or public issue advertisement?

7        A    Yes.

8        Q        What were those problems or issues that

9  were of concern to WMATA?

10       A        So let me speak to the period since

11 November 2010 when I arrived at WMATA as an

12 employee.  That's the period during which I have had

13 responsibility for the advertising area and I can

14 speak with some degree of expertise about those

15 matters.  But I'm aware generally that historically

16 in the '80s and '90s, the source of concern arose

17 very, very strongly over issue ads that were

18 offensive to some, some that created caricatures of

19 then President Reagan, there were some that created

20 controversy around pro life and pro choice, there

21 were some considered by some people disrespectful of

22 the Catholic church.  So generally I'm aware of

23 those, although I don't remember the specific ads.

24           Since 2010, the issues have been of

25 concern -- the one that created the most

Lynn M. Bowersox - April 13, 2016          40

1    consternation was one that was disrespectful of
2    President Obama with respect to his health care
3    policies and that one, just to characterize what
4    concern means, created a lot of feedback from our
5    employees, from our riders, from the elected
6    officials in the surrounding region, from the
7    community leaders and from the business leaders in
8    this region, all of whom wrote or called, talked to
9    us, talked to the media, etc., expressing their
10   dissatisfaction with our running of such ads,
11   accepting them on the system.
12            Other ads that created concern included
13   the one that I mentioned earlier, PETA had from time
14   to time ads that were disturbing to some people
15   showing animal cruelty.  The Open Skies ad was quite
16   controversial that is described here in war room
17   strategies in the Airline Association.  Condom
18   advertising in some messaging that was geared
19   towards AIDS awareness and prevention, anything to
20   do with marijuana legalization, sometimes sexual
21   orientation and rights of all people could be
22   controversial.  We had -- routinely we were flagging
23   controversial ads monthly to every other month basis
24   that would arise some concern from some aspect of
25   the community.

1      Q      That's a long history of controversy and

2  consternation over both what sounds to me to be the

3  content and the viewpoint of various ads; would you

4  agree?

5      A      Yes.

6      Q      Why in 2015 was this longstanding policy

7  changed?

8      A      Because after nearly 5 years of looking

9  at the issue and the revenues that were generated, I

10  became concerned that the value of the commercial

11  revenues being generated by controversial ads might

12  be outweighed by other considerations that a public

13  agency such as WMATA has and the role that we play

14  in the community and the role we play with our

15  riders and our employees.  And the series of ads war

16  room strategies, PETA, AFDI ads, all taken together,

17  gave me concern.

18          I was aware that previously there had

19  been some effort to try to defer certain ads for

20  certain reasons that were not successful, and our

21  lawyers' interpretation -- and you stop me if I'm

22  walking into another area -- but our lawyers' advice

23  to me was that it's an all or nothing proposition,

24  you either have the forum or you don't have the

25  forum, and if we have controversial ads, we take

Lynn M. Bowersox - April 13, 2016         42

1   them all, and if we don't have controversial ads, we

2   take none.

3            So after looking at all of the factors

4   that I have to consider for our stakeholders, I was

5   determined that we recommend to the board we ought

6   to stop and review whether or not controversial ads

7   and the value they generated were worthwhile in

8   serving transportation for the agency.

9        Q       For the record, when you paused and

10  parenthetically turned to your counsel and said stop

11  me if I'm going into certain areas or something to

12  that effect, you were speaking to Mr. Stief.

13       A       Mr. Stief in terms of privilege because I

14  depend on counsel for advice.

15       Q       Leading up to your decision to recommend

16  to this executive session of the board to place a

17  moratorium on these public issue ads, what kinds of

18  problems did WMATA encounter?  And let me give you

19  some examples, violence, vandalism, loss of

20  ridership, loss of revenue.  Looking at those

21  specific examples or any others that you can think

22  of, what I would like to do is catalog these

23  issues --

24       A       Um-hmm.

25       Q       -- because clearly something on that side

Lynn M. Bowersox - April 13, 2016          43

1   of the ledger caused you to decide that $2 million

2   worth of revenue was not sufficient.

3        A     Sure.  So the variety of ads in that

4   category sparked concerns that included community

5   opposition, and by community opposition I mean

6   negative publicity for WMATA that I was concerned

7   would impact adversely our reputation as a public

8   entity.  It included claims by some leaders in the

9   community that we were perpetuating discrimination

10  by carrying certain messages from certain

11  advertisers, whether that was offense against the

12  president of the United States or that particular

13  religious ad, that we were perpetuating

14  discriminatory messaging, and for a public agency we

15  were looking to hold ourselves to a higher standard.

16        I was concerned about employee morale

17  because our employees took offense to some of our

18  messages that they saw in controversial ads, and

19  unlike our riders were not temporarily passing by,

20  but if it were in a station where the employee

21  worked, were subjected to the message over and over

22  and over again for hours and days and weeks and

23  months.  Those are a few of the concerns.

24        I also had concern about security.  We

25  have had ads vandalized but basically that is

Lynn M. Bowersox - April 13, 2016          44

1    property damage and I can't dimension that in terms

2    of dollar value, it's more of a nuisance matter than

3    it is an economic issue for us with respect to

4    vandalism.

5         Q       Let me just ask you to pause if I may.

6         A       Um-hmm.

7         Q       Do you have any indication that the

8    vandalism was related to the content or subject

9    matter of the ads or just vandalism that occurred

10   simply?

11        A       I do believe in certain instances

12   vandalism was specific to the content of ads.

13        Q       What led you to that belief?

14        A       Because it wasn't just a matter of

15   damaging an ad.  Sometimes there were messages

16   written on ads that would contradict the message in

17   the ad, that were specific to the message in the ad.

18        Q       Do you recall any type of example?

19        A       Yes, with respect to PETA advertising I

20   would see on board trains, messages installed on the

21   interior of rail cars.

22        Q       What kind of messages?

23        A       So you would take a message that was

24   about a monkey and make implications about PETA and

25   others who were trying to be sympathetic to monkeys

Bienenstock Court Reporting & Video
Ph: 248.644.8888    Toll Free:  888.644.8080
**JA 130**

1    in some very hyperbolic and racially charged ways.

2         Q      So kind of a counter-messaging to the ad

3    itself?

4         A      Exactly.

5         Q      Any other aspects of this negative

6    outcome for these public issue ads?  You have

7    indicated communities' opposition which was negative

8    publicity; you have indicated claims by some leaders

9    regarding perpetuating discrimination; you have

10   mentioned employee morale; and then finally the

11   security/vandalism issue.

12        A      There's another security issue and that

13   is one that I have discussed with our law

14   enforcement operation here as well as Homeland

15   Security and that is ads that would incite violence

16   on the system in some way because they are

17   concurrent with world events, things going on that

18   are in the news that would call attention to Metro

19   in a specific time period that might make us --

20   might give people ideas about Metro being a sense of

21   place where violence might occur based on messages

22   carried within the system.

23        Q      What kinds of ads would fall under this

24   category?

25        A      Well, there was an occasion a couple of

Lynn M. Bowersox - April 13, 2016     46

1   years ago when your client's ad gave rise to that

2   concern.  I don't remember exactly what the message

3   was but it was in the wake of the Benghazi matter

4   and WMATA sought to defer the placement of the ad

5   for 30 days until the environment changed, and the

6   court denied WMATA.

7        Q        Any other ads that come to mind regarding

8   that issue of inviting violence?

9        A        Not recently.

10       Q        So just my client's prior ad fits into

11  that category?

12       A        In terms of that level of security

13  concern, yes.

14       Q        Did you have the same concern regarding

15  the current advertisement that's relevant to this

16  litigation?

17            MR. STIEF:  You can answer that question.

18       A        Okay.  I thought you were taking a breath

19  because you were going to insert an objection.

20            MR. STIEF:  No.

21       A        I did.

22       Q        Explain to me that concern.

23       A        The ad appeared in another location in

24  Texas and there was local violence associated with

25  the cartoon context, and it's hard to distinguish

1    AFDI's messaging versus other things that were

2    happening in that location so I can't say there was

3    a cause and effect.   But it came to my attention

4    because of the news media coverage of the violence

5    in Texas that the drawing of the Prophet Mohammad in

6    any certain fashion was so offensive to certain

7    members of the Islamic community that it could cause

8    people to react in a violent manner.

9          Q        Just to point for the record, you

10   indicate Prophet Mohammad.

11         A        Um-hmm.

12         Q        Is that the same of some historical

13   individual or --

14         A        Yes.

15         Q        What I'm getting at is is the word

16   prophet an adjective here or part of a proper noun?

17         A        Part of a proper noun in my use.

18         Q        So other than negative publicity

19   community opposition is no. 1, no. 2, claims by some

20   people that WMATA was perpetuating discrimination,

21   no. 3, employee morale, no. 4, security/vandalism,

22   no. 5, security/inciting violence, are there any

23   other issues that stacked up on the side of the

24   ledger that would bring you to suggest a moratorium?

25         A        It was administratively burdensome.   The

Lynn M. Bowersox - April 13, 2016        48

1    controversial ads created a lot of administrative
2    burden in terms of having to review matters that
3    came from Outfront advertising, determine whether or
4    not things were going to fit into one of the
5    exception categories, ask counsel to review creative
6    and getting back to us in a timely fashion.  There
7    was a process in place for looking at certain ads
8    that might fall into certain categories such as
9    obscenities or other categories where we would want
10   to consider not accepting an ad.  And so those
11   tended to come more in the controversial ad category
12   rather than the commercial ad category.  So there
13   was some administrative burden.
14        Q    You said you began your position in
15   November 2010?
16        A    I did.
17        Q    At that time were you in the same
18   position that you are today?
19        A    I had a slightly different title.
20        Q    But the same responsibilities?
21        A    Managing director of public relations.
22        Q    But the same responsibilities?
23        A    Yes.
24        Q    Other than possibly the security/incite
25   violence, all of the other issues you have

Lynn M. Bowersox - April 13, 2016          49

1    identified here today existed throughout your tenure
2    since November 2010, correct?
3         A    Yes.
4         Q    What was the precipitating event that
5    brought you to suggest a moratorium in May of 2015?
6         A    I don't think there was any single event,
7    it was cumulative.
8         Q    So it was not my client's ad per se?
9         A    Not per se.
10         Q    What percentage of your issue was related
11    to my client's advertisement?
12         A    I would say that the timing of that ad
13    was a factor in making that recommendation.  I had
14    before me a number of controversial ads that had
15    come in through the pipeline and then that one was
16    sort of -- that ad coming from AFDI, my concerns
17    about that ad, certainly it -- 60 to 70 percent of
18    the timing of my recommendation.
19         Q    Like the straw that broke the camel's
20    back?
21         A    That's well said.
22         Q    I note that there was a specific decision
23    by WMATA not to take down noncompliant ads that were
24    running on the date that the moratorium went into
25    effect, correct?

Lynn M. Bowersox - April 13, 2016        102

1        Q        Was one of your concerns when you

2    proposed the moratorium to the executive session the

3    possibility of violence arising from any of my

4    client's ads?

5        A        Can you repeat the question?

6            (Record read.)

7        A        Yes.

8        Q        Specifically what was that concern?

9        A        As I said with respect to the cartoon

10   drawing, there had been violence over that issue in

11   Texas just prior to the ad placement sought by your

12   client.  I had a concern that there might be other

13   similar reactions were that ad to appear in our

14   system.

15       Q        Were you concerned about generic violence

16   arising from that ad or did you have specific

17   concern about a certain reaction from a certain

18   group?

19       A        Just generic.

20       Q        So it happened in Texas and therefore it

21   might happen in the future?

22       A        It could.

23       Q        Nothing more choate than that though?

24       A        No.

25       Q        Have there been any ads rejected under

Lynn M. Bowersox - April 13, 2016         107

 1   so anything that had not been installed and wasn't

 2   already in the pipeline did not go forward,

 3   including your client's ad.

 4        Q     I understand that.  However, WMATA was

 5   aware that my client's ad was presented for

 6   submission at least as of May 22; is that correct?

 7        A     That's correct.

 8        Q     And you have testified that at that point

 9   in time WMATA knew the ad was compliant with the ad

10   policies in existence at that time, correct?

11        A     Yes.

12        Q     There was no reason for WMATA to reject

13   the ad at that time, correct?

14              MR. STIEF:  Objection, form and

15   foundation.  You can answer.

16        A     There was no reason.

17        Q     Turning to the new policy, would you

18   point to me where in the new policy there would be a

19   provision that would reject this ad as it was

20   presented and as it existed in the complaint at

21   paragraphs 23 and 24?

22        A     In the new policy?

23        Q     Yes, ma'am.

24        A     So I believe that it would be under the

25   resolve clause of the resolution under the new

1     policy.   So it's the first page that the commercial

2     advertising space is closed to issue oriented ads

3     including political, advocacy, and religious ads.

4     So this ad would be an advocacy ad and therefore

5     precluded.

6          Q     What about this ad is advocacy?

7          A     Just so you know, I do not make that

8     determination but I'll represent the authority on

9     this.   We have a panel of three attorneys who

10    interpret the board policy and determine what is

11    issue oriented, political, religious, and advocacy.

12    They would give me that guidance.   But I believe

13    that this ad would come under advocacy because it

14    advocates free speech and it does not try to sell

15    you a commercial product.   But that's not a legal

16    interpretation, that's merely my business

17    interpretation.

18         Q     Who are these three attorneys?

19         A     Their names are Sonia Bacchus,

20    B-a-c-c-h-u-s; Phil Staub, P-h-i-l S-t-a-u-b; and

21    Mark Pohl, the general counsel, make up that panel.

22         Q     They are all in house?

23         A     Yes.

24         Q     Who made the conscious decision to hold

25    my client's advertisement, that is to say not

Lynn M. Bowersox - April 13, 2016          113

1     Q     Or Ms. Murphy.

2     A     Murray.  I don't know if it was verbal or

3  by e-mail, but at some point it must have

4  transmitted the ad.

5     Q     I don't see any communication in the

6  documents produced.  Do you know if that document

7  still exists?

8     A     I don't.

9           MR. YERUSHALMI:  Will you check, Mr.

10  Stief, to see if that still exists?

11          MR. STIEF:  I can look into it.

12     Q     Since the passage of the new policy in

13  November of 2015, has WMATA approved commercial ads

14  that also contained advocacy issues or religious

15  issues or political issues?

16     A     Not to my knowledge.

17     Q     Ultimately after you consult with this

18  panel of three lawyers, if necessary, it's your

19  decision whether an ad runs or not?

20     A     So yes, I mean it is.  There's a process

21  for appealing that decision, but yes, ultimately it

22  lies with me.

23     Q     In other words, putting aside any

24  administrative appeal, you are the final

25  decision-maker?

1  read and sign.

2          (Signature not having been waived, the

3  deposition of LYNN M. BOWERSOX was adjourned at 2:10

4  p.m.)

5                    *   *   *

6

7          ACKNOWLEDGMENT OF DEPONENT

8      I, LYNN M. BOWERSOX, do hereby acknowledge I

9  have read and examined the foregoing testimony, and

10 the same is a true, correct and complete

11 transcription of the testimony given by me, and any

12 corrections appear in the attached errata sheet

13 signed by me.

14

15 _____     _____

16 Date                    LYNN M. BOWERSOX

17

18

19

20

21

22

23

24

25

128

1   CERTIFICATE OF SHORTHAND REPORTER – NOTARY PUBLIC

2      I, Marilyn J. Feldman, Registered Professional

3   Reporter, the officer before whom the foregoing

4   proceedings were taken, do hereby certify that the

5   foregoing transcript is a true and correct record of

6   the proceedings; that said proceedings were taken by

7   me stenographically and thereafter reduced to

8   computerized transcription under my supervision;

9   that reading and signing was requested; and that I

10  am neither counsel for, related to, nor employed by

11  any of the parties to this case and have no

12  interest, financial or otherwise, in its outcome.

13     IN WITNESS WHEREOF, I have hereunto set my hand

14  and affixed my notarial seal this 19th day of April

15  2016.

16  My commission expires:

17  December 14, 2016

18

19

20  _Marilyn J. Feldman_

21  NOTARY PUBLIC IN AND FOR

22  THE DISTRICT OF COLUMBIA

23

24

25

**JA 141**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FREEDOM DEFENSE    :
INITIATIVE,    et. al.,    :
    :
    Plaintiffs,    :
    :
    v.    : Civil Action No. 15-1038 (GK)
    :
WMATA, et. al.,    :
    :
    Defendants.    :

## ORDER

Plaintiffs, American Freedom Defense Initiative, Pamela Geller and Robert Spencer, (collectively, "Plaintiffs," or "AFDI"), bring this action against the Washington Metropolitan Area Transit Authority, et. al., (collectively, "Defendants," or "WMATA"), alleging violations of their First Amendment rights. This dispute arose when Plaintiffs submitted an ad to WMATA to display on its property. After Plaintiffs submitted the ad, WMATA changed its policy to close its advertising space to all "issue-oriented" advertising. WMATA then rejected Plaintiffs' ad under the new policy. Plaintiffs claim that WMATA's denial is a prior restraint on Plaintiffs' speech in violation of their First Amendment rights.

This matter is before the Court on the Parties' Cross-Motions for Summary Judgment [Dkt. Nos. 19, 20]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 20, 25], and Replies [Dkt. Nos.

**JA 142**

25, 29], and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED, that Defendant's Motion for Summary Judgment shall be **granted**; and it is further

ORDERED, that Plaintiff's Motion for Summary Judgment shall be **denied**.


March 28, 2017                          Gladys Kessler
                                        United States District Judge


**Copies to**: attorneys on record via ECF

-2-

**JA 143**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE, et. al., | : : : |
| Plaintiffs, | : : |
| v. | : Civil Action No. 15-1038 (GK) |
| WMATA, et. al., | : : |
| Defendants. | : : |

MEMORANDUM OPINION

Plaintiffs, American Freedom Defense Initiative, Pamela Geller and Robert Spencer, (collectively, "Plaintiffs," or "AFDI"), bring this action against the Washington Metropolitan Area Transit Authority, et. al., (collectively, "Defendants," or "WMATA"), alleging violations of their First Amendment rights. This dispute arose when Plaintiffs submitted an ad to WMATA to display on its property. After Plaintiffs submitted the ad, WMATA changed its policy to close its advertising space to all "issue-oriented" advertising. WMATA then rejected Plaintiffs' ad under the new policy. Plaintiffs claim that WMATA's denial is a prior restraint on Plaintiffs' speech in violation of their First Amendment rights.

1

**JA 144**

This matter is before the Court on the Parties' Cross-Motions for Summary Judgment [Dkt. Nos. 19, 20]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 20, 25], and Replies [Dkt. Nos. 25, 29], and the entire record herein, and for the reasons stated below, Defendants' Motion for Summary Judgment is **granted**, and Plaintiffs' Motion for Summary Judgment is **denied.**

I.   **BACKGROUND**

  A. **Factual Background**

Plaintiff AFDI is a nonprofit organization incorporated under the laws of New Hampshire. Compl. ¶ 7 [Dkt. No. 1]. Plaintiff Pamela Geller is the President of AFDI. Id. ¶ 10. Plaintiff Robert Spencer is the Vice President of AFDI. Id. ¶ 11. AFDI is dedicated to promoting and protecting the right to freedom of speech under the First Amendment. Plaintiffs' Statement of Material Facts ¶¶ 3-4 ("Pls.' SMF") [Dkt. No. 20-1]. Plaintiffs frequently purchase advertising space on transit authority property in major cities throughout the United States to run ads promoting its message on current events and political issues. Pls.' SMF ¶¶ 5-6. Plaintiffs have also frequently litigated transit authorities' rejection of those ads.

WMATA is a government agency that was established through a congressionally approved interstate compact to provide public

2

**JA 145**

transportation in the Washington, D.C. metropolitan area. See D.C. Code § 9-1107.01(80). WMATA operates the Metrorail and Metrobus systems in the Washington, D.C. metropolitan area. Defendants' Motion for Summary Judgment at 3 ("Mot.") [Dkt. No. 19-1].

WMATA leases advertising space on its buses and on free-standing dioramas in its subway stations. Pls.' SMF ¶ 9. Before May 28, 2015, "WMATA had a policy of accepting a broad range of issue-oriented ads." Mot. at 5. WMATA leased advertising space for issue-oriented and political advertisements under its earlier policy. Id. ¶¶ 29-30; Defendant's Reply to Plaintiff's Statement of Material Facts ¶¶ 29-30 (Defs.' Rep. to Pls.' SMF") [Dkt. No. 25-1].

On or about May 20, 2015, Plaintiffs submitted two proposed ads to WMATA's advertising agent for display on WMATA's buses and free-standing dioramas. Pls.' SMF ¶ 23. The proposed ads appear as follows:



Id. ¶ 24.



Id. ¶ 25.

On May 22, 2015, WMATA's advertising agent responded to
Plaintiffs' submission stating, "The copy has been submitted to
the transit authority. We are also looking into available
inventory. I will let you know about both as soon as I hear back."
Id. ¶ 26-27.

On May 28, 2015, WMATA's Board of Directors unanimously
adopted a motion ("May 28 Moratorium" or "Restriction") closing
"WMATA's advertising space to any and all issue-oriented
advertising, included but not limited to, political, religious,
and advocacy advertising until the end of the calendar year." Id.
¶¶ 44, 50. The motion also stated that the Board would "review
what role such issue-oriented advertising has in WMATA's mission

4

. . .and will seek public comment and participation for its consideration before making a final policy determination." Bowersox Decl., Ex. A [Dkt. No. 19-3].

WMATA rejected Plaintiffs' ads after the May 28 Moratorium was enacted. Pls.' SMF ¶¶ 59-60; Defs.' Rep. to Pls.' SMF ¶¶ 59-60.

On November 19, 2015, the WMATA Board of Directors adopted Resolution No. 2015-55 closing "WMATA's Commercial Advertising Space to issue-oriented ads, including political, religious, and advocacy ads. . ." Id., Ex. B. The Resolution included further "Guidelines Governing Commercial Advertising," which specified that,

> 9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited. . .11. Advertisements that support or oppose any political party or candidate are prohibited. 12. Advertisements that support or oppose any religion, religious practice or belief are prohibited. . . [and] 13. Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertisers are prohibited.

> Id.

**B. Procedural Background**

On July 1, 2015, Plaintiffs filed their Complaint. On August 5, 2016, Defendants filed their Motion for Summary Judgment. On

5

**JA 148**

September 5, 2016, Plaintiffs filed their Cross-Motion for Summary
Judgment ("Cross-Mot.") [Dkt. No. 20]. On October 3, 2016,
Defendants filed their Opposition to Plaintiffs' Cross-Motion for
Summary Judgment and Reply (Defs.' Rep.") [Dkt. No. 25]. On October
31, 2016, Plaintiffs filed their Reply ("Pls.' Rep.") [Dkt. No.
29].

## II.  STANDARD OF REVIEW

Summary judgment should be granted only if the moving party
has shown that there is no genuine dispute of material fact and
that the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56, see also Celotex Corp. v. Catrett, 477 U.S.
317, 322 (1986); Johnson v. Perez, 823 F.3d 701, 705 (D.C. Cir.
2016). A dispute of material fact is "'genuine'. . .if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).

In a summary judgment motion, the moving party has the
responsibility for "informing the district court of the basis for
its motion, and identifying those portions of the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, which it believes demonstrate
the absence of a genuine issue of material fact." Celotex, 477

6

**JA 149**

U.S. at 323 (internal quotation omitted).

The court should view the evidence in favor of the nonmoving party and draw all reasonable inferences in favor of that party making credibility determinations or weighing the evidence, Johnson, 823 F.3d at 705. "However, the nonmoving party may not rely solely on allegations or conclusory statements. Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor." Krishnan v. Foxx, 177 F. Supp. 3d 496, 503 (D.D.C. 2016) (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999)).

## III. ANALYSIS

### A. Forum Analysis

The Parties do not dispute that Plaintiffs' ads are protected speech. Courts analyze restrictions on protected speech on government property for compliance with the First Amendment under the public forum doctrine. Initiative & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066, 1070 (D.C. Cir. 2012). Under the public forum doctrine, government property is divided into three categories: 1) traditional public forums, 2) designated public forums, and 3) nonpublic forums. Id. "[T]he extent to which the Government can control access [to its property] depends on the nature of the relevant forum. Cornelius v. NAACP Legal Def. & Educ.

7

Fund, Inc., 473 U.S. 788, 800 (1985).

Traditional public forums, such as streets and parks, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)) (internal quotation marks omitted).

A designated public forum is government property "which the state has opened for use by the public as a place for expressive activity." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983) "The Constitution forbids a state to enforce certain exclusions from a [designated public forum] even if it was not required to create the forum in the first place." Id. "[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest." Cornelius, 473 U.S. at 800.

A nonpublic forum "is not by tradition or designation a forum for public communication," Perry, 460 U.S. at 46, and the First Amendment does not guarantee unlimited expression in this forum. Rather, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression

8

**JA 151**

merely because public officials oppose the speaker's view." Id.
Access to a nonpublic forum can be restricted as long as the
restrictions are viewpoint neutral and reasonable. Cornelius, 473
U.S. at 800.

Plaintiffs contend that WMATA's advertising space was a
designated public forum at the time they submitted their ads.
Cross-Mot. at 13-20. WMATA does not dispute this assertion. See
Defs.' Rep. at 3-4. Plaintiffs argue that this Court should
therefore analyze WMATA's rejection of AFDI's ads by using the
higher standard that applies to designated public forums. WMATA
contends that its advertising space was a nonpublic forum when it
rejected AFDI's ad, and therefore the rejection should be analyzed
under the standard that applies to nonpublic forums. This Court
agrees with WMATA. WMATA's new guidelines must therefore be
viewpoint neutral and reasonable. Pleasant Grove City v. Summum,
555 U.S. 460, 470 (2009).

### 1. **WMATA's Restriction is Viewpoint Neutral**

The parties do not dispute that the government has a right to
convert a designated public forum into a nonpublic forum. See Mot.
at 7-8; Cross-Mot. at 17-18; Pls.' Rep. at 10; Cornelius, 473 U.S.
at 802 ("the government is not required to indefinitely retain the
open character of [a] facility"). However, Plaintiffs argue that

9

**JA 152**

WMATA's decision to close its property to issue-oriented advertising was improper because the change specifically targeted Plaintiffs' ads.[1] See Pls.' Rep. at 10.

Needless to say, it would be unconstitutional for WMATA to close its property to issue-oriented advertising "merely as a ruse for impermissible viewpoint discrimination." See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 394 (1993) ("[T]the First Amendment forbids the government to regulate speech

---

[1]    To the extent that Plaintiff brings their claims under WMATA's pre-May 28, 2015 policy which permitted the publication of issue-oriented ads on WMATA's property, WMATA's May 28 Moratorium mooted any such claim. See AFDI v. MTA, 815 F.3d 105 (2d. Cir. 2016). In AFDI, the same Plaintiffs sued the New York Metropolitan Transit Authority for refusing to publish a similarly political ad. Id. After the district court granted Plaintiffs' Motion for a preliminary injunction, the MTA changed its advertising standards to convert MTA's property from a designated public forum to a nonpublic forum. Id. The district court held that the MTA's new policy mooted Plaintiffs' claims, and the Second Circuit affirmed. Id.

The AFDI case is consistent with the law in our Circuit. See Initiative & Referendum Inst., 685 F.3d at 1074 ("[a] challenge to a superseded law is rendered moot unless there is evidence indicating that the challenged law likely will be reenacted"). Even considered in the light most favorable to Plaintiffs, they have not presented any facts suggesting that WMATA is likely to reverse its regulation. On the contrary, WMATA's May 28 Moratorium was made permanent on November 19, 2015 and has remained in effect ever since. Plaintiffs' argument that WMATA's financial difficulties will force it to redesignate its property as a designated public forum are nothing more than speculation.

**JA 153**

in ways that favor some viewpoints or ideas at the expense of others") (internal quotations omitted); Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 77 (1st Cir. 2004).

WMATA argues that its reasons for closing its advertising space to issue oriented ads were "that controversial ads were hurting WMATA's reputation with the community; ensuring employee morale, which was adversely affected by constant exposure to messages they might find offensive; minimizing vandalism directed at issue-oriented ads; and reducing the administrative burden on WMATA, its outside advertising management company, and its counsel, who were forced to review controversial ads to determine if they complied with the former advertising policy." Defs.' Rep. at 10 (citing Bowersox Depo at 41:6-48:13).

Plaintiffs argue that the timing of WMATA's May 28 Moratorium shows that it was targeted at Plaintiffs' ads. Specifically, Plaintiffs allege that because their ad was pending when WMATA took what they characterize as an "unprecedented and hasty action of passing a 'moratorium' which created a sea change in the way WMATA had been doing business for decades," the new guidelines must have been "timed so as to prevent the display of Plaintiffs' advertisements." Pls.' Rep. at 10 (emphasis in original).

However, Defendants cite many cases in which the government

11

**JA 154**

changed its guidelines during the pendency of a lawsuit and the court did not infer viewpoint discrimination from such timing. For example, in Ridley, a case which Plaintiffs cite as well, the defendant agreed to run an ad in April 2002, mooting a pending appeal over the refusal to publish the ad, rejected an additional ad in August 2002, and changed its guidelines in January 2003. Ridley, 390 F.3d at 74-75. Despite the timing of the changed guidelines, the court found "no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements." Id. at 77.

In Ridley, the court did find that one of the defendants had engaged in viewpoint discrimination based on statements by some of its officials. Id. at 87-88. Here, Plaintiffs rely on a statement by Defendants' representative that Plaintiffs' ad was the "straw that broke the camel's back" and pushed WMATA to change its guidelines. Even in the light most favorable to Plaintiffs, that statement does not support an inference that WMATA's guidelines were revised for the purpose of rejecting Plaintiffs' ads. Rather, the statement suggests that WMATA had previously been considering a policy change for other reasons and only saw Plaintiffs' ad as additional support for their previous thinking.

12

**JA 155**

Plaintiffs argue that because WMATA published issue-oriented ads in the past, the changes to its guidelines and subsequent rejection of Plaintiffs' ads can only be due to a preference for other controversial messages over Plaintiffs' message. Cross-Mot. at 25-26. However, having established that WMATA was permitted to change its guidelines, the relevant inquiry is not whether WMATA allowed other controversial messages before the May 28 Moratorium, but whether WMATA has consistently enforced the new guidelines since they were enacted. Plaintiffs have submitted no evidence that the new guidelines have been inconsistently enforced.[2]

### 2. WMATA's Restriction is Reasonable

"A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use." Initiative & Referendum Inst., 685 F.3d at 1073 (citing Perry, 460 U.S. at 50-51). A restriction "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808 (emphasis in

_____

[2] Plaintiffs' argument that the government may not "discriminate" against non-commercial ads in favor of commercial ads, see Pls.' Rep. at 12, is unsupported by the case it cites, Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 514 (1981), and runs counter to the holdings of many of the other cases cited above upholding guidelines that prohibit political or issue-oriented advertising. See e.g. SMART, 698 F.3d 885.

13

**JA 156**

original).   There  is  no  "requirement  that  the  restriction  be
narrowly    tailored   or   that   the   Government's   interest   be
compelling,"  Cornelius,  473  U.S.  at  809,  especially  because  the
nonpublic  forum  is  "rarely  []the  only  means  of  contact  with  a
particular  audience."  Id.

Plaintiffs  respond  that  "it  is  unreasonable  to  argue  that  an
ad  displayed  on  the  outside  of  a  bus  traveling  through  Washington,
D.C.-  a  bustling  city  in  which  passengers  and  outside  observers
are  besieged  by  a  cacophony  of  expressive,  and  quite  often
political  and  controversial,  media-  would  somehow  interfere  with
the  operation  of  WMATA's  bus  system."  Cross-Mot.  at  28.

Yet,  Defendants  explained  how  such  ads  have  interfered  with
WMATA's  operations.   For  example,  WMATA  stated  that  controversial
ads  had  led  to  vandalism  directed  at  issue-oriented  ads  and  an
administrative  burden  on  WMATA's  advertising  agent  and  counsel  who
were  forced  to  review  them  to  determine  if  they  complied  with  the
former  advertising  policy.   Courts  have  consistently  held  that
restrictions   on   issue-oriented   advertising   on   public
transportation  for  reasons  such  as  these  are  reasonable. This  Court
finds  WMATA's  restrictions  to  be  reasonable  as  well.  See  Lehman  v.
City  of  Shaker  Heights,  418  U.S.  298,  304  (1974)  ("the  managerial
decision   to   limit   car   card   space   to   innocuous   and   less

14

**JA 157**

controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation"); SMART, 698 F.3d at 892-893.

### B. **WMATA's Restriction Is not Unconstitutionally Vague**

Plaintiffs argue that the May 28 Moratorium and subsequent guidelines are "hopelessly vague," and therefore violate the First Amendment by giving "officials [] unbridled discretion over [the] forum's use." Cross-Mot. at 16 (quoting Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). A law or guideline limiting free speech must have "narrow, objective, and definite standards to guide the licensing authority." Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147, 151 (1969).

WMATA's advertising guidelines include sufficiently definite standards regarding what constitutes "issue-oriented ads." The guidelines specify that the Restriction is "including but not limited to, political, religious and advocacy advertising." Bowersox Decl., Ex. B. The guidelines further elaborate each of the modifiers in that part of the Restriction. For example, the guidelines state that "[a]dvertisements that promote or oppose any political party or candidate are prohibited;" and that "[a]dvertisements that promote or oppose any religion, religious practice or belief are prohibited; and that "[a]dvertisements

15

**JA 158**

intended to influence members of the public regarding an issue on which there are varying opinions are prohibited," among other specifications. Id.

Thus, WMATA's Restriction is clearly not unconstitutionally vague. See SMART, 698 F.3d 885 (held that a restriction on "political or political campaign advertising" was "not so vague or ambiguous that a person could not readily identify the applicable standard" and therefore upheld another transit authority's rejection of another one of plaintiffs' ads).

Defendants' Motion for Summary Judgment is therefore granted and Plaintiffs' Cross-Motion for Summary Judgment is denied.[3]

---

3 Plaintiffs seek nominal damages under 42 U.S.C. § 1983. Defendants argue that WMATA is immune from suit under Section 1983, and that Plaintiffs are therefore not entitled to nominal damages. Because this Court finds that Defendants are not liable, Plaintiffs are not entitled to nominal damages and the Court need not reach the issue of whether WMATA possesses sovereign immunity.

16

**JA 159**

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment shall be **granted**; and Plaintiffs' Cross-Motion for Summary Judgment shall be **denied**. An Order shall accompany this Memorandum Opinion.

March 28, 2017                          Gladys Kessler
                                        United States District Judge

**Copies to**: attorneys on record via ECF

17

**JA 160**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Appellants*